**No. 22-3286**

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

JEFFREY GOOD,

Plaintiff-Appellant,

v.

UNITED STATES DEPARTMENT OF EDUCATION, *et al.*,

Defendants-Appellees.

On Appeal from the United States District Court
for the District of Kansas
No. 2:21-cv-2539-JAR-ADM
Hon. Julie A. Robinson

**BRIEF FOR DEFENDANT-APPELLEE
HIGHER EDUCATION LOAN AUTHORITY
OF THE STATE OF MISSOURI**

Matthew D. Guletz
Thompson Coburn LLP
One U.S. Bank Plaza
St. Louis, MO 63101
(314) 552-6311
mguletz@thompsoncoburn.com

*Attorneys for Defendant-Appellee
Higher Education Loan Authority
of the State of Missouri*

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................... iii

RULE 28.2(C)(3) STATEMENT ......................................................... viii

GLOSSARY .............................................................................................. ix

JURISDICTION ..........................................................................................1

STATEMENT OF THE ISSUES ................................................................2

STATUTES .................................................................................................2

STATEMENT OF THE CASE ...................................................................2

     A.    MOHELA .....................................................................................2

     B.    MOHELA's Servicing Of Mr. Good's Student Loans ........................5

     C.    Proceedings Below ............................................................................6

SUMMARY OF THE ARGUMENT .........................................................8

STANDARD OF REVIEW ......................................................................13

ARGUMENT .............................................................................................14

I.    The District Court Properly Entered Judgment For MOHELA Because It Is An Arm Of The State Of Missouri Entitled To Eleventh Amendment Immunity .....................................................................................14

     A.    Eleventh Amendment immunity extends to arms of the state. ...........14

     B.    The Tenth Circuit's four "primary factors" test is dispositive and warrants the conclusion that MOHELA is an arm of the State of Missouri. ..............................................................................16

          1.    The first factor favors immunity because Missouri law treats MOHELA as a part of state government. .......................17

2.    The second factor favors immunity because the State of Missouri possesses expansive control over MOHELA, which has little autonomy. ......................................................25

3.    The third factor, assessing MOHELA's finances, favors immunity or alternatively is neutral because MOHELA depends on state authorization to derive its funds, is subject to state requirements and requests for funds, and the state restricts MOHELA's ability to generate revenue.......33

4.    The fourth factor decidedly favors immunity because MOHELA is concerned primarily with state-wide affairs. ......37

C.    The Court need not proceed to the second step of the analysis, the "twin reasons" underlying the Eleventh Amendment, but those considerations do not sway the ultimate result that MOHELA is an arm of the state............................................................40

CONCLUSION ..........................................................................................44

STATEMENT REGARDING ORAL ARGUMENT .............................................46

CERTIFICATE OF COMPLIANCE.......................................................................47

CERTIFICATE OF SERVICE ..............................................................................48

ADDENDUM

Pertinent statutory provisions .............................................................. ADD-1

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Aguon v. Commonwealth Ports Auth.*, 316 F.3d 899 (9th Cir. 2003)......................25

*Barnes v. Wagoner Cnty. Rural Water Dist. No. 4*, No. 15-CV-479-JHP, 2016 WL 1627622 (E.D. Okla. Apr. 22, 2016) .........................24

*Cas. Reciprocal Exch. v. Missouri Emps. Mut. Ins. Co.*, 956 S.W.2d 249 (Mo. banc 1997)...................................................................30, 42

*Couser v. Gay*, 959 F.3d 1018 (10th Cir. 2020) .................................................13, 17

*Dep't of Transp. v. Ass'n of Am. Railroads*, 575 U.S. 43 (2015) ...........................41

*Duke v. Grady Mun. Sch.*, 127 F.3d 972 (10th Cir. 1997)
................................................................................12, 15, 16, 17

*Dykes v. Missouri Higher Educ. Loan Auth.*, No. 4:21-CV-00083-RWS, 2021 WL 3206691 (E.D. Mo. July 29, 2021) ..........................42

*Gordon v. Duncan*, 2010 WL 1462555 (D.Or. 2010) ............................................40

*Gowens v. Capella Univ., Inc.*, No. 4:19-CV-362-CLM, 2020 WL 10180669 (N.D. Ala. June 1, 2020)
........................................................ 19, 20, 25, 27, 33, 35, 36, 39, 40

*Hennessey v. Univ. of Kansas Hosp. Auth.*, 53 F.4th 516 (10th Cir. 2022)
.................... 8, 9, 12, 13, 14, 15, 16, 17, 25, 26, 27, 32, 33, 34, 36, 37, 40, 43, 44

*Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30 (1994)...........................12, 21

*In re Stout*, 231 B.R. 313 (Bankr. W.D. Mo. 1999) .................................................19

*Karns v. Shanahan*, 879 F.3d 504 (3d Cir. 2018)....................................................24

*Kozaczek v. New York Higher Educ. Services Corp.*, 503 Fed. Appx. 60 (2d Cir. 2012)................................................................................40

*Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374 (1995) .................................41

*Lightfoot v. Henry Cty. Sch. Dist.*, 771 F.3d 764 (11th Cir. 2014)..........................15

*Little v. Tennessee Student Assistance Corp.*, 537 F. Supp. 2d 942
(W.D. Tenn. 2008) ................................................................40

*MAP v. Bd. of Trustees*, No. 12-CV-02666-RM-KLM, 2013 WL
5386897 (D. Colo. Aug. 21, 2013), *report and recommendation
adopted sub nom. MAP v. Bd. of Trustees for Colorado Sch. for the
Deaf & Blind*, No. 12-CV-02666-RM-KLM, 2014 WL 3748185
(D. Colo. July 29, 2014) ........................................................38

*McCoy v. Kansas*, No. 16-2129-JAR, 2016 WL 3549100 (D. Kan.
June 30, 2016)......................................................................14

*Menorah Med. Ctr. v. Health & Educ. Facilities Auth.*, 584 S.W.2d 73
(Mo. 1979) ...............................................................22, 23, 29

*Moor v. Alameda Cnty.*, 411 U.S. 693 (1973) .........................................22

*Myers v. Koopman*, 738 F.3d 1190 (10th Cir. 2013), *as amended on
denial of reh'g* (Jan. 8, 2014) ...............................................13

*Nebraska v. Biden*, 52 F.4th 1044 (8th Cir. 2022)......................15, 19, 44

*Patterson v. Rural Water Dist. 2*, 438 F. Supp. 3d 1258 (W.D. Okla.
2020) ....................................................................................24

*Pub. Sch. Ret. Sys. of Missouri v. State St. Bank & Tr. Co.*, 640 F.3d
821 (8th Cir. 2011)...............................................................32

*Regents of the Univ. of California v. Doe*, 519 U.S. 425 (1997)...........................15

*Sorrell v. Illinois Student Assistance Comm'n*, 314 F. Supp. 2d 813
(C.D. Ill. 2004)......................................................................40

*State Highway Comm'n of Wyoming v. Utah Const. Co.*, 278 U.S. 194
(1929) ..................................................................................32

*Steadfast Ins. Co. v. Agric. Ins. Co.*, 507 F.3d 1250 (10th Cir. 2007)...............8, 17

*Sturdevant v. Paulsen*, 218 F.3d 1160 (10th Cir. 2000) .........................................15

*Todd v. Curators of Univ. of Missouri*, 147 S.W.2d 1063 (Mo. 1941) ..................42

*Tomlinson v. El Paso Corp.*, 653 F.3d 1281 (10th Cir. 2011)................................13

*U.S. ex rel. Oberg v. Pennsylvania Higher Educ. Assistance Agency*,
    804 F.3d 646 (4th Cir. 2015) ........................................................42, 43

*U.S. ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472
    F.3d 702 (10th Cir. 2006), *abrogated on other grounds by Cochise
    Consultancy, Inc. v. United States ex rel. Hunt*, 139 S. Ct. 1507
    (2019)................................................................................................26, 39

*Watson v. Univ. of Utah Med. Ctr.*, 75 F.3d 569 (10th Cir. 1996).....................8, 14

**Statutes and Constitutional Provisions**

15 U.S.C. § 1681s-2(b) ................................................................................6

28 U.S.C. § 1291 .........................................................................................1

Fair Credit Reporting Act .............................................................................1

FDCPA ......................................................................................................40

Higher Education Act, Pub. L. No. 89-329, 79 Stat. 1219 (1965) ............................2

Missouri Health and Educational Facilities Act ......................................................22

Missouri Higher Education Loan Authority Act. RSMo. §§ 173.350 -
    173.445................................................................................................3, 35

Missouri's Sunshine Law (RSMo. § 610.020, *et seq.*) ........................................5, 28

N.J. Stat. Ann. § 32:1-4..................................................................................21

N.J. Stat. Ann. § 32:1-7..................................................................................21

N.Y. Unconsol. Law § 6404 .............................................................................21

N.Y. Unconsol. Law § 6407 .............................................................................22

RSMo. § 173.005 ..........................................................................................18

RSMo. § 173.007 ..........................................................................................18

RSMo. § 173.360 .......................... 3, 4, 9, 11, 12, 17, 18, 22, 26, 27, 28, 37, 38, 41

RSMo. § 173.365 ............................................................5, 9, 28, 29, 31

RSMo. § 173.370 ....................................................................................29

RSMo. § 173.385 ................................. 3, 4, 9, 27, 28, 30, 31, 32, 34, 35, 41, 42, 43

RSMo. § 173.385.1 ...............................................................................26

RSMo. § 173.387 ..........................................................................26, 30, 32

RSMo. § 173.390 ......................................................................26, 30, 32, 34

RSMo. § 173.392 ......................................................................26, 30, 32, 43

RSMo. § 173.395 ....................................................................................26

RSMo. § 173.405 ....................................................................................26

RSMo. § 173.410 ....................................................................................26

RSMo. § 173.415 ............................................... 3, 4, 9, 18, 20, 23, 24

RSMo. §173.420 ..............................................................................30, 42

RSMo. § 173.445 ............................................... 4, 18, 26, 28, 30, 34, 42

RSMo. § 360.020 ....................................................................................22

RSMo. § 360.085 ....................................................................................22

RSMo. § 610.020 ..........................................................................26, 28, 30

**Rules**

10th Cir. R. 31.3(B) ...............................................................................2

Fed. R. App. P. 4(a)(1)B..........................................................................1

Fed. R. Civ. P. 12 ..........................................................................1, 7, 13

**Other Authorities**

*Merriam-Webster.com Dictionary*, https://www.merriam-
   webster.com/dictionary/on%20behalf%20of%20someone................................23

U.S. Const. amend. XI

................................ 1, 2, 6, 7, 8, 11, 12, 13, 14, 15, 16, 17, 19, 36, 39, 40, 42, 44

## RULE 28.2(C)(3) STATEMENT

There have been no prior appeals in this case, and counsel is not aware of any other appeals related to this case.

# GLOSSARY

| | |
|---|---|
| FCRA | Fair Credit Reporting Act |
| HEA | Higher Education Act |
| LCD FUND | Lewis and Clark Discovery Fund |
| MDHE | Missouri Department of Higher Education |
| MOHEFA | Health and Educational Facilities Authority of the State of Missouri |
| MOHELA | Higher Education Loan Authority of the State of Missouri |
| PHEAA | Pennsylvania Higher Education Assistance Agency |
| TRANSUNION | TransUnion, LLC |
| USDOE | United States Department of Education |

## JURISDICTION

Plaintiff-appellant Jeffrey Good ("Mr. Good") filed this action in state court alleging claims under the Fair Credit Reporting Act ("FCRA") against defendants-appellees United States Department of Education ("USDOE") and the Higher Education Loan Authority of the State of Missouri ("MOHELA"), as well as defendant TransUnion, LLC ("TransUnion"). App. 9-32.[1] USDOE removed the case to the United States District Court for the District of Kansas. App. 6.

In a Memorandum and Order filed on June 16, 2022, the United States District Court for the District of Kansas granted (i) MOHELA's motion for judgment on the pleadings pursuant to FED. R. CIV. P. 12(c) on the grounds that MOHELA is an arm of the State of Missouri entitled to Eleventh Amendment immunity; and, (ii) USDOE's motion to dismiss for lack of subject matter jurisdiction. App. 187-208. Mr. Good and TransUnion later settled. App. 108.

On November 1, 2022, the district court clerk entered a final judgment for MOHELA and USDOE. App. 209-210. On December 30, 2022, Mr. Good timely filed, under FED. R. APP. P. 4(a)(1)B), a notice of appeal within 60 days of the entry of judgment. *Id.* at 211-12. Thus, MOHELA concedes that this Court has jurisdiction to hear Mr. Good's appeal, pursuant to 28 U.S.C. § 1291.

---

[1] Citations to "App." refer to pages of the appendix filed by Appellant.

## STATEMENT OF THE ISSUES

The district court dismissed Mr. Good's FCRA claim against MOHELA on the grounds that MOHELA is an arm of the State of Missouri entitled to Eleventh Amendment immunity. As it pertains to MOHELA,[2] the issue presented on appeal is:

1.      Did the district court correctly conclude that MOHELA is an arm of the State of Missouri entitled to Eleventh Amendment immunity?

## STATUTES

Pertinent statutory provisions are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

### A.    MOHELA

Under the Higher Education Act, Pub. L. No. 89-329, 79 Stat. 1219 (1965) ("HEA"), and related statutes and regulations, USDOE issues a variety of loans and grants to students. Rather than self-service the loans, USDOE contracts with third-party servicers to perform that function. Every aspect of that servicing is highly regulated by USDOE.

MOHELA was created by the General Assembly of the State of Missouri through passage of House Bill (HB) 326, signed into law on June 15, 1981, in order

---

[2] MOHELA states that it is exempt from 10th Cir. R. 31.3(B) as the only other appellee is a governmental entity, and thus a certificate stating the reasons why a separate brief is filed is unnecessary.

to ensure that all eligible postsecondary education students have access to guaranteed student loans. The legislation was amended[3] to provide MOHELA with generally expanded powers to finance, originate, acquire, and service student loans, including, but not limited to, those guaranteed or insured pursuant to the HEA.

MOHELA is, and at all times material hereto was, a public instrumentality and a body politic and corporate of the State of Missouri. RSMo. § 173.360; App. 33-34, 43-44, 191. A Missouri statute declares MOHELA a state instrumentality: "The authority is hereby declared to be performing a public function and to be a separate public instrumentality of the state." RSMo. § 173.415; App. 191.

MOHELA is organized and exists under the Missouri Higher Education Loan Authority Act. RSMo. §§ 173.350 - 173.445. MOHELA's mission is "to assure that all eligible postsecondary education students have access to student loans that are guaranteed or insured, or both," and to provide funding for capital and technology projects at Missouri's public colleges and universities. RSMo. § 173.360. Missouri law requires MOHELA to contribute hundreds of millions of dollars to the State's Lewis and Clark Discovery Fund ("LCD Fund"). RSMo. § 173.385.2. MOHELA is also authorized to service student loans for any owner thereof, regardless of

---

[3] Effective August 28, 1994, August 28, 2003, August 28, 2007, and May 2, 2008.

whether such student loans are originated in Missouri or outside Missouri.  RSMo. § 173.385.1(18).

As demonstrated by the following non-inclusive list, MOHELA's structure is consistent with that of other Missouri public instrumentalities:

- MOHELA's property, income, bonds and activities are exempt from state taxation (RSMo. § 173.415);

- MOHELA is assigned to and reports to a state agency, the Missouri Department of Higher Education ("MDHE") (RSMo. § 173.445), which has two of its officials seated on MOHELA's board and which must approve the sale of student loans owned by MOHELA (RSMo. § 173.385.1(8));

- MOHELA is required to report on its financial condition to the MDHE annually (RSMo. § 173.445);

- Five of the seven members of MOHELA's governing board are appointed directly by the Governor, and the other members are indirectly appointed by the Governor because one is a member of Missouri's Coordinating Board for Higher Education (appointed by the Governor) and the other is the Commissioner of the MDHE (appointed by the Coordinating Board for Higher Education) (RSMo. § 173.360);

- The Governor may remove any board member for cause (*Id.*);

- MOHELA meetings are open to the public (RSMo. § 173.365), and MOHELA is subject to and complies with Missouri's Sunshine Law (RSMo. § 610.020, *et seq.*).

In 2011, MOHELA was selected through a competitive process by USDOE to service student loans on a national basis. App. 56. MOHELA remains a third-party servicer of USDOE and is not itself a party to the underlying loan contracts between USDOE and its borrowers. *Id.*

**B.   MOHELA's Servicing Of Mr. Good's Student Loans**

Mr. Good was obligated on certain student loans owed to USDOE, which were at one time serviced by MOHELA. App. 11, 21, 27-28. In or about April 2021, Mr. Good alleges he submitted disputes to each of the three major credit reporting agencies—Experian, Equifax, and TransUnion—asserting that his credit reports contained errors relating to his student loans. *Id.* at 11. Mr. Good alleges Experian and Equifax made changes or corrections, but TransUnion did not. *Id.* at 12.

MOHELA communicated directly with Mr. Good regarding his dispute. App. at 12, 21-22. MOHELA advised Mr. Good that, as of December 4, 2017, the servicing of his student loans had transferred away from MOHELA, which was also reflected on Mr. Good's credit report. *Id.* at 12, 21, and 27-28. MOHELA further

explained the results of its investigation regarding MOHELA's prior reporting of a delinquency status on the loans between 2013 and 2017.  *Id.* at 21.

**C.    Proceedings Below**

Mr. Good originally filed this civil action in state court, the District Court of Johnson County, Kansas, against TransUnion, USDOE, and MOHELA.  App. 9-32. Mr. Good alleged each of the defendants violated the FCRA.  *Id.*  Asserting a single claim against MOHELA for violation of 15 U.S.C. § 1681s-2(b), Mr. Good alleges that MOHELA failed to investigate his dispute and correct its tradeline with respect to the student loans on Mr. Good's credit report with TransUnion.  *Id.*, at 15-18, 188. As it pertains to MOHELA, Mr. Good sought relief in the form of statutory, actual, and punitive damages, as well as costs, reasonable attorneys' fees, and pre-judgment or post-judgment interest.  App. 17.

On November 19, 2021, USDOE removed the action to the United States District Court for the District of Kansas.  App. 6.  On December 13, 2021, MOHELA filed its Answer (App. 33-48), Motion for Judgment on the Pleadings (App. 49-52) under FED. R. CIV. P. 12(c), and Memorandum in Support (App. 53-68).  In summary, MOHELA argued that judgment should be entered in its favor because it is an arm of the sovereign State of Missouri and thus immune from suit in the District of Kansas under the Eleventh Amendment to the United States Constitution.  *Id.* at 54.

On December 14, 2021, USDOE filed its Motion to Dismiss (App. 69-70) and Memorandum in Support (App. 71-116) advancing arguments regarding lack of subject matter jurisdiction under FED. R. CIV. P. 12(b)(1) and failure to state a claim under FED. R. CIV. P. 12(b)(6).

Mr. Good opposed MOHELA's and USDOE's motions. App. 117-151. MOHELA and USDOE each filed a reply brief. App. 152-186.

On June 16, 2022, the district court granted both MOHELA's and USDOE's motions. App. 187-208. As it pertains to MOHELA, the district court applied the governing Tenth Circuit test and concluded that the balance of the factors weighed in favor of the conclusion that MOHELA was an arm of the State of Missouri entitled to Eleventh Amendment immunity. App. 195. As it pertains to USDOE, the district court concluded that the FCRA does not clearly and explicitly waive USDOE's sovereign immunity. *Id.* at 208. Finding that it lacked subject matter jurisdiction over Mr. Good's FCRA claim against USDOE, the district court did not proceed to USDOE's alternative argument that Mr. Good failed to state a claim. *Id.*

On October 31, 2022, a stipulation of dismissal with prejudice of TransUnion, the sole remaining defendant, was filed. App. 8. On November 1, 2022, the district court clerk entered judgment for MOHELA and USDOE. App. 209-210.

## SUMMARY OF THE ARGUMENT

The Eleventh Amendment to the U.S. Constitution provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. It is well established that this immunity extends to "arms of the state." *Watson v. Univ. of Utah Med. Ctr.*, 75 F.3d 569, 574 (10th Cir. 1996). The burden to establish "arm of the state" immunity falls on the entity claiming immunity.

This Court employs a two-step process for evaluating whether an entity is an "arm of the state." Initially, this Court evaluates four potentially dispositive factors: (1) the character ascribed to the entity under state law; (2) the degree of autonomy accorded the entity under state law; (3) the entity's finances; and (4) whether the entity in question is concerned primarily with local or state affairs. *See Hennessey v. Univ. of Kansas Hosp. Auth.*, 53 F.4th 516, 528 (10th Cir. 2022) (quoting *Steadfast Ins. Co. v. Agric. Ins. Co.*, 507 F.3d 1250, 1253 (10th Cir. 2007)). The district court properly analyzed those factors, and concluded that MOHELA was entitled to arm of the state status. This Court should reach the same conclusion.

The first factor weighs in favor of MOHELA's arm of the state status. Missouri's legislature created MOHELA by special law, designated it as a "public instrumentality of the state," assigned it to the MDHE (itself an executive agency of

the State of Missouri), and declared MOHELA to be exercising an "essential public function." RSMo. §§ 173.415, 173.360. MOHELA is the only entity in the State of Missouri devoted to higher education finance and which can issue bonds to finance student loans. Missouri statute identifies MOHELA as a public instrumentality of the State of Missouri.

The second factor also supports MOHELA's arm of the state status as the State of Missouri possesses expansive control over MOHELA and limits MOHELA's autonomy in many respects. The "autonomy factor" is complex and considers a host of issues, but it encompasses the entire relationship between the State and MOHELA. *See Hennessy*, 54 F.4th at 536. The Governor of Missouri appoints five of MOHELA's seven members; the remaining two are officials of other state entities; and all seven are "remov[able] by the governor" for cause. RSMo. § 173.360. The State of Missouri controls MOHELA by limiting it to only certain enumerated powers. RSMo. § 173.385. Missouri also "assigned" MOHELA to the MDHE, and placed two MDHE officials on MOHELA's board. MOHELA must make annual financial reports to MDHE, which must also approve MOHELA's sale of loans. *Id.*; RSMo. § 173.385.1(8). MOHELA's meetings must be public. RSMo. § 173.365. In summary, the State of Missouri exercises significant oversight over MOHELA's decision-making and regulates MOHELA's functions and operations.

The third factor analyzes MOHELA's finances. MOHELA does not receive direct funding from the State of Missouri. Nor does MOHELA have the right to levy taxes. MOHELA can issue bonds, but that authority is subject to statutory limitations and mandatory reporting to the State, including the requirement that the MDHE approve a pledge of loans to secure bonds because such a pledge constitutes a sale of loans. MOHELA's funding is, therefore, inextricably tied to the State of Missouri. Moreover, with respect to the transfer of funds, MOHELA's relationship with the State of Missouri is a one-way street. Pursuant to state statute and by virtue of the State's control, MOHELA has transferred hundreds of millions of dollars to the State of Missouri to support capital projects, public colleges and universities, and state scholarship and grant programs. The State of Missouri can, and has, imposed financial obligations on MOHELA, such as it did in 2007 when it amended state statutes to require MOHELA to transfer $350 Million to the State via the LCD Fund. In addition, the State of Missouri has requested and MOHELA has provided $93 Million in State-based higher education scholarship and grant funding between 2010 and 2022 (and MOHELA will provide another $6 Million in July). MOHELA respectfully submits that this factor weighs in favor of immunity or is neutral.

The fourth factor clearly supports MOHELA's arm of the state status as MOHELA is concerned primarily with state-wide interests. MOHELA's function is to "support the efforts of public colleges and universities to create and fund capital

projects, and in order to support the Missouri technology corporation's ability to work with colleges and universities in identifying opportunities for commercializing technologies, transferring technologies, and to develop, recruit, and retain entities engaged in innovative technologies[.]"  RSMo. § 173.360.  Led by its Governor-appointed and -controlled board, MOHELA's purpose is to "assure that all eligible postsecondary education students have access to student loans that are guaranteed or insured, or both[.]"  *Id.*  MOHELA is the only Missouri state entity that can issue bonds and provide related funding for student loans, and MOHELA is undoubtedly focused on the furtherance of state-wide interests. There is nothing "local" about MOHELA's function or purpose.

In summary, the <u>first</u> factor (character ascribed to MOHELA under state law) and <u>fourth</u> factor (whether MOHELA is concerned with state-wide matters) clearly support immunity.  The <u>second</u> factor (MOHELA's autonomy under state law) is complex and contemplates a litany of considerations, but warrants a finding of immunity.  And finally, the <u>third</u> factor (MOHELA's finances) favors immunity or is neutral.  These four primary factors support the finding that MOHELA is an arm of the State of Missouri entitled to Eleventh Amendment immunity.  Because the proper balancing of this test is conclusive, there is no need to proceed further.  The district court's well-reasoned decision should be affirmed.

Since the assessment of the four primary factors is dispositive, the Court need not proceed to the second step of the analysis, which considers the "'twin reasons' underlying the Eleventh Amendment—avoiding an afront to the dignity of the state and the impact of a judgment on the state treasury." *Hennessey*, 53 F.4th at 528 (quoting *Duke v. Grady Mun. Sch.*, 127 F.3d 972, 978 (10th Cir. 1997)) (quoting *Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 47 (1994)). Should the Court do so, however, the "twin reasons" underlying the Eleventh Amendment are, at best, neutral and do not change the overall conclusion.

As for the first consideration, MOHELA is a public instrumentality of the State of Missouri. It was created by special law of the Missouri legislature, is overseen by a Governor-appointed and -controlled board, and is declared to be exercising its powers, as conferred and limited by the State, in "the performance of an essential public function." RSMo. § 173.360. The Missouri legislature "assigned" MOHELA to the MDHE, a state agency, and placed two MDHE officials on MOHELA's board. The State of Missouri also required MOHELA to make annual financial reports to the MDHE. In summary, exercising federal jurisdiction over MOHELA would act as an affront to the State of Missouri.

The second consideration looks to the protection of the state treasury. While the State of Missouri is not directly responsible in the first instance for a judgment against MOHELA, the State has the power to impose financial obligations on

MOHELA, and has done so as discussed herein; thus, a judgment against MOHELA could impact the State of Missouri's fisc. Even if this consideration is found to be neutral or weigh against MOHELA, it is the only factor that falls in that category and it is alone insufficient to tip the balance towards a finding against Eleventh Amendment immunity.

## STANDARD OF REVIEW

The district court granted MOHELA's motion for judgment on the pleadings under FED. R. CIV. P. 12(c), which is the same standard applied to a motion to dismiss for failure to state a claim under FED. R. CIV. P. 12(b)(6). *Myers v. Koopman*, 738 F.3d 1190, 1193 (10th Cir. 2013), *as amended on denial of reh'g* (Jan. 8, 2014). The standard of review is "de novo." *Id.*; *see also Tomlinson v. El Paso Corp.*, 653 F.3d 1281, 1286 (10th Cir. 2011).

Eleventh Amendment immunity is also a question of law reviewed de novo. *Hennessey*, 53 F.4th at 527; *Couser v. Gay*, 959 F.3d 1018, 1026 (10th Cir. 2020). Appellate courts "give deference to state court decisions regarding whether a given entity is an arm of the state, but [they] do not view these rulings as dispositive." *Id.* (quoting *Steadfast,* 507 F.3d at 1253).

# ARGUMENT

## I. The District Court Properly Entered Judgment For MOHELA Because It Is An Arm Of The State Of Missouri Entitled To Eleventh Amendment Immunity.

### A. Eleventh Amendment immunity extends to arms of the state.

The Eleventh Amendment to the U.S. Constitution provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. Though, by its terms, the Eleventh Amendment immunizes only "States" against private actions brought by citizens of other states, *see id.*, it is well established that suits against 'arms' of a state may nonetheless be barred by the Eleventh Amendment. *See, e.g., Watson*, 75 F.3d at 574 ("The arm-of-the-state doctrine bestows [Eleventh Amendment] immunity on entities created by state governments that operate as alter egos or instrumentalities of the states."); *Hennessey*, 53 F.4th at 527 ("In terms of scope, Eleventh Amendment immunity extends to states and state entities but not to counties, municipalities, or other local government entities.") (quoting *Steadfast*, 507 F.3d at 1253); *McCoy v. Kansas*, No. 16-2129-JAR, 2016 WL 3549100, at *3 (D. Kan. June 30, 2016) ("This immunity extends to state agencies functioning as arms of the state and applies regardless of the type of relief sought.").

Federal law governs whether an entity is an "arm of the state" such that it is entitled to immunity under the Eleventh Amendment. *Duke*, 127 F.3d at 975; *see also Lightfoot v. Henry Cty. Sch. Dist.*, 771 F.3d 764, 771 (11th Cir. 2014) ("[I]t is federal law, not state law, that ultimately governs whether an entity is immune under the Eleventh Amendment."). That federal question, however, "can be answered only after considering the provisions of state law that define the agency's character." *Duke*, 127 F.3d at 975 (quoting *Regents of the Univ. of California v. Doe*, 519 U.S. 425, 430 n. 5 (1997)); *see also Hennessey*, 53 F.4th at 528 ("Although ultimately a matter of federal law, arm-of-the-state status must be determined in each case by reference to the particular state laws characterizing the entity.") (quoting *Sturdevant v. Paulsen*, 218 F.3d 1160, 1164 (10th Cir. 2000)). Assessing Missouri's statutory framework pertaining to MOHELA, the Eighth Circuit Court of Appeals noted the State's characterization of MOHELA and stated recently that "MOHELA may well be an arm of the State of Missouri under the reasoning of our precedent." *Nebraska v. Biden*, 52 F.4th 1044, 1047 (8th Cir. 2022).

The law is settled in the Tenth Circuit that the proponent of a claim of arm of the state immunity bears the burden to establish the same. *See Hennessey*, 53 F.4th at 532. While the district court issued its decision prior to *Hennessey*, it assigned the burden of proof to MOHELA. App. at 190. The district court also clarified that, in resolving a motion for judgment on the pleadings, it could rely on affirmative

defenses raised by MOHELA's Answer, including statutes, of which the district court could take judicial notice.  App. at 189.

**B.    The Tenth Circuit's four "primary factors" test is dispositive and warrants the conclusion that MOHELA is an arm of the State of Missouri.**

In assessing whether an entity is an arm of the state, the Tenth Circuit employs a two-step process.  *Hennessey*, 53 F.4th at 528; *see also Duke*, 127 F.3d at 978.  "As an initial, sometimes dispositive, step, [this Court] evaluate[s] four 'primary factors':

> *First*, we assess the character ascribed to the entity under state law. Simply stated, we conduct a formalistic survey of state law to ascertain whether the entity is identified as an agency of the state.
>
> *Second*, we consider the autonomy accorded the entity under state law. This determination hinges upon the degree of control the state exercises over the entity.
>
> *Third*, we study the entity's finances. Here, we look to the amount of state funding the entity receives and consider whether the entity has the ability to issue bonds or levy taxes on its own behalf.
>
> *Fourth*, we ask whether the entity in question is concerned primarily with local or state affairs. In answering this question, we examine the agency's function, composition, and purpose."

*Hennessey*, 53 F.4th at 528 (quoting *Steadfast*, 507 F.3d at 1253) (double emphasis in original).

"If these factors are in conflict and point in different directions, a court should proceed to the second step and consider the 'twin reasons' underlying the Eleventh Amendment—avoiding an afront to the dignity of the state and the impact of a

judgment on the state treasury." *Hennessey*, 53 F.4th at 528 (quoting *Duke*, 127 F.3d at 978) (quoting *Hess*, 513 U.S. at 47)).

The district court applied the four factor test announced in *Steadfast*, as that was the test more recently applied by the Tenth Circuit in *Couser* and within the District of Kansas.  App. 190.  The district court ultimately concluded that the balance of factors weighed in favor of the finding that MOHELA was entitled to arm of the state Eleventh Amendment immunity.  App. 190-195.

> **1.    The first factor favors immunity because Missouri law treats MOHELA as a part of state government.**

The first factor requires an assessment of "the character ascribed to the entity under state law." *Steadfast*, 507 F.3d at 1253; *Hennessey*, 53 F. 4th at 528.  "Simply stated, [the Court] conduct[s] a formalistic survey of state law to ascertain whether the entity is identified as an agency of the state." *Hennessey*, 53 F. 4th at 528 (citing *Steadfast*, 507 F.3d at 1253).  Missouri's legislature created MOHELA by special law "[i]n order to assure that all eligible postsecondary education students have access to student loans that are guaranteed or insured, or both."  RSMo. § 173.360.  The law was later amended to provide for MOHELA's support of "the efforts of public colleges and universities to create and fund capital projects, and in order to support the Missouri technology corporation's ability to work with colleges and universities" in certain endeavors.  *Id.*  MOHELA's character is expressly defined as follows:  "[MOHELA] is hereby declared to be performing a public function and

- 17 -

to be a separate public instrumentality *of the state*."  RSMo. § 173.415 (emphasis added).  Missouri statute further defines MOHELA as "a public instrumentality and body corporate," stating that "the exercise by [MOHELA] of [its] powers … shall be deemed to be the performance of an essential public function."  RSMo. § 173.360.  Moreover, MOHELA "is assigned to" the MDHE,[4] which is itself an executive agency of the State of Missouri.  RSMo. § 173.445.

All of MOHELA's board members are appointed directly or indirectly by the Governor of Missouri.  RSMo. § 173.360.  Five members are appointed directly with the advice and consent of the state senate.  *Id.*  The two other members are MDHE officials.  That is, the sixth member is a member of the Missouri Coordinating Board for Higher Education (also appointed by the Governor), and the seventh member is the Commissioner of Higher Education (appointed by the Coordinating Board), who heads the MDHE.  *Id.*; *see* Footnote 4.  The Governor also has the authority to remove any member of MOHELA's board for cause.  RSMo. § 173.360.

Assessing Missouri law's treatment of MOHELA, the district court correctly concluded that "this factor weighs in favor of finding that MOHELA is an arm of

---

[4] MDHE (now known as the Missouri Department of Higher Education and Workforce Development) is overseen by the Missouri Coordinating Board for Higher Education, which consists of nine members appointed by the Governor with the advice and consent of the senate.  RSMo. § 173.005.  The Coordinating Board appoints the Commissioner of Higher Education.  RSMo. § 173.007.

the state." App. 191. The district court's conclusion followed the decisions of other lower courts, including the Northern District of Alabama in *Gowens v. Capella Univ., Inc.*, No. 4:19-CV-362-CLM, 2020 WL 10180669 (N.D. Ala. June 1, 2020). Reviewing the nearly identical factor of "how state law defines the entity,"[5] the *Gowens* court concluded that this "factor weighs heavily in MOHELA's favor" because "Missouri statutes **unambiguously dictate** MOHELA to be an 'arm of the state' of Missouri."[6] *Id.* at *2 (emphasis added) (also noting that another federal court held that "MOHELA is an 'arm of the state' of Missouri and thus dismissed claims against MOHELA under the Eleventh Amendment) (citing *In re Stout*, 231 B.R. 313, 317 (Bankr. W.D. Mo. 1999)); *see also Nebraska*, 52 F.4th at 1047 (recently stating that "MOHELA may well be an arm of the State of Missouri under the reasoning of our precedent.").

---

[5] "The Eleventh Circuit employs a four factor test to determine whether an entity is an 'arm of the State': '(1) how state law defines the entity; (2) what degree of control the State maintains over the entity; (3) where the entity derives its funds; and (4) who is responsible for judgments against the entity.'" *Gowens*, 2020 WL 10180669, at *2 (quoting *Manders v. Lee*, 338 F.3d 1304, 1309 (11th Cir. 2003)).

[6] The district court acknowledged the existence of other district court decisions from outside the Tenth Circuit assessing whether MOHELA is an arm of the state. App. 195. While there is significant overlap, the various Circuits have articulated different tests for determining arm of the state status. The district court correctly concluded that the *Gowens* decision, which employed the Eleventh Circuit's four factor test, was "more instructive" to the Court's determination of MOHELA's arm of the state status because of the similarity between the Eleventh Circuit's and Tenth Circuit's prevailing tests. App. 195.

On this point, Mr. Good rehashes similar arguments that the district court properly rejected. For example, Mr. Good argues (Br. 25) that Missouri statute declares that MOHELA is a "*separate* public instrumentality of the state." RSMo. § 173.415 (emphasis added by Mr. Good). Mr. Good emphasizes the wrong language. The more important word in the statute is that MOHELA is "a separate public instrumentality *of* the state." *Id.* (emphasis added). Of course, "of" is used in the statute to express the relationship between the part, *i.e.*, MOHELA, and the whole, *i.e.,* the State of Missouri. Mr. Good ignores that reality and mistakenly seeks to seize on the word "separate" to argue that "of" should be replaced with "from," and thus that there is a physical separation between the part (MOHELA) and the whole (State of Missouri). Mr. Good may wish to re-write the statute to replace "of" with "from," but that is simply not what the statute says. The district court appropriately rejected Mr. Good's argument, emphasizing the word "of" in reaching the conclusion that Missouri statute treats MOHELA as an instrumentality "of the state." App. 191. And as the *Gowens* court concluded, the Missouri legislature's definition of MOHELA as a "public instrumentality of the state" is definitive. 2020 WL 10180669, at *2.

Mr. Good also argues (Br. 24) that the legislature's establishment of a separate corporate body does not alone suggest that such a body is an arm of the state. But that argument misses the point. MOHELA's argument is not that its "body corporate

and politic" status alone compels the conclusion that Missouri law treats MOHELA as an arm of the state. To the contrary, MOHELA's argument—accepted by the district court—is that a holistic analysis of the Missouri statutes compels the conclusion that Missouri ascribes to MOHELA the status of a state instrumentality.

Mr. Good's cited authorities are readily distinguishable from the plain language of the Missouri statute at issue and do not rebut the district court's correct finding that the first factor supports the finding that MOHELA is an arm of the state. For example, in *Hess*, the Supreme Court concluded that an interstate compact authority and its implementing legislation did not "type the [Port Authority of New York and New Jersey] as a state agency[,]" in part because various phrases were used, including "joint or common agency[,] "body corporate and politic[,]" and "municipal corporate instrumentality of the two states for the purpose of developing the port and effectuating the pledge of the states in the ... compact." 513 U.S. at 44-45. But there, the New Jersey and New York statutes did not expressly qualify the phrase "body corporate and politic" with "of the state" or "of the states."[7] The same

---

[7] *See, e.g.,* N.J. Stat. Ann. § 32:1-4 ("There is hereby created 'The Port of New York Authority' (for brevity hereinafter referred to as the 'Port Authority'"), which shall be a body corporate and politic, having the powers and jurisdiction hereinafter enumerated, and such other and additional powers as shall be conferred upon it by the Legislature of either State concurred in by the Legislature of the other, or by Act or Acts of Congress, as hereinafter provided..."); N.Y. Unconsol. Law § 6404 (McKinney) (identical); N.J. Stat. Ann. § 32:1-7 ("The port authority shall constitute a body, both corporate and politic, with full power and authority to purchase,

is true of the California county at issue in *Moor v. Alameda Cnty.*, 411 U.S. 693, 720 (1973) (citing Cal. Gov't Code § 23003) ("A county is a body corporate and politic, has the powers specified in this title and such others necessarily implied from those expressed").

Nor does the Supreme Court of Missouri's decision in *Menorah Med. Ctr. v. Health & Educ. Facilities Auth.*, 584 S.W.2d 73 (Mo. 1979) support Mr. Good's argument.  In *Menorah Med. Ctr.*, the court considered whether the Missouri Health and Educational Facilities Act, which created the Health and Educational Facilities Authority of the State of Missouri ("MOHEFA"), contravened the Missouri and United States Constitutions.  The statute in question, enacted in 1975, established MOHEFA as "a body politic" and a "public instrumentality and body corporate," exercising statutory authority in "the performance of an essential public function." RSMo. § 360.020.  The statute establishing MOHELA, enacted in 1981, contains similar language.  RSMo. § 173.360.  But importantly, while the Missouri legislature stated that MOHEFA is "declared to be performing a public function ***in behalf of*** the state and to be a public instrumentality of the state[,]"  RSMo. § 360.085 (emphasis added), the Missouri legislature stated several years later that MOHELA is "declared to be performing a public function and to be a separate public

_____

construct, lease and/or operate any terminal or transportation facility within said district[.]"); N.Y. Unconsol. Law § 6407 (McKinney) (identical).

instrumentality *of the state.*" RSMo. § 173.415 (emphasis added). The contrast in language is stark. "In behalf of" is commonly defined as "for the benefit of someone" or "in support of someone." *See Merriam-Webster.com Dictionary*, https://www.merriam-webster.com/dictionary/on%20behalf%20of%20someone. Accessed April 3, 2023. Based in part on this statutory language, the Supreme Court of Missouri held that MOHEFA was "an entity apart from the state." 584 S.W.2d at 82. But that holding does not compel a similar finding as it pertains to MOHELA, where its statute lacks the "in behalf of" language.

There are other significant differences between MOHEFA and MOHELA. MOHEFA's statutes do not impose limits on bond issuances like those imposed on MOHELA by statute, and MOHELA's statutes do not require state approval for the sale of assets. MOHEFA does not regularly provide money to the State of Missouri, while MOHELA does. The Missouri legislature has statutorily required MOHELA to provide hundreds of millions of dollars to the State over the last 15 years and has annually requested additional funds for scholarships and grants. Importantly, members of MOHEFA's board do not include representatives from a state agency, as compared to the two MDHE officials that sit on MOHELA's board.

In summary, Mr. Good argues (Br. 24-26) that the Missouri legislature's designation of MOHELA as a "body politic and corporate" does not alone mean that MOHELA is an arm of the state, or alternatively that use of this phrase, which

- 23 -

denotes a corporate status, undermines MOHELA's arm of the state status. But Mr. Good's arguments simply ignore the Missouri legislature's plain language that MOHELA is a "public instrumentality of the state." In interpreting similar "of the state" language under the first factor of the Tenth Circuit test, other Tenth Circuit district courts have held that this language weighs in favor of arm of the state immunity. *See, e.g.*, *Patterson v. Rural Water Dist. 2*, 438 F. Supp. 3d 1258, 1268-69 (W.D. Okla. 2020) (finding that first factor of the test "weighs strongly in favor" of a rural water district, created as "a body politic and corporate and an agency and legally constituted authority of the State of Oklahoma"); *Barnes v. Wagoner Cnty. Rural Water Dist. No. 4*, No. 15-CV-479-JHP, 2016 WL 1627622, at *2 (E.D. Okla. Apr. 22, 2016) (noting that water district denoted as a "body politic and corporate and an agency and legally constituted authority of the State of Oklahoma" is a state agency).

In interpreting the first factor, the district court also relied on the fact that MOHELA's income and property are exempt from state taxation under RSMo. § 173.415. App. 191. On this point, Mr. Good argues (Br. 27-28) that tax-exempt status is not unique to arms of the state and is a status shared by many different types of entities, including private entities. But tax-exempt status is a factor for consideration in the arm of the state analysis, and that status can weigh in favor of immunity. *See Karns v. Shanahan*, 879 F.3d 504, 517 (3d Cir. 2018) (fact that

defendant was exempt from state taxation weighed in favor of immunity); *Aguon v. Commonwealth Ports Auth.*, 316 F.3d 899, 903 (9th Cir. 2003) (in holding that the defendant was a public entity, the court noted that the entity "is exempt from taxation"). Mr. Good also ignores that the *Gowens* court also addressed this issue, finding the fact that MOHELA's property, income, bonds, and activities are exempt from state taxation supported a finding of immunity. 2020 WL 10180669, at *3.[8]

In summary, this Court should not accept Mr. Good's invitation to ignore the plain, unambiguous language of Missouri statute. MOHELA is expressly characterized as a "public instrumentality of the state." The district court correctly concluded that the first factor weighed in favor of MOHELA's arm of the state status. App. 191. And *Gowens* went even further, stating that this "factor weighs heavily in MOHELA's favor." 2020 WL 10180669, at *2.

> **2.    The second factor favors immunity because the State of Missouri possesses expansive control over MOHELA, which has little autonomy.**

This Court recently described the "autonomy factor" as "the most complex of the four factors because it spans a broad range of considerations." *Hennessey*, 53 F.4th at 536. The autonomy determination "hinges upon the degree of control the

---

[8] In its analysis of MOHELA's "character" under state law, the district court cited the fact that MOHELA's board composition is exclusively designated by the State. App. 191. Mr. Good (Br. at 28-9) addresses same. MOHELA submits that analysis fits better within the consideration of *Steadfast's* second factor.

state exercises over the entity." *Id.* at 528. This Court considers a litany of issues in applying this factor, including: "(1) control of the entity by the governor and legislature, (2) classification of the entity's employees, (3) the entity's ownership and control over property, (4) the entity's ability to form contracts, (5) the entity's ability to set policies, and (6) the ability of the entity to sue and be sued." *Id.* at 536, n. 9. To be clear, however, "[t]hese considerations are not an exhaustive list," *id.*, and the Court will evaluate the "entire relationship" between the State of Missouri and MOHELA. *U.S. ex rel. Sikkenga v. Regence Bluecross Blueshield of Utah*, 472 F.3d 702, 720 (10th Cir. 2006), *abrogated on other grounds by Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 139 S. Ct. 1507, 1511-12 (2019).

While MOHELA possesses some autonomy, it is significantly confined by state control. That control is manifested in MOHELA's Governor-appointed and controlled leadership, MOHELA's assignment to the MDHE (a state agency), the MDHE's oversight over MOHELA's financial status, significant restrictions and limitations on MOHELA's ability to raise funds and sell assets, and other hallmarks of state agencies, like public meetings requirements. *See* RSMo. §§ 173.360, 173.445, 173.385.1, 173.392, 173.387, 173.390, and 610.020. The issuance of bonds is MOHELA's funding source, yet MOHELA is tightly limited in setting the terms that can be included in such bonds (RSMo. §§ 173.395, 173.405, 173.410) and by MDHE's necessary approval of the collateral (pledge of loans to secure such bonds)

because such a pledge is considered a sale of the loans, since it could lead to loss of the loans if the collateral is foreclosed upon.  RSMo. § 173.385.1(8).

The Missouri legislature created MOHELA and the Governor appoints and controls MOHELA's leadership.  An initial consideration is the role the state executive branch and legislature play in the operations of the entity.  *Hennessey*, 53 F.4th at 536.  At a baseline level, a structure where "the [G]overnor and legislature respectively appoint and confirm members of the board that oversees the entity [...] weighs against the entity's autonomy from the state."  *Id.* at 537.  The statute creating MOHELA meets this requirement, as MOHELA "shall consist of seven members, five of whom shall be appointed by the [G]overnor by and with the advice and consent of the senate[,]" with the other two members being indirectly appointed by the Governor because one is a member of Missouri's Coordinating Board for Higher Education (appointed by the Governor) and the final board member is the Commissioner of the MDHE (appointed by the Coordinating Board for Higher Education).  RSMo. § 173.360.  The district court correctly assessed MOHELA's leadership, stressing that "MOHELA's seven-member board is controlled by the state."  App. 191.  *See also Gowens*, 2020 WL 10180669, at *2 ("The State of Missouri selects and controls MOHELA's seven-member board of directors; five are appointed by the Governor of Missouri, one is a designee from the Missouri Coordinating Board for Higher Education [also appointed by the Governor], and the

final board member is the Commissioner of the MDHE [appointed by the Coordinating Board].") (citing RSMo. § 173.360).

Other considerations underscore Missouri's control over MOHELA. The Missouri legislature established MOHELA's powers, see RSMo. §173.385, and in doing so controls MOHELA by limiting it to only those powers. Missouri also "assigned" MOHELA to the MDHE, itself an executive agency of the State, and placed two MDHE officials on MOHELA's board. RSMo. § 173.445. MOHELA's meetings are also public and subject to Missouri's Sunshine Law. *See* RSMo. § 173.365 ("Each meeting of the authority for any purpose whatsoever shall be open to the public. Notice of meetings shall be given as provided in the bylaws of the authority. The proceedings and actions of the authority shall comply with all statutory requirements respecting the conduct of public business by a public agency."); RSMo. § 610.020.

Mr. Good speculates (Br. 29) that members of MOHELA's board "do not represent state interests exclusively" and instead represent "private interests or non-state public interests." But that is plainly incorrect. Missouri statute states definitively that MOHELA's exercise of its powers, as granted and limited by the Missouri legislature, is the "performance of an essential ***public*** function." RSMo. § 173.360 (emphasis added). Moreover, MOHELA is the only state entity that can issue debt to finance student loans. Even if Mr. Good's point was not wrong, the

question remains whether the executive branch and legislature appoint and have control over MOHELA within the meaning of the arm of the state analysis.[9]  That question is clearly answered in MOHELA's favor.

The classification of MOHELA's employees.  Consistent with its non-profit status, MOHELA's board members serve on a volunteer basis.  They are not compensated for their work, and are only eligible for expense reimbursements. RSMo. § 173.365.  The MOHELA board appoints a secretary and a treasurer who, if not a member of MOHELA, may receive compensation from MOHELA, and the board also appoints an executive director, who is compensated by MOHELA. RSMo. § 173.370(1).  The "powers and duties" of the executive director are fixed by a MOHELA duly-adopted resolution.  *Id.*  The Executive Director may then hire all additional employees as needed to carry out MOHELA's functions and purposes, and they receive compensation fixed by MOHELA.  *Id.*, at § 173.370(2).  While it is true that the compensation for MOHELA's executive director, secretary, and treasurer does not come directly from state coffers, this compensation is still set by the MOHELA board, which is entirely appointed and controlled by the Governor.

---

[9] Mr. Good argues (Br. 28-9) that the same could be said for MOHEFA, which was found to an "entity apart from the state."  *Menorah Med. Ctr*, 584 S.W. at 82. *Menorah Med. Ctr.* did not meaningfully analyze the composition of MOHEFA's board nor its impact on the arm of the state analysis.

MOHELA can own property, but subject to state control.  MOHELA does have the ability to own and control property.  *See, e.g.*, RSMo. § 173.385(5) (MOHELA may "maintain an office at such place or places in the state of Missouri as it may designate[.]"); RSMo. § 173.385(14) (MOHELA may "acquire, hold and dispose of personal property to carry out its purposes[.]").  But these rights are subject to significant restrictions imposed by the State of Missouri, as recognized by the district court.  For example, the State of Missouri imposes restrictions on how MOHELA conducts business, including (i) limitations on investments (RSMo. § 173.385.1(13)) and the contingency that the MDHE approve MOHELA's ability to sell student loans (RSMo. § 173.385.1(8)), which is needed for MOHELA's bond financing, (ii) required distributions to the LCD Fund (RSMo. § 173.392), (iii) limitations on Stafford loan origination (RSMo. § 173.387), (iv) limitations on the types, terms, and nature of bond issuances (RSMo. § 173.390), and (v) required compliance with Missouri's Sunshine Law (RSMo. § 610.020).  Similarly, MOHELA must file an annual report with the MDHE of its previous year's income, expenditures, and bonds or other forms of indebtedness issued and outstanding. RSMo. § 173.445.  Finally, the State of Missouri preserved its authority "over assets of" MOHELA, RSMo. §173.420, and may "abolish" MOHELA at its pleasure.  *See Cas. Reciprocal Exch. v. Missouri Emps. Mut. Ins. Co.*, 956 S.W.2d 249, 255 (Mo.

banc 1997) (noting that State could abolish public corporation by repealing act or setting terms of public corporation's dissolution).

MOHELA can enter into contracts approved by the Governor-appointed board.  MOHELA is vested with the ability to enter into contracts to carry out its purpose.  RSMo. § 173.385.1(11).  But MOHELA's autonomy to do so is expressly limited by the requirement that those contracts be approved by a quorum of MOHELA's board, appointed by and subject to the Governor's control.  *See* RSMo. § 173.365 ("Four members of the Authority shall constitute a quorum for the purpose of conducting business and exercising the powers of the Authority.  Action may be taken by the authority upon the affirmative vote of at least four of its members.").  Thus, while MOHELA does have the ability to enter into contracts, its autonomy and discretion to do so is subject to state control by virtue of the constituency of MOHELA's board.

MOHELA may establish and set policies to further its "essential public function," subject to statutory limitations.  MOHELA is authorized to "adopt bylaws for the regulation of its affairs and the conduct of its business," RSMo. § 173.385.1(11), as well as to enact policies to further its state-mandated purposes. Nevertheless, the State of Missouri imposes restrictions on how MOHELA conducts business and its policy-making as it pertains to its business, including (i) limitations on investments (RSMo. § 173.385.1(13)), (ii) required distributions to the LCD Fund

(RSMo. § 173.392), (iii) limitations on Stafford loan origination (RSMo. § 173.387), and (iv) limitations on the type, terms, and nature of bond issuances (RSMo. § 173.390).

MOHELA can "sue and be sued" only in a court having jurisdiction.  RSMo. § 173.385(3) vests MOHELA with the power "[t]o sue and be sued and to prosecute and defend, at law or in equity, *in any court having jurisdiction of the subject matter and of the parties*."  (emphasis added).  This ability alone, however, does not compel the conclusion that an entity is not an arm of the state.  *See, e.g., State Highway Comm'n of Wyoming v. Utah Const. Co.*, 278 U.S. 194, 197-99 (1929) (finding suit was "in effect, against the state" even where statute provided entity could sue or be sued).  The Eighth Circuit Court of Appeals acknowledged this very same factor and held that the ability to sue or be sued did not "preclude a finding that [the entities] are arms of the State of Missouri," where state statutes greatly restricted the entities' operational independence and extensively regulated the way the entities carry out their limited purpose.  *Pub. Sch. Ret. Sys. of Missouri v. State St. Bank & Tr. Co.*, 640 F.3d 821, 827-28 (8th Cir. 2011).

On balance, the autonomy factor boils down to the degree of control that the State of Missouri exercises over MOHELA, and tilts towards the conclusion that MOHELA is an arm of the state.  The autonomy factor is "complex" in view of its assessment of a "broad range of considerations."  *Hennessey*, 53 F.4th at 536.  But

"[t]hese considerations are not an exhaustive list," and the final determination "hinges upon the degree of control the state exercises over the entity." *Id.* at 528, 536, n. 9 (quoting *Steadfast*, 507 F.3d at 1253). The district court reviewed a host of these considerations and, after properly balancing the same, concluded that "the control that the state exercises over MOHELA through the appointment of the board, limitations on financial expenditures, and requirements for spending and filing reports weighs slightly in favor of finding that MOHELA is an arm of the state." App. 192. Similarly, the *Gowens* court concluded MOHELA's autonomy was "not a close question" because "[t]he State of Missouri exercises significant oversight over MOHELA's decision-making and statutorily regulates MOHELA's functions and operations, including its leadership." 2020 WL 10180669, at *3. While it is a "complex" factor that "spans a broad range of considerations," the district court properly concluded that MOHELA is subject to significant state control and has limited autonomy. This Court should reach the same conclusion.

> **3.    The third factor, assessing MOHELA's finances, favors immunity or alternatively is neutral because MOHELA depends on state authorization to derive its funds, is subject to state requirements and requests for funds, and the state restricts MOHELA's ability to generate revenue.**

"In considering the finances factor a court must look to 'the amount of state funding the entity receives and consider whether the entity has the ability to issue bonds or levy taxes on its own behalf.'" *Hennessey*, 53 F.4th at 533 (quoting

*Steadfast*, 507 F.3d at 1253). "[I]f an entity cannot levy taxes *and* its ability to issue bonds is subject to state review or state procedures, this is also an indicator that the entity is an arm of the state." *Id.* (emphasis in original). "[A]n entity's ability to generate its own revenue so as not to need financial assistance from the state supports a finding that the entity is not an arm of the state." *Id.* "Finally, we consider the existence, or lack thereof, of regulations on how an entity may handle its finances and whether the entity's funds are classified as 'public funds.'" *Id.* (quoting *Steadfast*, 507 F.3d at 1254).

MOHELA does not receive direct funding from the State of Missouri. Nor does MOHELA have the right to levy taxes. MOHELA does have the ability to issue bonds; however, that authority is subject to limitations on the nature of bond issuances to revenue bonds (RSMo. § 173.390), the use of proceeds to finance student loans (RSMo. § 173.385(7)), to sell student loans only with state approval (RSMo. § 173.385(8)), and mandatory annual reporting of its bond issuances and other forms of indebtedness to the MDHE (RSMo. § 173.445). Absent the statutory mandate to ensure that Missouri postsecondary students have access to student loans, MOHELA would have no source of funds. MOHELA's funding is, therefore, inextricably tied to the State of Missouri where its ability to issue bonds is subject to state limitations and review, and where MOHELA cannot levy taxes. *See Hennessey*, 53 F.4th at 533 ("Likewise, if an entity cannot levy taxes *and* its ability

- 34 -

to issue bonds is subject to state review or state procedures, this is also an indicator that the entity is an arm of the state.") (citing *Sturdevant*, 218 F.3d at 1170) (emphasis in original). Moreover, the State of Missouri can, and has, imposed financial obligations on MOHELA, such as it did in 2007 when it required MOHELA to transfer $350 Million to the State via the LCD Fund. *See* RSMo. § 173.385.2. Finally, the State of Missouri has requested and MOHELA has provided $93 Million in scholarships and grant funding between 2010 and 2022. *See* https://perma.cc/4GR3-MDLD, at 10 (Accessed April 3, 2023). At the State's request, and as evidence of the continuing nature of MOHELA's contributions, MOHELA is scheduled to provide another $6 Million in July 2023.

The *Gowens* court considered MOHELA's source of funding, noting that "[w]hile MOHELA does not derive its funds directly from the State of Missouri, its ability to earn revenue arises from and depends on the authority granted to it by the Missouri legislature under the Missouri Higher Education Loan Authority Act." 2020 WL 10180669, at *3. "The Act mandates that MOHELA ensure that Missouri students have access to student loans." *Id.* "As a result, MOHELA can earn fees for servicing loans on behalf of [USDOE] and earn income by holding and servicing MOHELA-owned student loans and servicing student loans made by private lenders." *Id.* "Because Missouri law enables MOHELA to derive its funds,

MOHELA's funding is directly linked to the State of Missouri." *Id.* In the end, the *Gowens* court concluded that the factor "leans slightly in MOHELA's favor." *Id.*

The district court assessed MOHELA's finances and initially concluded that because "MOHELA does not receive state funding, can issue bonds (although circumscribed by the state), and cannot levy taxes[,] ... this consideration is neutral to slightly in favor of immunity." App. 193. The district court then considered, however, whether a judgment against MOHELA would be satisfied by the state treasury. *Id.* Finding that any such liability would be indirect, the district court concluded that this consideration weighed against a finding of Eleventh Amendment immunity. Finding this latter consideration an "important one," the district court held that the third factor weighed against immunity. App. 194.

Following the district court's decision, this Court decided *Hennessey* and clarified the prevailing test in this Circuit for arm of the state immunity. This inquiry regarding "whether a judgment against MOHELA would be satisfied by the state treasury" was not central to the Court's consideration of the third "finances factor"; rather, this consideration is found in the "second step" of the test, consideration of the "twin reasons" underlying the Eleventh Amendment, which come into play if the primary four factors "are in conflict and point in different directions." *Hennessey*, 53 F.4th at 528. Thus, consistent with this Court's recent opinion in *Hennessey*, MOHELA respectfully submits that the district court's original inkling that the

"finances factor" "is neutral to slightly in favor of immunity" should have prevailed. App. 193.

In summary, MOHELA respectfully submits that the best analysis supports the conclusion that the third "finances factor" weighs in favor of immunity or is neutral.

### 4. The fourth factor decidedly favors immunity because MOHELA is concerned primarily with state-wide affairs.

As to the fourth factor, the Court asks "whether the entity in question is concerned primarily with local or state affairs." *Hennessey*, 53 F.4th at 528 (quoting *Steadfast*, 507 F.3d at 1253). "In answering this question, [the Court] examine(s) the agency's function, composition, and purpose." *Id.* This factor weighs decidedly in favor of the conclusion that MOHELA is entitled to arm of the state immunity.

MOHELA's main function is as the sole state entity devoted to student loan financing and to "assure that all eligible postsecondary education students have access to student loans that are guaranteed or insured, or both[.]" RSMo. § 173.360. This is a state-wide, not local, mission. The composition of MOHELA's board is entirely appointed, either directly or indirectly, by the Governor of Missouri, and its board members come from various geographic parts of the State of Missouri. *Id.* Finally, another function or purpose of MOHELA is to "support the efforts of public colleges and universities to create and fund capital projects, and in order to support the Missouri technology corporation's ability to work with colleges and universities

in identifying opportunities for commercializing technologies, transferring technologies, and to develop, recruit, and retain entities engaged in innovative technologies[.]" *Id*. This activity triggers state-wide concerns, not local city or county matters, as found by the district court. App. 194-195; *see also MAP v. Bd. of Trustees*, No. 12-CV-02666-RM-KLM, 2013 WL 5386897, at *9 (D. Colo. Aug. 21, 2013), *report and recommendation adopted sub nom. MAP v. Bd. of Trustees for Colorado Sch. for the Deaf & Blind*, No. 12-CV-02666-RM-KLM, 2014 WL 3748185, at *9 (D. Colo. July 29, 2014) (finding factor weighed in favor of arm-of the state status because the Colorado School for the Deaf and the Blind and its board of trustees were created by the legislature to assist deaf and blind children residing in the state and to be a resource for state institutions). There is nothing about MOHELA that is in any way concerned with purely local affairs.

In the briefing before the district court, Mr. Good did not even address this factor. App. 117-130; App. 164. The district court properly noted that MOHELA was focused on "statewide matters[,]" and concluded that this factor weighed in MOHELA's favor. 194-95. And Mr. Good's opening brief gives short shrift to this factor, effectively conceding that it falls in MOHELA's favor.

Mr. Good concedes MOHELA's function and purpose to fund state-wide capital projects, but argues (Br. 42-3) that this factor is neutralized by the fact that MOHELA services student loans for "students throughout the country" and is

engaged in "nationwide activity."[10]   But the fact that MOHELA services student loans for borrowers outside Missouri does not alter the conclusion.   MOHELA's function and purpose is to further educational interests of the State of Missouri.   The fourth factor weighs in favor of Eleventh Amendment immunity.

*In summary,* MOHELA submits that the "primary" four factor test weighs in favor of MOHELA's entitlement to Eleventh Amendment immunity as an arm of the State of Missouri.   The <u>first</u> factor (character ascribed to MOHELA under state law) clearly favors immunity.   App. 191; *Gowens*, 2020 WL 10180669, at *2.   The <u>second</u> factor (MOHELA's autonomy) is nuanced, but the underlying consideration of "the degree of control the state exercises" over MOHELA favors of immunity.   App. 191; *Gowens*, 2020 WL 10180669, at *3 ("MOHELA's autonomy, by contrast, is not a close question.").   The <u>third</u> factor (MOHELA's finances) should weigh in favor of immunity or be neutral.   *Gowens*, 2020 WL 10180669, at *4.   And finally, the <u>fourth</u> factor (whether MOHELA is concerned with state-wide matters) definitively favors immunity.   App. 194-195.   These four primary factors support the finding that MOHELA is an arm of the State entitled to Eleventh Amendment

---

[10] Mr. Good's reliance (Br. 42) on *Sikkenga* is misplaced.   The entity in question in that case, Associated Regional and University Pathologists, was not registered as a non-profit, issued stock, was licensed in nine states, and marketed its services to all fifty states.   472 F.3d at 719.

immunity.   The district court's well-reasoned analysis and decision should be affirmed.[11]

**C.    The Court need not proceed to the second step of the analysis, the "twin reasons" underlying the Eleventh Amendment, but those considerations do not sway the ultimate result that MOHELA is an arm of the state.**

Because the four "primary factors" are not in conflict and are dispositive, the Court need not proceed to the second step of the analysis.   Should the Court do so, however, the "twin reasons" underlying the Eleventh Amendment are, at best, neutral.

The first consideration is "avoiding an afront to the dignity of the state." *Hennessey*, 53 F.4th at 529.    As addressed *supra*, MOHELA is a public

---

[11] In addition, the district court's decision and the *Gowens* decision are in line with a number of cases around the country involving student loan-related entities (like MOHELA) holding that Eleventh Amendment immunity protects such entities from private suits under federal consumer protection statutes in the student loan context.  *See, e.g.*, *Kozaczek v. New York Higher Educ. Services Corp.*, 503 Fed. Appx. 60 (2d Cir. 2012) (New York Higher Education Services Corporation was a state agency, and the Eleventh Amendment barred debtor's FDCPA claim); *Gordon v. Duncan*, 2010 WL 1462555 (D.Or. 2010) (California Student Aid Commission is an agency of the state and the Board of Trustees of California State University is an "arm of the state" and both state entities are entitled to sovereign immunity from debtor's claims under FDCPA and certain other federal statutes); *Little v. Tennessee Student Assistance Corp.*, 537 F. Supp. 2d 942 (W.D. Tenn. 2008) (Tennessee Student Assistance Corporation is a state entity entitled to sovereign immunity from debtor's claims under FDCPA)*; Sorrell v. Illinois Student Assistance Comm'n*, 314 F. Supp. 2d 813 (C.D. Ill. 2004) (Illinois Student Assistance Commission is a state agency, and therefore debtor's claims under the FDCPA and the FCRA are barred by the Eleventh Amendment).

instrumentality of the State of Missouri. "Government-created and -controlled corporations are" often "part of the Government itself." *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 397 (1995). Such corporations exist when the Government (1) "creates [the] corporation by special law," (2) "for the furtherance of governmental objectives," and (3) "retains for itself permanent authority to appoint a majority of the directors." *Id.* at 399. "[T]he practical reality of [government] control and supervision prevails" over corporate labels. *Dep't of Transp. v. Ass'n of Am. Railroads*, 575 U.S. 43, 55 (2015).

First, the Missouri legislature created MOHELA by special law. RSMo. § 173.360. Second, Missouri declares that "the exercise by [MOHELA] of the powers conferred" on it, which include ensuring access to loans for Missouri students, is "the performance of an essential public function." *Id.* Third, the Governor appoints five of MOHELA's seven board members, the remaining two are officials of the MDHE, the state agency to which MOHELA is "assigned," and all seven are "remov[able] by the governor" for cause. *Id.*

Other considerations demonstrate the State of Missouri's ongoing control over MOHELA, an entity it created. The State established MOHELA's powers, RSMo. § 173.385, and in doing so controls MOHELA by limiting it to only those powers. Missouri "assigned" MOHELA to the MDHE, to which MOHELA must make annual financial reports of MOHELA's finances and which controls the sale of

MOHELA's loans. RSMo. § 173.445, RSMo. § 173.385.1(8). The State of Missouri has required MOHELA to contribute hundreds of millions of dollars to state initiatives, including the LCD Fund and state scholarship and grant programs. Additionally, Missouri preserved its authority "over assets of" MOHELA, RSMo. § 173.420, and may "abolish" MOHELA at its pleasure, *see Cas. Reciprocal Exch.*, 956 S.W.2d at 255. Notably, MOHELA qualifies as a "public entity" entitled to sovereign immunity from tort claims under state law. *Id.* at 254 (discussing sovereign-immunity factors); *see also Dykes v. Missouri Higher Educ. Loan Auth.*, No. 4:21-CV-00083-RWS, 2021 WL 3206691, at *6 (E.D. Mo. July 29, 2021) (finding that MOHELA, as a public entity, was entitled to immunity under Missouri statute for tort claims); *Todd v. Curators of Univ. of Missouri*, 147 S.W.2d 1063, 1064 (Mo. 1941) (finding immunity for entity that "may sue and be sued").

Mr. Good does not offer persuasive arguments that the exercise of federal jurisdiction would not impose an affront to the dignity of the State of Missouri. In addition to rehashing his prior arguments, Mr. Good cites (Br. 45) to *U.S. ex rel. Oberg v. Pennsylvania Higher Educ. Assistance Agency*, 804 F.3d 646, 677 (4th Cir. 2015), a Fourth Circuit Court of Appeals decision employing a different Eleventh Amendment immunity test and analyzing the Pennsylvania Higher Education Assistance Agency ("PHEAA"). The *Oberg* court's conclusion that exercising federal jurisdiction over PHEAA was not "an affront to Pennsylvania's sovereign

dignity" rested on the court's conclusion that neither the Governor nor legislature set PHEAA's policies or fiscal and operational decisions. 804 F.3d at 659-60, 677. But unlike PHEAA, the State of Missouri imposes significant control on MOHELA, as discussed herein, and expressly limits MOHELA's financial and operational independence. *Oberg* does not support Mr. Good's arguments here. Put simply, exercising federal jurisdiction over MOHELA would act as an affront to the State of Missouri.

The second consideration is "avoiding state liability for any judgment against the entity." *Hennessey*, 53 F.4th at 528. While the State of Missouri is not directly responsible in the first instance for a judgment against MOHELA, a judgment against MOHELA could impact the State of Missouri's fisc.

MOHELA transfers money to Missouri in two ways. First, the State of Missouri has the power to require MOHELA to transfer funds, as it did in 2007 when it created the LCD Fund. MOHELA has given $245 million to the State's LCD Fund. RSMo. § 173.392.2(1); "Financial Statements: Higher Education Loan Authority of the State of Missouri As of and for the Years Ended June 30, 2022 and 2021 With Reports of Independent Auditors," MOHELA, at 20, available at https://perma.cc/2F8G-WWWV (Accessed April 3, 2023); RSMo. § 173.385.2 Second, Missouri has authorized MOHELA to provide student financial aid, RSMo. §173.385.1(19), and MOHELA has done so by contributing, at the Governor's

request, nearly $100 million over the last 12 years to the State's scholarship and grant programs.  *See "*Grants and Scholarships," MISSOURI DEP'T OF HIGHER EDUC. AND WORKFORCE DEVELOPMENT, https://perma.cc/4GR3-MDLD, (listing the State's programs) (Accessed April 3, 2023).  As recently noted by the Eighth Circuit Court of Appeals, "financial impact on MOHELA ... threatens to independently impact Missouri" by preventing or delaying MOHELA's contributions to "the LCD Fund."  *Nebraska*, 52 F.4th at 1047.  A judgment against MOHELA threatens financial injury to the State of Missouri.  With that said, MOHELA acknowledges this Court's recent statement that "[t]he focus of this judgment liability issue is on direct legal liability and not on any indirect or practical loss of funds to the state." *Hennessey*, 53 F.4th at 529.

Even if this final "reason" in the immunity test is found to weigh against MOHELA, it is the only factor that falls in that category.  Thus, this factor alone is insufficient to tip the balance towards a finding against MOHELA's arm of the state status.

## CONCLUSION

The district court did not err in finding that the MOHELA is an arm of the State of Missouri entitled to Eleventh Amendment immunity. Judgment on the pleadings in MOHELA's favor was proper, and the district court's order should be affirmed.

April 6, 2023

Respectfully submitted,

**THOMPSON COBURN LLP**

By */s/ Matthew D. Guletz*
    Matthew D. Guletz,
    One US Bank Plaza
    St. Louis, Missouri 63101
    314-552-6000
    FAX 314-552-7000
    mguletz@thompsoncoburn.com

*Counsel for Defendant-Appellee Higher Education Loan Authority of the State of Missouri*

## STATEMENT REGARDING ORAL ARGUMENT

Mr. Good requested oral argument.  As Mr. Good indicated, districts courts have reached conflicting decisions on MOHELA's arm of the state status.  As to the claim against USDOE, various circuit courts have reached conflicting decisions on the question of whether the FCRA waives federal agencies' sovereign immunity.  Thus, oral argument would be beneficial to the Court's consideration and resolution of this appeal.

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the forgoing brief complies with the type-volume limitations of FRAP 32(a)(7)(B).  The brief is composed in a 14-point proportional typeface, Times New Roman.  As calculated by my word processing software (Microsoft Word, Version 2202), the brief (excluding those parts permitted to be excluded under the Federal Rules of Appellate Procedure and this Court's rules), contains 10,746 words.

/s/ Matthew D. Guletz
Matthew D. Guletz

**CERTIFICATE OF SERVICE**

I hereby certify that on April 6, 2023, I electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Tenth Circuit by using the CM/ECF system. I further certify that all participants in the case are registered CM/ECF users who will be served by the appellate CM/ECF system.

/s/ Matthew D. Guletz
Matthew D. Guletz

**ADDENDUM**

**STATUTORY ADDENDUM**

**RSMo. § 173.005** provides:

1. There is hereby created a "Department of Higher Education and Workforce Development", and the division of higher education of the department of education is abolished and all its powers, duties, functions, personnel and property are transferred as provided by the Reorganization Act of 1974, Appendix B, RSMo.

2. The commission on higher education is abolished and all its powers, duties, personnel and property are transferred by type I transfer to the "Coordinating Board for Higher Education", which is hereby created, and the coordinating board shall be the head of the department. The coordinating board shall consist of nine members appointed by the governor with the advice and consent of the senate, and not more than five of its members shall be of the same political party. None of the members shall be engaged professionally as an educator or educational administrator with a public or private institution of higher education at the time appointed or during his term. Moreover, no person shall be appointed to the coordinating board who shall not be a citizen of the United States, and who shall not have been a resident of the state of Missouri two years next prior to appointment, and at least one but not more than two persons shall be appointed to said board from each congressional district. The term of service of a member of the coordinating board shall be six years and said members, while attending the meetings of the board, shall be reimbursed for their actual expenses. Notwithstanding any provision of law to the contrary, nothing in this section relating to a change in the composition and configuration of congressional districts in this state shall prohibit a member who is serving a term on August 28, 2011, from completing his or her term. The coordinating board may, in order to carry out the duties prescribed for it in subsections 1, 2, 3, 7, and 8 of this section, employ such professional, clerical and research personnel as may be necessary to assist it in performing those duties, but this staff shall not, in any fiscal year, exceed twenty-five full-time equivalent employees regardless of the source of funding. In addition to all other powers, duties and functions transferred to it, the coordinating board for higher education shall have the following duties and responsibilities:

(1) The coordinating board for higher education may approve, not approve, or provisionally approve proposed new degree programs to be offered by the state institutions of higher education. The coordinating board may authorize a degree program outside an institution's coordinating board-approved mission only when the coordinating board has received clear evidence that the institution proposing to offer the program:

(a) Made a good-faith effort to explore the feasibility of offering the program in collaboration with an institution the mission of which includes offering the program;

(b) Is contributing substantially to the goals in the coordinating board's coordinated plan for higher education;

(c) Has the existing capacity to ensure the program is delivered in a high-quality manner;

(d) Has demonstrated that the proposed program is needed;

(e) Has a clear plan to meet the articulated workforce need; and

(f) Such other factors deemed relevant by the coordinating board;

(2) The governing board of each public institution of higher education in the state shall have the power and authority to confer degrees in chiropractic, osteopathic medicine, and podiatry only in collaboration with the University of Missouri, provided that such collaborative agreements are approved by the governing board of each institution and that in these instances the University of Missouri will be the degree-granting institution. Should the University of Missouri decline to collaborate in the offering of such programs, any of these institutions may seek approval of the program through the coordinating board for higher education's comprehensive review process when doing so would not unnecessarily duplicate an existing program, collaboration is not feasible or a viable means of meeting the needs of students and employers, and the institution has the academic and financial capacity to offer the program in a high quality manner;

(3) The coordinating board for higher education may promote and encourage the development of cooperative agreements between Missouri public four-year institutions of higher education which do not offer graduate degrees and Missouri public four-year institutions of higher education which do offer graduate degrees for the purpose of offering graduate degree programs on campuses of those public four-year institutions of higher education which do not otherwise offer graduate degrees. Such agreements shall identify the obligations and duties of the parties, including assignment of administrative responsibility. Any diploma awarded for graduate degrees under such a cooperative agreement shall include the names of both institutions inscribed thereon. Any cooperative agreement in place as of August 28, 2003, shall require no further approval from the coordinating board for higher education. Any costs incurred with respect to the administrative provisions of this

subdivision may be paid from state funds allocated to the institution assigned the administrative authority for the program. The provisions of this subdivision shall not be construed to invalidate the provisions of subdivision (1) of this subsection;

(4) In consultation with the heads of the institutions of higher education affected and against a background of carefully collected data on enrollment, physical facilities, manpower needs, and institutional missions, the coordinating board for higher education shall establish guidelines for appropriation requests by those institutions of higher education; however, other provisions of the Reorganization Act of 1974 notwithstanding, all funds shall be appropriated by the general assembly to the governing board of each public four-year institution of higher education which shall prepare expenditure budgets for the institution;

(5) No new state-supported senior colleges or residence centers shall be established except as provided by law and with approval of the coordinating board for higher education;

(6) The coordinating board for higher education shall establish admission guidelines consistent with institutional missions;

(7) The coordinating board for higher education shall require all public two-year and four-year higher education institutions to replicate best practices in remediation identified by the coordinating board and institutions from research undertaken by regional educational laboratories, higher education research organizations, and similar organizations with expertise in the subject, and identify and reduce methods that have been found to be ineffective in preparing or retaining students or that delay students from enrollment in college-level courses;

(8) The coordinating board shall establish policies and procedures for institutional decisions relating to the residence status of students;

(9) The coordinating board shall establish guidelines to promote and facilitate the transfer of students between institutions of higher education within the state and, with the assistance of the committee on transfer and articulation, shall require all public two-year and four-year higher education institutions to create by July 1, 2014, a statewide core transfer library of at least twenty-five lower division courses across all institutions that are transferable among all public higher education institutions. The coordinating board shall establish policies and procedures to ensure such courses are accepted in transfer among public institutions and treated as equivalent to similar courses at the receiving institutions. The coordinating board shall develop

a policy to foster reverse transfer for any student who has accumulated enough hours in combination with at least one public higher education institution in Missouri that offers an associate degree and one public four-year higher education institution in the prescribed courses sufficient to meet the public higher education institution's requirements to be awarded an associate degree. The department of elementary and secondary education shall maintain the alignment of the assessments found in section 160.518 and successor assessments with the competencies previously established under this subdivision for entry-level collegiate courses in English, mathematics, foreign language, sciences, and social sciences associated with an institution's general education core;

(10) The coordinating board shall collect the necessary information and develop comparable data for all institutions of higher education in the state. The coordinating board shall use this information to delineate the areas of competence of each of these institutions and for any other purposes deemed appropriate by the coordinating board;

(11) Compliance with requests from the coordinating board for institutional information and the other powers, duties and responsibilities, herein assigned to the coordinating board, shall be a prerequisite to the receipt of any funds which the coordinating board is responsible for administering;

(12) If any institution of higher education in this state, public or private, willfully fails or refuses to follow any lawful guideline, policy or procedure established or prescribed by the coordinating board, or knowingly deviates from any such guideline, or knowingly acts without coordinating board approval where such approval is required, or willfully fails to comply with any other lawful order of the coordinating board, the coordinating board may, after a public hearing, withhold or direct to be withheld from that institution any funds the disbursement of which is subject to the control of the coordinating board, or may remove the approval of the institution as an approved institution within the meaning of section 173.1102. If any such public institution willfully disregards board policy, the commissioner of higher education may order such institution to remit a fine in an amount not to exceed one percent of the institution's current fiscal year state operating appropriation to the board. The board shall hold such funds until such time that the institution, as determined by the commissioner of higher education, corrects the violation, at which time the board shall refund such amount to the institution. If the commissioner determines that the institution has not redressed the violation within one year, the fine amount shall be deposited into the general revenue fund, unless the institution appeals such decision to the full coordinating board, which shall have the authority

to make a binding and final decision, by means of a majority vote, regarding the matter. However, nothing in this section shall prevent any institution of higher education in this state from presenting additional budget requests or from explaining or further clarifying its budget requests to the governor or the general assembly;

(13) In recognition of institutions that meet the requirements of subdivision (2), (3), or (4) of subsection 1 of section 173.616, are established by name as an educational institution in Missouri, and are authorized to operate programs beyond secondary education for purposes of authorization under 34 CFR 600.9, the coordinating board for higher education shall maintain and publish on its website a list of such postsecondary educational institutions; and

(14)(a) As used in this subdivision, the term **"out-of-state public institution of higher education"** shall mean an education institution located outside of Missouri that:

a. Is controlled or administered directly by a public agency or political subdivision or is classified as a public institution by the state;

b. Receives appropriations for operating expenses directly or indirectly from a state other than Missouri;

c. Provides a postsecondary course of instruction at least six months in length leading to or directly creditable toward a degree or certificate;

d. Meets the standards for accreditation by an accrediting body recognized by the United States Department of Education or any successor agency; and

e. Permits faculty members to select textbooks without influence or pressure by any religious or sectarian source.

(b) No later than July 1, 2008, the coordinating board shall promulgate rules regarding:

a. The board's approval process of proposed new degree programs and course offerings by any out-of-state public institution of higher education seeking to offer degree programs or course work within the state of Missouri; and

b. The board's approval process of degree programs and courses offered by any out-of-state public institutions of higher education that, prior to July 1, 2008, were

approved by the board to operate a school in compliance with the provisions of sections 173.600 to 173.618. The rules shall ensure that, as of July 1, 2008, all out-of-state public institutions seeking to offer degrees and courses within the state of Missouri are evaluated in a manner similar to Missouri public higher education institutions. Such out-of-state public institutions shall be held to standards no lower than the standards established by the coordinating board for program approval and the policy guidelines of the coordinating board for data collection, cooperation, and resolution of disputes between Missouri institutions of higher education under this section. Any such out-of-state public institutions of higher education wishing to continue operating within this state must be approved by the board under the rules promulgated under this subdivision. The coordinating board may charge and collect fees from out-of-state public institutions to cover the costs of reviewing and assuring the quality of programs offered by out-of-state public institutions. Any rule or portion of a rule, as that term is defined in section 536.010, that is created under the authority delegated in this section shall become effective only if it complies with and is subject to all of the provisions of chapter 536 and, if applicable, section 536.028. This section and chapter 536 are nonseverable and if any of the powers vested with the general assembly under chapter 536 to review, to delay the effective date, or to disapprove and annul a rule are subsequently held unconstitutional, then the grant of rulemaking authority and any rule proposed or adopted after August 28, 2007, shall be invalid and void.

(c) Nothing in this subdivision or in section 173.616 shall be construed or interpreted so that students attending an out-of-state public institution are considered to be attending a Missouri public institution of higher education for purposes of obtaining student financial assistance.

3. The coordinating board shall meet at least four times annually with an advisory committee who shall be notified in advance of such meetings. The coordinating board shall have exclusive voting privileges. The advisory committee shall consist of thirty-two members, who shall be the president or other chief administrative officer of the University of Missouri; the chancellor of each campus of the University of Missouri; the president of each state-supported four-year college or university, including Harris-Stowe State University, Missouri Southern State University, Missouri Western State University, and Lincoln University; the president of State Technical College of Missouri; the president or chancellor of each public community college district; and representatives of each of five accredited private institutions selected biennially, under the supervision of the coordinating board, by the presidents of all of the state's privately supported institutions; but always to include at least one representative from one privately supported community college, one

privately supported four-year college, and one privately supported university. The conferences shall enable the committee to advise the coordinating board of the views of the institutions on matters within the purview of the coordinating board.

4. The University of Missouri, Lincoln University, and all other state-governed colleges and universities, chapters 172, 174, 175, and others, are transferred by type III transfers to the department of higher education and workforce development subject to the provisions of subsection 2 of this section.

5. The state historical society, chapter 183, is transferred by type III transfer to the University of Missouri.

6. The state anatomical board, chapter 194, is transferred by type II transfer to the department of higher education and workforce development.

7. All the powers, duties and functions vested in the division of public schools and state board of education relating to community college state aid and the supervision, formation of districts and all matters otherwise related to the state's relations with community college districts and matters pertaining to community colleges in public school districts, chapters 163, 178, and others, are transferred to the coordinating board for higher education by type I transfer. Provided, however, that all responsibility for administering the federal-state programs of vocational-technical education, except for the 1202a postsecondary educational amendments of 1972 program, shall remain with the department of elementary and secondary education. The department of elementary and secondary education and the coordinating board for higher education shall cooperate in developing the various plans for vocational-technical education; however, the ultimate responsibility will remain with the state board of education.

8. All the powers, duties, functions, and properties of the state poultry experiment station, chapter 262, are transferred by type I transfer to the University of Missouri, and the state poultry association and state poultry board are abolished. In the event the University of Missouri shall cease to use the real estate of the poultry experiment station for the purposes of research or shall declare the same surplus, all real estate shall revert to the governor of the state of Missouri and shall not be disposed of without legislative approval.

**RSMo. § 173.007** provides:

The coordinating board for higher education shall appoint, and shall fix the powers, duties, and compensation within the limits of appropriations made for that purpose of, a commissioner of higher education, who shall be the chief administrative officer of the coordinating board.

**RSMo. § 173.360** provides:

In order to assure that all eligible postsecondary education students have access to student loans that are guaranteed or insured, or both, and in order to support the efforts of public colleges and universities to create and fund capital projects, and in order to support the Missouri technology corporation's ability to work with colleges and universities in identifying opportunities for commercializing technologies, transferring technologies, and to develop, recruit, and retain entities engaged in innovative technologies, there is hereby created a body politic and corporate to be known as the "Higher Education Loan Authority of the State of Missouri". The authority is hereby constituted a public instrumentality and body corporate, and the exercise by the authority of the powers conferred by sections 173.350 to 173.450[1] shall be deemed to be the performance of an essential public function. The authority shall consist of seven members, five of whom shall be appointed by the governor by and with the advice and consent of the senate, each of whom shall be a resident of the state; and a member of the coordinating board; and the commissioner of higher education. In making appointments to the authority, the governor shall take into consideration nominees recommended to him for appointment by the chairman of the coordinating board. Two of the appointed members shall be representatives of higher education institutions, one public and one private, in Missouri, two of the appointed members shall be representatives of lending institutions in Missouri, and one of the appointed members shall be representative of the public. The members of the authority first appointed by the governor shall be appointed to serve for terms of one, two, three, four and five years, respectively, from the date of appointment, or until their successors shall have been appointed and shall have qualified. The initial term of each member is to be designated by the governor at the time of making the appointment. Upon the expiration of the initial terms of office, successor members shall be appointed for terms of five years and shall serve until their successors shall have been appointed and shall have qualified. Any member shall be eligible for reappointment. The governor shall fill any vacancy in the authority for the members he appoints for the remainder of the unexpired term. Any member of the authority may be removed by the governor for misfeasance, malfeasance, willful neglect of

duty, or other cause after notice and a public hearing unless the notice or hearing shall be expressly waived in writing.

**RSMo. § 173.365** provides:

Four members of the authority shall constitute a quorum for the purpose of conducting business and exercising the powers of the authority. Action may be taken by the authority upon the affirmative vote of at least four of its members. Members may participate in a meeting by means of conference telephone or similar communications equipment whereby all persons participating in or attending the meeting can communicate with each other, and participation in a meeting in this manner shall constitute presence in person at the meeting for all purposes. Each meeting of the authority for any purpose whatsoever shall be open to the public. Notice of meetings shall be given as provided in the bylaws of the authority. The proceedings and actions of the authority shall comply with all statutory requirements respecting the conduct of public business by a public agency. Members of the authority shall receive no compensation for services but shall be entitled to reimbursement for necessary expenses, including traveling and lodging expenses, incurred in the discharge of their duties. Any payment for expenses shall be paid from funds of the authority.

**RSMo. § 173.370** provides:

1. The chairman of the coordinating board shall call and convene the initial organizational meeting of the authority and shall serve as its chairman pro tem. At the initial meeting and annually thereafter, the authority shall elect one of its members as chairman and one as vice chairman. In addition, at the initial meeting and annually thereafter, the authority shall appoint a secretary and a treasurer either of whom may be a member of the authority and, if not a member of the authority, shall receive such compensation as shall be fixed from time to time by action of the authority. The authority may appoint an executive director who shall not be a member of the authority and who shall serve at its pleasure. If an executive director is appointed, he shall receive such compensation as shall be fixed from time to time by action of the authority. The authority may designate the secretary to act in lieu of the executive director. The secretary shall keep a record of the proceedings of the authority and shall be the custodian of all books, documents, and papers filed with the authority, the minute books or journal thereof, and its official seal. The secretary may cause copies to be made of all minutes and other records and documents of the authority and may give certificates under the official seal of the authority to the effect that the copies are true and correct copies, and all persons dealing with the authority

may rely on such certificates. The authority, by resolution duly adopted, shall fix the powers and duties of its executive director as it may from time to time deem proper and necessary.

2. The executive director, with approval of the authority, may hire such additional employees as may be needed to carry out the functions and purposes of the authority. These employees shall receive such compensation as shall be fixed from time to time by action of the authority.

**RSMo. § 173.385** provides:

1. The authority shall have the following powers, together with all powers incidental thereto or necessary for the performance thereof:

(1) To have perpetual succession as a body politic and corporate;

(2) To adopt bylaws for the regulation of its affairs and the conduct of its business;

(3) To sue and be sued and to prosecute and defend, at law or in equity, in any court having jurisdiction of the subject matter and of the parties;

(4) To have and to use a corporate seal and to alter the same at pleasure;

(5) To maintain an office at such place or places in the state of Missouri as it may designate;

(6) To issue bonds or other forms of indebtedness to obtain funds to purchase student loan notes or finance student loans, or both, including those which are guaranteed under the provisions of sections 173.095 to 173.187, or under the provisions of the federal Higher Education Act of 1965, as amended, or secondary education loans, or scholarships which have been converted to loans under the Missouri teacher education scholarship program provided for in sections 160.276 to 160.283. Such bonds or other forms of indebtedness shall be payable from and secured by a pledge of revenues derived from or by reason of the ownership of student loan notes or financing of student loans, or both, and investment income or shall be payable from and secured as may be designated in a bond resolution authorized by the authority. Such bonds or other forms of indebtedness shall not constitute a debt or liability of the state of Missouri or of any political subdivision thereof;

(7) To cause proceeds of any bond or any other form of indebtedness to be used to purchase student loan notes or finance student loans, or both, including those which are guaranteed under section 173.110, or guaranteed under the federal Higher Education Act of 1965, as amended, or secondary education loans, or scholarships which have been converted to loans under the Missouri teacher education scholarship program provided for in sections 160.276 to 160.283;

(8) To sell or enter into agreements to sell student loan notes acquired pursuant to subdivision (7) of this section, and any agreement to sell student loan notes guaranteed under section 173.110 shall be subject to prior approval of the department. Such agreements to sell student loan notes shall be limited only by the terms of the bond resolution authorizing the issue of the bonds or other forms of indebtedness, but shall not be limited by any other provision of law limiting the sale of such student loan notes;

(9) To transfer assets of the authority to the Lewis and Clark discovery fund established in section 173.392;

(10) To accept appropriations, gifts, grants, bequests, and devises and to utilize or dispose of the same to carry out its purpose;

(11) To make and execute contracts, releases, compromises, and other instruments necessary or convenient for the exercise of its powers, or to carry out its purpose;

(12) To collect reasonable fees and charges in connection with making and servicing its loans, notes, bonds, obligations, commitments, and other evidences of indebtedness, and in connection with providing technical, consultative and project assistant services. Such fees and charges shall be used to pay the costs of the authority;

(13) To invest any funds not required for immediate disbursement in obligations of the state of Missouri or of the United States government or any instrumentality thereof, the principal and interest of which are guaranteed by the state of Missouri, or the United States government or any instrumentality thereof, or certificates of deposit or time deposits of federally insured banks, or federally insured savings and loan associations or of insured credit unions, or, with respect to moneys pledged or held under a trust estate or otherwise available for the owners of bonds or other forms of indebtedness, any investment authorized under the bond resolution governing the security and payment of such obligations or repurchase agreements for the specified investments;

(14) To acquire, hold and dispose of personal property to carry out its purposes;

(15) To enter into agreements or other transactions with any federal or state agency, any person and any domestic or foreign partnership, corporation, association or organization;

(16) To take any necessary actions to be qualified to issue tax-exempt bonds or other forms of tax-exempt indebtedness pursuant to the applicable provisions of the Internal Revenue Code of 1986, as amended, including the issuance of such bonds to fulfill the obligations of the authority under subsection 2 of this section;

(17) To take any necessary actions to be qualified to issue bonds or other forms of indebtedness, the interest on which is not exempt from federal income taxation, including the issuance of such bonds to fulfill the obligations of the authority under subsection 2 of this section;

(18) To service student loans for any owner thereof, regardless of whether such student loans are originated in this state or out of this state;

(19) To create, acquire, contribute to, or invest in any type of financial aid program that provides grants and scholarships to students.

2. The authority shall distribute three hundred fifty million dollars of assets of the authority to the Lewis and Clark discovery fund established in section 173.392 as follows: two hundred thirty million dollars no later than September 15, 2007; five million dollars by December 31, 2007; and five million dollars each quarter thereafter ending September 30, 2013. Any investment earnings on the moneys in the Lewis and Clark discovery fund shall be credited against the next distribution by the authority and shall thereby reduce the amount of any such distribution by the authority. The authority shall make any distributions to the Lewis and Clark discovery fund pursuant to the dates scheduled in this subsection, provided, however, that the date of any such distribution may be delayed by the authority if the authority determines that any such distribution may materially adversely effect the services and benefits provided Missouri students or residents in the ordinary course of the authority's business, the borrower benefit programs of the authority, or the economic viability of the authority. Notwithstanding the ability of the authority to delay any distribution required by this subsection, the distribution of the entire three hundred fifty million dollars of assets by the authority to the Lewis and Clark discovery fund shall be completed no later than September 30, 2013, unless

otherwise approved by the authority and the commissioner of the office of administration.

3. No member of the authority who lawfully acts or votes on any agreement or other matter authorized under the powers granted to the authority under this section shall incur any personal liability as a result of such lawful deliberations, acts, or votes, and such members shall be immune from suit for such deliberations, acts, or votes. In no event shall such deliberations, acts, or votes constitute a conflict of interest under section 173.380.

4. Notwithstanding any provision of law to the contrary, in the event of the initial distribution of two hundred thirty million dollars of assets by the authority to the Lewis and Clark discovery fund created in section 173.392, the director of the department of economic development shall allocate to and reserve for the authority during the year of such first distribution and in at least each of the next fourteen years thereafter a percentage of the state ceiling under sections 108.500 to 108.532, which percentage shall at a minimum be equal to one and one-half percent less than the average percentage of the authority's allocation of state ceiling for the two calendar years 2005 and 2006 calculated annually. The dollar amount of state ceiling to be received by the authority as determined under the provisions of this subsection for calendar year 2014 and later years, not to exceed calendar year 2021, shall be reduced in any calendar year by the percentage of the three hundred fifty million dollars not yet distributed by the authority to the Lewis and Clark discovery fund by the preceding calendar year end.

**RSMo. § 173.387** provides:

Notwithstanding any other provision of law, the authority shall not have the power or authority to cause any asset of the authority to be used for the payment of debt incurred by the state, and the authority shall not have the power or authority to distribute any asset of the authority to any fund of the state of Missouri for the purpose of payment of debt incurred by the state.

**RSMo. § 173.390** provides:

Bonds of the authority may be issued as serial bonds, as term bonds, or as a combination of both types. All such bonds issued by the authority shall be payable solely from and secured by a pledge of revenues derived from or by reason of the ownership of student loan notes and investment income or as may be designated in

a bond resolution authorized by the authority. Such bonds may be executed and delivered by the authority at any time and from time to time, may be in such form and denomination or denominations and of such terms and maturities, may be in fully registered form or in bearer form, registrable either as to principal or interest or both, may bear such conversion privileges, may be payable in such installment or installments and at such time or times not exceeding forty years from the date of the issuance thereof, may be payable at such place or places whether within or without the state of Missouri, may bear interest at such rate or rates per annum as determined by the authority without regard to section 108.170, may be made payable at such time or times and at such place or places, may be evidenced in such manner, may be executed by such officers of the authority, may have attached thereto, in the case of bearer bonds or bonds registrable as to principal only, interest coupons bearing the facsimile signature of the secretary of the authority, and may contain such provisions not inconsistent herewith, all as shall be provided in the bond resolution or resolutions of the authority whereunder the bonds shall be authorized to be issued. If deemed advisable by the authority, there may be retained in the bond resolution under which any bonds of the authority are authorized to be issued an option to call for redemption in advance of maturity all or any part of such bonds as may be specified in the bond resolution, at such price or prices, upon the giving of such notice or notices, and upon such terms and conditions as may be set forth in the bond resolution and as may be recited on the face of the bonds, but nothing in this section shall be construed to confer upon the authority the right or option to call for redemption in advance of maturity any bonds except as may be provided in the bond resolution under which they shall be issued. The bonds of the authority may be sold at public or private sale for such price, in such manner, and from time to time as may be determined by the authority notwithstanding the provisions of section 108.170, and the authority may pay all expenses, premiums, and commissions which it may deem necessary or advantageous in connection with the issuance thereof from the proceeds of the bonds. Other forms of indebtedness issued by the authority shall have such terms as may be provided in a bond resolution authorized by the authority. Any such indebtedness may bear interest at such rates and be sold in such manner as may be determined by the authority notwithstanding the provisions of section 108.170, and the authority may pay all expenses, premiums and commissions which it may deem necessary or advantageous in connection with the issuance thereof from proceeds therefrom or from other funds of the authority.

**RSMo. § 173.392** provides:

1. There is hereby created in the state treasury a fund to be known as the "Lewis and Clark Discovery Fund". The state treasurer shall deposit to the credit of the fund all moneys which may be distributed to it by the authority, appropriated to it by the general assembly, and any gifts, contributions, grants, or bequests received from federal, private, or other sources for deposit into the fund. The office of administration shall administer the fund. The moneys in the fund shall only be used for any purpose enumerated in subsection 2 of this section. The moneys in the fund may be appropriated by the general assembly, but only for any purpose enumerated in subsection 2 of this section. None of the moneys in the fund shall be considered state funds unless and to the extent such moneys are appropriated by the general assembly.

2. The general assembly may annually appropriate moneys from the Lewis and Clark discovery fund only for the following purposes:

(1) To support funding of capital projects at public colleges and universities, provided that moneys shall not be appropriated to any public college or university that knowingly employs, as of September 1, 2007, any person, as a professor or instructor, required to be registered under sections 589.400 to 589.425; and

(2) To support funding for the Missouri technology corporation's ability to work with colleges and universities in identifying opportunities for commercializing technologies, transferring technologies, and to develop, recruit, and retain entities engaged in innovative technologies.

3. Moneys in the fund shall be invested by the state treasurer in the manner prescribed by law for investment of general revenue funds and any interest earned on invested moneys shall accrue to the benefit of the Lewis and Clark discovery fund and shall reduce payments by the authority pursuant to subsection 2 of section 173.385. Notwithstanding the provisions of section 33.080 to the contrary, moneys in the Missouri Lewis and Clark discovery fund shall not revert to the credit of the general revenue fund at the end of the biennium.

**RSMo. § 173.395** provides:

Issuance by the authority of one or more series of bonds or other forms of indebtedness shall not preclude it from issuing other bonds or other forms of indebtedness in connection with the same purpose or any other purpose hereunder,

but the bond resolution whereunder any subsequent bonds or other forms of indebtedness may be issued shall recognize and protect any prior pledge made for any prior issue of bonds or other forms of indebtedness. Any issue of bonds or other forms of indebtedness of the authority at any time outstanding may be refunded at any time and from time to time by the authority by the issuance of its refunding bonds or other forms of indebtedness in such amount as the authority may deem necessary, but not exceeding the amount sufficient to refund the principal of the bonds or other forms of indebtedness so to be refunded together with any unpaid interest thereon and any premiums, commissions, service fees, and other expenses necessary to be paid in connection with the refunding. Any such refunding may be effected whether the bonds or other forms of indebtedness to be refunded then shall have matured or thereafter shall mature, either by sale of the refunding bonds or other forms of indebtedness and the application of the proceeds thereof to the payment of the bonds or other forms of indebtedness being refunded or by the exchange of the refunding bonds or other forms of indebtedness for the bonds or other forms of indebtedness being refunded with the consent of the holder or holders of the bonds or other forms of indebtedness being refunded, regardless of whether or not the bonds or other forms of indebtedness being refunded were issued for the same purpose or any other purpose hereunder and regardless of whether or not the bonds or other forms of indebtedness proposed to be refunded shall be payable on the same date or different dates or shall be due serially or otherwise.

**RSMo. § 173.405** provides:

The principal of and interest on any bonds issued by the authority shall be secured by a pledge of the revenues derived from or by reason of the ownership of student loan notes and investment income or such other funds as may be designated in a bond resolution authorized by the authority. The bond resolution under which the bonds are authorized to be issued may contain any agreements and provisions respecting the purchase and sale of student loan notes or financing of student loans, or both, the creation and maintenance of special funds from such revenues or receipts, and the rights and remedies available in the event of default, including the designation of a trustee, all as the authority shall deem advisable and not in conflict with the provisions hereof. The principal of and interest on any other form of indebtedness issued by the authority shall be secured in such manner as may be set forth in the bond resolution authorizing such indebtedness and such bond resolutions may contain such other agreements and provisions as the authority may determine. Each pledge, agreement, and indenture made for the benefit or security of any of the bonds or other forms of indebtedness of the authority shall continue effective until

the principal of and interest thereon for the benefit of which the same were made shall have been fully paid or provisions for such payment duly made. In the event of a default in the payment or in any agreement of the authority made as a part of the bond resolution under which the bonds or other forms of indebtedness were issued or secured, the payment or agreement may be enforced by suit, mandamus, the appointment of a receiver in equity, or any one or more of these remedies.

**RSMo. § 173.410** provides:

Bonds or other forms of indebtedness issued under the provisions of sections 173.350 to 173.450 shall not be deemed to constitute a debt or liability of the state or of any political subdivision thereof or a pledge of the full faith and credit of the state or of any such political subdivision, but shall be payable solely from the funds provided for in sections 173.350 to 173.450. The issuance of bonds or other forms of indebtedness under the provisions of sections 173.350 to 173.450 shall not, directly, indirectly, or contingently, obligate the state or any political subdivision thereof to levy any form of taxation therefor or to make any appropriation for their payment. Nothing in this section shall be construed to authorize the authority to create a debt of the state within the meaning of the constitution or statutes of the state of Missouri, and each bond or other form of indebtedness issued by the authority shall be payable and shall state on its face that it is payable solely from the funds pledged for its payment in accordance with the bond resolution authorizing its issuance. The state shall not be liable in any event for the payment of the principal of or interest on any bonds of the authority or for the performance of any pledge, mortgage, obligation, or agreement of any kind whatsoever which may be undertaken by the authority. No breach of any such pledge, mortgage, obligation, or agreement may impose any pecuniary liability upon the state or any charge upon the general credit or taxing power of the state.

**RSMo. § 173.415** provides:

The authority is hereby declared to be performing a public function and to be a separate public instrumentality of the state. Accordingly, the income of the authority and all properties at any time owned by the authority shall be exempt from all taxation in the state of Missouri. For the purposes of section 409.402, all bonds or other forms of indebtedness issued by the authority shall be deemed to be securities issued by a separate public instrumentality of the state of Missouri.

**RSMo. §173.420** provides:

All expenses of the authority incurred in carrying out the provisions of sections 173.350 to 173.450 shall be payable solely from funds provided under such sections, and no liability shall be incurred by the authority beyond the extent to which moneys shall have been provided; except that, for the purpose of meeting the necessary expenses of operation until such date as the authority derives moneys from funds provided hereunder, the authority shall be empowered to borrow such moneys as may be required for the necessary expenses of operation, or to receive advances from funds to be appropriated for this purpose by the general assembly. The borrowed moneys shall be repaid or shall be reimbursed to general revenue within a reasonable time after the authority receives funds as provided in sections 173.350 to 173.450, and shall be repaid solely from such funds. Nothing in sections 173.350 to 173.450 shall be construed as a restriction upon any powers which the authority might otherwise have under any laws of this state, but shall be construed as cumulative of any such powers. Nothing in these sections shall be construed to deprive the state and its governmental subdivisions of their respective powers over assets of the authority or to impair any power thereof of any official or agency of the state and its governmental subdivisions which otherwise may be provided by law.

**RSMo. § 173.445** provides:

The higher education loan authority is assigned to the department of higher education and workforce development. The authority shall annually file with the director of said department a report of its previous year's income, expenditures and bonds or other forms of indebtedness issued and outstanding.