## PUBLIC CITIZEN LITIGATION GROUP

1600 20th Street NW • Washington DC 20009
202/588-1000 • www.citizen.org

July 29, 2024

Christopher M. Wolpert, Clerk
United States Court of Appeals
   for the Tenth Circuit
Byron White U.S. Courthouse
1823 Stout Street
Denver, CO 80257-1823

Re: *Good v. U.S. Department of Education, et al.*, No. 22-3286

Dear Mr. Wolpert,

Pursuant to Federal Rule of Appellate Procedure 28(j), appellant Jeffrey Good apprises this Court of the recent decision in *Walker v. Higher Education Loan Authority of the State of Missouri*, No. 1:21-cv-879 (E.D. Cal. July 26, 2024), holding that appellee Higher Education Loan Authority of the State of Missouri (MOHELA) is not an arm of Missouri entitled to immunity from suit.

*Walker* first explains that *Biden v. Nebraska*, 600 U.S. 477 (2023), did not address whether MOHELA has immunity from suit and "did not hold MOHELA to be the State of Missouri for all purposes." Slip op. 7, 8. *Walker* notes that the conclusion that MOEHLA is *not* an arm of the state for immunity purposes "is consistent with the Missouri Supreme Court's determination that a similarly structured agency, the Missouri Health and Educational Facilities Authority (MOHEFA), was distinct from the state in a case involving the issuance of bonds." *Id*. (citing *Menorah Med. Ctr. v. Health & Educ. Facilities Auth.*, 584 S.W.2d 73 (Mo. 1979) (en banc)).

Turning to the arm-of-the-state factors, *Walker* finds two considerations dispositive: First, "MOHELA has significant independent authority to engage in business dealings without prior approval or subsequent veto power by the State" and, thus, enjoys "broad retained powers and … operational and financial independence." *Id*. at 12–13. Second, "MOHELA's assets are otherwise categorically excluded from the state's treasury, and Missouri is not financially responsible for MOHELA or its debts and obligations." *Id*. at 15.

*Walker* supports Mr. Good's argument here that MOHELA is not an arm of the state entitled to sovereign immunity. A copy of the slip opinion is attached.

Respectfully submitted,

/s/ Nandan M. Joshi

Nandan M. Joshi
Counsel for Appellant Jeffrey Good

cc: All counsel by ECF

1

2

3

4

5

6

7 UNITED STATES DISTRICT COURT

8 EASTERN DISTRICT OF CALIFORNIA

9

10 MELISSA LOIS WALKER,

No.  1:21-CV-00879-KES-SAB

11 Plaintiff,

ORDER GRANTING IN PART AND
DENYING IN PART WALKER'S MOTION
12 v.
FOR PARTIAL SUMMARY
ADJUDICATION AND GRANTING IN PART
13 HIGHER EDUCATION LOAN
AND DENYING IN PART MOHELA'S
AUTHORITY OF THE STATE OF
MOTION FOR SUMMARY JUDGMENT.
14 MISSOURI D/B/A MOHELA,

15 Defendant.

Docs. 98, 99

16

17

18      This matter is before the court on the parties' cross-motions pursuant to Fed. R. Civ. P. 56.

19 Defendant Higher Education Loan Authority of the State of Missouri ("MOHELA") moves for

20 summary judgment.  Doc. 99.  Plaintiff Melissa Walker ("Walker") moves for partial summary

21 adjudication.  Docs. 98, 100.  The motions are fully briefed.  *See* Docs. 106, 107, 108, 110.  Both

22 parties have also filed notices regarding supplemental authority.  Docs. 111, 112, 118, 119.[1]  The

23 court heard argument on the motions.  Doc. 120.  For the reasons set forth below, Walker's

24 motion for summary adjudication is granted in part and denied in part, and MOHELA's motion

25 for summary judgment is granted in part and denied in part.

26

27
────────────────────

[1]  The court previously granted Walker's request to seal certain portions of the record.  Doc. 114.
28

1    **I.        FACTUAL AND PROCEDURAL BACKGROUND[2]**

2          **A.  <u>Federal student loans fraudulently obtained in Walker's name</u>**

3          The U.S. Department of Education provides student loans to eligible borrowers under the

4    Direct Loan Program, 20 U.S.C. § 1087a *et seq.*  The Department of Education contracts with

5    third-party servicers, such as MOHELA, to service such student loans.  In 2017, an unauthorized

6    individual fraudulently took out two federal student loans in Walker's name.  MOHELA began

7    servicing the loans for the Department of Education shortly after they were disbursed.

8    Ultimately, in August 2021, the Department of Education determined that the loans had been

9    fraudulently obtained and discharged the loans as to Walker.

10         On November 28, 2017, Walker filed a report with the Fresno Police Department

11   regarding the theft of her identity with respect to the two student loans.  She provided a copy of

12   the police report to MOHELA in January 2018.  MOHELA advised Walker on December 6,

13   2017, that she needed to submit a "Loan Discharge Application:  Identity Theft" with additional

14   documentation and provided her with the application form.  The application packet required the

15   submission of copies of five documents with Walker's signature.  On December 7, 2017,

16   MOHELA updated the credit reporting on the student loans with a code reflecting that the

17   reporting was disputed and under investigation.  Walker submitted the identity theft packet to

18   MOHELA by early February 2018, but MOHELA informed her that her application was

19   incomplete because it did not include five documents with Walker's handwritten signature.[3]

20   MOHELA did not submit the application to the U.S. Department of Education because MOHELA

21   found it to be incomplete.  In a call on March 26, 2018, MOHELA again told Walker that her

22

23   _____

24   [2]  Unless identified below as being in dispute, the facts set out below were confirmed by the
     parties as being not reasonably in dispute for purposes of the present motion.  *See* Answer, Doc.

25   23; Walker's response to MOHELA's statement of additional undisputed material facts, Doc.
     110–1; MOHELA's response to Walker's statement of disputes of material facts, Doc. 108–1;

26   MOHELA's opposition to Walker's statement of undisputed facts, Doc. 106–1.

27   [3]  Walker argues that the record is disputed as to whether she submitted the five signature
     examples in early 2018, but Walker admitted that she did not recall submitting them and

28   MOHELA documents that it did not receive them.  See 108-1 at 10–12.

2

1 application was incomplete.  Walker responded that she would return the required information but

2 did not thereafter submit the five missing signed and dated signature copies in 2018 or 2019.

3   In October 2018, Walker received a demand for payment from MOHELA for the

4 outstanding student loans.  The loans defaulted on May 7, 2019, and, as a result, the U.S.

5 Department of Education transferred the servicing of the loans from MOHELA.  Prior to May

6 2019, MOHELA reported the loans to credit reporting agencies on Walker's credit file.

7 MOHELA no longer serviced Walker's loans after May 2019.

8   In June 2020, Walker submitted an Identity Theft Notification ("IDTN") to MOHELA and

9 credit reporting agencies, stating that Walker was a victim of identity theft, disputing that she

10 owed the student loans, and stating that the contact information on the loan applications did not

11 belong to her or anyone she knew.  Walker included with the IDTN an affidavit of identity theft, a

12 police report, Walker's driver's license, annotated copies of her credit reports identifying the

13 disputed loan accounts, and a copy of the fraudulently signed promissory note.  Walker also

14 submitted with the IDTN a copy of the loan discharge application she had previously submitted to

15 MOHELA in January 2018 and that MOHELA had deemed incomplete.  MOHELA concedes

16 that Walker's June 2020 packet was complete.  MOHELA forwarded the IDTN to the Department

17 of Education but did not correct its prior credit reporting reflecting Walker's default on the loans.

18   On June 5, 2020, MOHELA received credit dispute verification forms from credit

19 reporting agencies concerning the student loans under Walker's name.  In response, MOHELA

20 verified its prior reporting on Walker's credit report that the loans were in default.  MOHELA did

21 not become aware until this litigation that, in August 2021, the Department of Education

22 approved Walker's application for a loan discharge.

23   **B.  <u>The cross-motions for summary judgment</u>**

24   Walker's complaint alleges that MOHELA violated the Fair Credit Reporting Act, 15

25 U.S.C. § 1681 *et seq.* ("FCRA"), and the California Consumer Credit Reporting Agencies Act,

26 Cal. Civ. Code § 1785 *et seq.* ("CCRAA"), by reporting incorrect information to credit reporting

27 agencies and by failing to investigate and have the fraudulent account information deleted from

28 Walker's credit report after becoming aware of the fraud allegation.  Doc. 1 (complaint) at ¶¶ 9,

99-120.

MOHELA seeks summary judgment on the ground that, as a matter of law, it is immune from liability under the Eleventh Amendment as it is either part of the state of Missouri or an arm of the state.  Doc. 99-1.  MOHELA also contends that it is entitled to summary judgment as a matter of law on claims I, II, III (FCRA claims) and IV (CCRAA claim) on the ground that the evidence does not support the claims.  *Id.*  MOHELA also seeks summary judgment as to Walker's damages.  *Id.*

Walker seeks partial summary adjudication as to certain elements of her FCRA and CCRAA claims.  Specifically, as to her FCRA claims, she seeks summary adjudication regarding whether (1) MOHELA is a "furnisher" of information for purposes of 15 U.S.C. § 1681s-2(b); (2) MOHELA reported the fraudulent loan accounts to the consumer reporting agencies; (3) Walker disputed MOHELA's reporting with the consumer reporting agencies; (4) the information on Walker's credit report was inaccurate; (5) MOHELA conducted a reasonable investigation as required by federal law; and (6) MOHELA's actions were reckless and/or willful. *See* Doc. 98-1.  On her CCRAA claim, Walker seeks summary adjudication regarding whether (1) MOHELA is a "person" as defined by the Civil Code; and (2) whether MOHELA reported information about Walker to consumer credit reporting agencies that it knew or should have known was inaccurate.  *Id.*

## II.    STANDARD OF LAW

Summary judgment is appropriate when the moving party demonstrates that no genuine issue of material fact exists, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  "In ruling on crossmotions for summary judgment, we evaluate each motion separately, giving the nonmoving party in each instance the benefit of all reasonable inferences."  *Am. Civ. Liberties Union of Nev. v. City of Las Vegas*, 333 F.3d 1092, 1097 (9th Cir. 2003).  "The filing of cross-motions for summary judgment does not mean that material facts are undisputed, and the denial of one motion does not necessarily require the granting of the other."  *Congdon v. Uber Techs., Inc.*, 291 F. Supp. 3d 1012, 1020 (N.D. Cal. 2018) (citing *Regents of Univ. of Calif. v. Micro Therapeutics,*

1  *Inc.*, 507 F.Supp.2d 1074, 1077–78 (N.D. Cal. 2007)).

2        The moving party on a motion for summary judgment always bears the initial

3  responsibility of informing the district court of the basis of its motion, and identifying those

4  portions of "the pleadings, depositions, answers to interrogatories, and admissions on file together

5  with affidavits, if any," which it believes demonstrate the absence of a genuine issue of material

6  fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will

7  bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly

8  be made in reliance solely on the pleadings, depositions, answers to interrogatories, and

9  admissions on file."  *Id*. at 324 (internal quotation marks omitted).  Indeed, summary judgment

10  should be entered against a party who does not make a showing sufficient to establish the

11  existence of an element essential to that party's case, and on which that party will bear the burden

12  of proof at trial.

13        If the moving party meets its initial responsibility, the burden then shifts to the opposing

14  party to establish that a genuine issue as to any material fact does exist.  *Matsushita Elec. Indus.*

15  *Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 (1986); *First Nat'l Bank of Ariz. v. Cities Serv.*

16  *Co.*, 391 U.S. 253, 288–89 (1968).  In attempting to establish the existence of this factual dispute,

17  the opposing party may not rely upon the denials of its pleadings but is required to tender

18  evidence of specific facts in the form of affidavits, and/or admissible discovery material, in

19  support of its contention that the dispute exists.  Fed. R. Civ. P. 56(c).  The opposing party must

20  demonstrate that the fact in contention is material, *i.e.*, a fact that might affect the outcome of the

21  suit under the governing law, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and that

22  the dispute is genuine, *i.e.*, the evidence is such that a reasonable jury could return a verdict for

23  the nonmoving party.  *Id*. at 251–52.

24        In the endeavor to establish the existence of a factual dispute, the opposing party need not

25  establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

26  dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

27  trial."  *First Nat'l Bank of Ariz.*, 391 U.S. at 288–89.  Thus, the "purpose of summary judgment is

28  to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for

5

trial.'" *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (quoting Rule 56(e) advisory committee's note on 1963 amendments).

In resolving a summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with any applicable affidavits. Fed. R. Civ. P. 56(c); *SEC v. Seaboard Corp.*, 677 F.2d 1301, 1305–06 (9th Cir. 1982). All reasonable inferences that may be drawn from the established facts must be drawn in favor of the opposing party. *Anderson*, 477 U.S. at 255. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. *Richards v. Nielsen Freight Lines*, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985), *aff'd*, 810 F.2d 898 (9th Cir. 1987). Finally, to demonstrate a genuine issue that necessitates a jury trial, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id*. at 587.[4]

## III.    ANALYSIS

The court begins with the sovereign immunity analysis because "precedent dictates that we resolve an Eleventh Amendment immunity claim before reaching the merits." *Coal. to Def. Affirmative Action v. Brown*, 674 F.3d 1128, 1133 (9th Cir. 2012). The Eleventh Amendment provides that "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of

---

[4] In evaluating the merits of the cross motions for summary judgment, the court relies upon material undisputed facts that may be presented in an admissible form at trial. *See* Fed. R. Civ. P. 56(c)(2); *Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 665 (9th Cir. 2021) ("[I]f the submitted evidence does not create a genuine dispute of material fact, there is no need for the court to separately determine whether it is relevant because, even assuming it is not, it will not affect the ultimate summary judgment ruling."); *Sali Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1005 (9th Cir. 2018) ("the court must review the evidence in light of what would be admissible before either the court or jury" [citation omitted]); *Burch v. Regents of the Univ. of Cal.*, 433 F. Supp. 2d 1110, 1119–20 (E.D. Cal. 2006) (even if evidence is presented in a form that is currently inadmissible, it may be considered on a motion for summary judgment so long as the admissibility defects could be cured at trial).

1   another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI.  A

2   defendant "bear[s] the initial burden of establishing [its] Eleventh Amendment defense, but once

3   that burden is met, 'the burden shifts to Plaintiff to demonstrate that an exception to Eleventh

4   Amendment immunity applies.'" *D'Agostino v. Arizona Dep't of Econ. Sec.*, 623 F. Supp. 3d

5   1009, 1012 (D. Ariz. 2022) (quoting *Comm. To Protect Our Agric. Water v. Occidental Oil &*

6   *Gas Corp.*, 235 F. Supp. 3d 1132, 1161 (E.D. Cal. 2017).

7        **A.  <u>MOHELA's motion for summary judgment based on Eleventh Amendment</u>**

8           **<u>immunity</u>**

9        MOHELA first contends it is immune from suit under the Eleventh Amendment because it

10   is part of the state of Missouri.  Doc. 99-1 at 7–8.  Alternatively, MOHELA contends it is

11   immune as an "arm of the state."  *Id.* at 8.  MOHELA "must prove its entitlement to immunity by

12   a preponderance of the evidence."  *ITSI T.V. Prods., Inc. v. Agricultural Assocs.*, 3 F.3d 1289,

13   1292 (9th Cir. 1993).

14             **1.  Part of Missouri**

15        MOHELA first argues that it is entitled to Eleventh Amendment immunity because it "has

16   no legal identity apart from Missouri" and is a "part of" Missouri.  Doc. 99-1 at 13.  MOHELA

17   relies on the United States Supreme Court's decision in *Biden v. Nebraska*, 600 U.S. ___, 143 S.

18   Ct. 2355 (2023), which concerned the federal government's student loan debt cancellation plan.

19   In *Biden*, the Court considered as an initial matter whether Missouri had standing to challenge the

20   plan.  *Id.*, 143 S. Ct. at 2365–68.  Although MOHELA was not a party in *Biden*, the Court

21   concluded that Missouri had standing to sue as the plan "harm[ed] MOHELA and thereby directly

22   injure[d] Missouri—conferring standing on that State."  *Id.* at 2365.  The Court held that

23   MOHELA was sufficiently "part of" Missouri such that the state would suffer an injury in fact

24   due to MOHELA's potential loss of revenue if the plan were implemented, establishing the

25   State's standing to sue.  *Id.* at 2368.

26        The Supreme Court did not consider sovereign immunity in the *Biden* decision.  As

27   another district court recently found, "MOHELA's reliance on *Biden* to argue that it is 'part of'

28   the State of Missouri" for Eleventh Amendment purposes "is unpersuasive considering that the

1    Supreme Court did not address sovereign immunity." *Pellegrino v. Equifax Info. Servs., LLC*, __

2    F. Supp. 3d __, No. 1:23-cv-1166 (LMB/LRV), 2024 WL 37062, at *2 (E.D. Va. Jan. 2, 2024).

3    Rather, the *Biden* decision addressed the relationship between MOHELA and Missouri solely in

4    the context of whether Missouri suffered an injury in fact for standing purposes due to the

5    potential losses to MOHELA. *Biden*, 143 S. Ct. at 2366-68. As the *Pellegrino* court found, the

6    *Biden* decision "does not resolve the question of whether MOHELA is entitled to Eleventh

7    Amendment immunity." *Pellegrino*, 2024 WL 37062, at *3.

8         The *Biden* decision does not support MOHELA's argument that it has no separate legal

9    identity from the State of Missouri. The Supreme Court did not hold MOHELA to be the State of

10   Missouri for all purposes. It found that MOHELA was a "public instrumentality" of the state of

11   Missouri and held an "essential public function" of helping Missourians access student loans

12   needed to pay for college. *Id.* at 2365; *see* Mo. Rev. Stat. § 173.360 (2007). In fulfilling that

13   public function, the Court noted that MOHELA "remains (for many purposes at least) part of the

14   [state] Government itself." *Biden*, 143 S. Ct. at 2367. But the Court recognized that "MOHELA,

15   as a public corporation, has a legal personality separate from the State." *Id.* The Court

16   recognized the legal distinction between the state and MOHELA, noting that the issue in *Biden*

17   was "a State's standing to sue for a harm to its instrumentality" and that "a public corporation can

18   count as part of the State *for some but not other purposes*." *Id.* at 2368 n.3 (emphasis added).

19        The conclusion that MOHELA is not a part of the State of Missouri for all purposes is

20   consistent with the Missouri Supreme Court's determination that a similarly structured agency,

21   the Missouri Health and Educational Facilities Authority (MOHEFA), was distinct from the state

22   in a case involving the issuance of bonds. *Menorah Med. Ctr. v. Health & Educ. Facilities Auth.*,

23   584 S.W.2d 73 (Mo. 1979) (en banc). Like MOHELA, MOHEFA was designated a "public

24   instrumentality" serving a "public function." Mo. Rev. Stat. §§ 360.020–360.140 (1975);

25   § 173.360. MOHEFA, like MOHELA, had the power to issue bonds: in the case of MOHEFA, to

26   support health and education institutions throughout the state, whereas in the case of MOHELA,

27   to support student loan programs and higher education. *See id.* §§ 360.045, 173.385. Like

28   MOHELA, MOHEFA must give annual reports to the Department to which it is assigned, and its

income and property are tax-exempt.  *Id.* §§ 360.135, 360.140, 173.415, 173.440, 173.445.  As with MOHELA, the proceeds of MOHEFA's bonds were not state revenues, and MOHEFA retained broad discretion as to how it distributed financial assistance in accomplishing its public purpose.  *See id.* §§ 360.050–.080, 360.105, 360.115, 173.385, 173.425.  In *Menorah*, the Missouri Supreme Court held that MOHEFA "is not the state," the credit which it lent was not the state's credit, and its bonds were not state liabilities.  584 S.W.2d at 78–79.

MOHELA has a legal identity separate from Missouri and is not the State of Missouri for Eleventh Amendment purposes.  Accordingly, the court considers whether MOHELA nonetheless qualifies as an "arm of the State" entitled to Eleventh Amendment immunity.

## 2. Arm of the State

Eleventh Amendment immunity "extends not just to suits in which the state itself is a named party but also to those against an 'arm of the state.'"  *Kohn v. State Bar of Cal.*, 87 F.4th 1021, 1025 (9th Cir. 2023) (en banc) (quoting *Mt. Healthy City Sch. Dist. Bd. of Education*, 429 U.S. 274, 280 (1977)); *accord Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 47 (1994).  Whether an entity is an arm of the state within the meaning of the Eleventh Amendment is a question of federal law.  *Kohn*, 87 F.4th at 1025; *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 n.5 (1997).

In *Kohn*, the Ninth Circuit modified its test for determining whether an entity is an arm of the state for sovereign immunity purposes, adopting the D.C. Circuit's three-part test.  *Kohn*, 87 F.4th at 1030.  In evaluating whether an entity is an arm of the state, courts must consider: "(1) the state's intent as to the status of the entity, including the functions performed by the entity; (2) the state's control over the entity; and (3) the entity's overall effects on the state treasury."  *Id.* (citing *P.R. Ports Auth. v. Fed. Mar. Comm'n*, 531 F.3d 868, 874 (D.C. Cir. 2008).  The Ninth Circuit found the Supreme Court has emphasized "that state dignity and solvency are the Eleventh Amendment's 'twin reasons for being' and entitled to equal weight."  *See Kohn*, 87 F.4th at 1028 (quoting *Hess*, 513 U.S. at 47.)  Accordingly, the Ninth Circuit found "the best arm of the state test is . . . an analysis that drills down on whether the state 'structured' the entity to enjoy immunity from suit."  *Kohn*, 87 F.4th at 1030 (citation omitted).  The Ninth Circuit also

1   confirmed that an entity-based, rather than activity-based, approach applies: "An entity either is

2   or is not an arm of the State:  The status of an entity does not change from one case to the next

3   based on the nature of the suit, the State's financial responsibility in one case as compared to

4   another, or other variable factors."  *Kohn* at 1031; *see also P.R. Ports Auth.*, 531 F.3d at 873.

5        In evaluating the *Kohn* factors, the court considers the relevant Missouri statutory

6   provisions and the material undisputed facts established in the parties' summary judgment

7   pleadings.  The parties dispute whether MOHELA is an arm of the State for purposes of Eleventh

8   Amendment immunity, but there is no genuine issue of material fact concerning MOHELA's

9   operations and relations with the State of Missouri.

10            **i.**    **Missouri's intent regarding MOHELA**

11        The first *Kohn* factor "turns on whether state law expressly characterizes the entity as a

12   governmental instrumentality rather than as a local governmental or non-governmental entity;

13   whether the entity performs state governmental functions; whether the entity is treated as a

14   governmental entity for purposes of other state law; and state representations about the entity's

15   status."  *Kohn*, 87 F.4th at 1030, citing *P.R. Ports Auth.*, 531 F.3d at 874.

16        Missouri law established MOHELA in 1981 as "a public instrumentality and body

17   corporate."  Mo. Rev. Stat. § 173.360; *see generally* Mo. Rev. Stat. §§ 173.350–173.450.

18   "Missouri established the Authority to perform the 'essential public function' of helping

19   Missourians access student loans needed to pay for college."  *Biden*, 143 S. Ct. at 2366 (quoting

20   Mo. Rev. Stat. § 173.360); *see also* Doc. 108-1 at 3.  Missouri later amended the law to provide

21   for MOHELA to finance, originate, acquire, and service student loans, including federally

22   guaranteed or insured student loans.  Doc. 108-1 at 4.  MOHELA now also has a mandate "to

23   support the efforts of public colleges and universities to create and fund capital projects, and to

24   support the Missouri technology corporation's ability to work with colleges and universities."

25   Mo. Rev. Stat. § 173.360.  MOHELA's meetings are required to be open to the public.  *Id.*

26   § 173.365.  MOHELA's property, income, bonds, and activities are exempt from state taxation.

27   *Id.* § 173.415.

28        The Missouri legislature's creation of MOHELA as a public instrumentality of the State of

Missouri with the "essential public function" of helping Missourians access student loans, *see Biden*, 143 S. Ct. at 2365, MOHELA's mandate to support Missouri public colleges and universities, and its exemption from state taxation as to its property, income, bonds, and activities weigh in favor of this factor supporting sovereign immunity. Missouri's public position in the *Biden* case also reflects its intent that MOHELA be considered an instrumentality of the State of Missouri. On balance, this factor weighs in favor of finding MOHELA entitled to sovereign immunity.

### ii.    Missouri's control over MOHELA

The second *Kohn* factor requires consideration of how members of MOHELA's governing body are appointed and removed, as well as whether the state can directly supervise and control MOHELA's "ongoing operations." *Kohn*, 87 F.4th at 877. MOHELA's enabling statute authorizes the governor to appoint five members of the seven-member board. Mo. Rev. Stat. § 173.360. The remaining two members are prescribed by statute: one must be a member of the board for higher education and the remaining person must be the commissioner of higher education. *Id.* MOHELA is also "assigned to the [Missouri] department of higher education and workforce development" and must file an annual report of "its previous year's income, expenditures and bonds or other forms of indebtedness issued and outstanding." *Id.* § 173.445.

Other statutory provisions reflect MOHELA's significant operational independence. MOHELA has autonomy to hire its own employees, adopt bylaws, sue and be sued, and enter into contracts. *See generally* § 173.385. MOHELA's powers include, among other things, the ability "to adopt bylaws for the regulation of its affairs and the conduct of its business," "[t]o issue bonds or other forms of indebtedness to obtain funds to purchase student loan notes or finance student loans," "to enter into agreements or other transactions with any federal or state agency, any person and any domestic or foreign partnership, corporation, association or organization," and "[t]o service student loans for any owner thereof, regardless of whether such student loans are originated in [Missouri] or out of this state." *Id.* § 173.385.1(2), (3), (6), (15), (18). It also has the power to acquire, hold and dispose of personal property. *Id.* § 173.385.1(14). There are some

1   limitations on investments and how bonds are issued, *id.* §§ 173.385.1(6)–(7), 173.390, but the

2   state has no veto power over MOHELA's regular activities, *see* § 173.445.  MOHELA may

3   "transfer assets of the authority to the Lewis and Clark discovery fund," but these become "state

4   funds" only when, and if, the Missouri legislature elects to use the money for designated

5   educational purposes.[5]  *Id.* § 173.392.

6   　　　MOHELA has broad authority to invest in and finance student loans, service student loans

7   and collect reasonable fees for doing so.  *Biden*, 143 S. Ct. at 2365; *see* Mo. Rev. Stat. Ann.

8   §§ 173.385(1)(6)–(7).  It may "enter into agreements or other transactions with any federal or

9   state agency, any person and any domestic or foreign partnership, corporation, association or

10  organization."  *Id.* § 173.385.1(15).  Essentially, MOHELA has significant independent authority

11  to engage in business dealings without prior approval or subsequent veto power by the State.  *See*

12  §§ 173.385, 173.445.  Indeed, MOHELA contracted with the federal government to service

13  "nearly $150 billion worth of federal loans, having been hired by the Department of Education to

14  collect payments and provide customer service to borrowers."  *Biden*, 143 S. Ct. at 2365–66 (also

15  noting that MOHELA owned over $1 billion in student loans).  MOHELA does not dispute that it

16  services student loans in all 50 states.  As the *Pellegrino* court noted, the state "made

17  MOHELA a financially independent entity with expansive powers."  *Pellegrino*, 2024 WL 37062,

18  at *6.[6]

19

20  ───────────────

21  [5]  The law as amended initially mandated that MOHELA provide over $350 million to the Lewis
    and Clark discovery fund.  Mo. Rev. Stat. 173.385.2.  At oral argument, MOHELA's counsel

22  asserted that MOHELA continued to pay "significant funds to the state of Missouri for a public
    purpose," and that a judgment against MOHELA would leave the entity with less money to

23  contribute to the Lewis and Clark Discovery fund.  However, the parties acknowledged that the
    record is insufficiently developed regarding whether MOHELA has any continuing duty to

24  contribute to the Lewis and Clark Discovery fund.

25  [6]  MOHELA cites to cases concluding that Missouri exercises control over MOHELA for
    Eleventh Amendment purposes.  *See Dykes v. Mo. Higher Educ. Loan. Auth.*, No. 4:21-cv-00083-

26  RWS, 2021 WL 3206691, at *3 (E.D. Mo. July 29, 2021); *Gowens v. Capella Univ., Inc.*, No.
    4:19-CV-362-CLM, 2020 WL 10180669, at *3 (N.D. Ala. June 1, 2020).  However, these

27  decisions do not apply the same factors as under *Kohn*.  The *Dykes* decision also ultimately found

28  MOHELA was not entitled to Eleventh Amendment immunity.

As to the second factor, considering *Kohn*'s instruction to evaluate "whether the state can 'directly supervise and control [the entity's] ongoing operations,'" 87 F.4th at 1030, the court finds that MOHELA's broad retained powers and its operational and financial independence weigh against a finding of Eleventh Amendment immunity.

### iii. MOHELA's overall effects on the State treasury

The third *Kohn* factor considers the "[entity's] financial relationship to [the state] and its overall effects on [the state's] treasury." *Kohn*, 87 F.4th at 1036 (citations omitted). "In analyzing this third factor . . . the relevant issue is a state's overall responsibility for funding the entity or paying the entity's debts or judgments, *not* whether the state would be responsible to pay a judgment *in the particular case at issue*." *Id.* (quoting *P.R. Ports Auth.*, 531 F.3d at 878).

MOHELA's governing statutes make clear that the Missouri "legislature intended to create a self-sustaining and financially independent agency." *Dykes v. Missouri Higher Ed. Loan Auth.*, No. 4:21-CV-00083-RWS, 2021 WL 3206691 (E.D. Mo. July 29, 2021) (finding MOHELA not entitled to Eleventh Amendment immunity). Missouri established MOHELA, and its revenues and liabilities, to be independent of the State. The enabling legislation states in relevant part:

> No asset of the authority shall be considered to be part of the revenue of the state . . . and no asset of the authority shall be required to be deposited into the state treasury, and no asset of the authority shall be subject to appropriation by the general assembly, except for those amounts distributed by the authority to the Lewis and Clark discovery fund . . . The assets of the authority shall remain under the exclusive control and management of the authority to be used as required pursuant to [the enabling statutes], except for those amounts to be distributed by the authorities to the Lewis and Clark Discovery Fund.

Mo. Rev. Stat. § 173.425. Missouri law also provides that "[t]he state shall not be liable in any event for the payment of the principal of or interest on any bonds of the authority or for the performance of any pledge, mortgage, obligation, or agreement *of any kind whatsoever* which may be undertaken by the authority." Mo. Rev. Stat § 173.410 (emphasis added). Additionally, "[n]o breach of any such pledge, mortgage, obligation, or agreement may impose any pecuniary liability upon the state or any charge upon the general credit or taxing power of the state." *Id.*

13

MOHELA acknowledges that "there is no statute that requires the State to cover a judgment against [it]." Doc. 99-1 at 16. While MOHELA argues the State could nonetheless be functionally liable for a judgment against it, it fails to identify any evidence that the State has paid any such judgment in the past or would do so in the future. At oral argument on the motion, counsel for MOHELA conceded that a loss to MOHELA would not be directly or indirectly payable out of the state's treasury. *See also Good v. U.S. Dep't of Educ.*, No. 21-CV-2539-JAR-ADM, 2022 WL 2191758, at *4 (D. Kan. June 16, 2022) (judgment against MOHELA would not be satisfied by state treasury); *Dykes*, 2020 WL 3206691, at *4 (rejecting argument that Missouri would be functionally liable for judgment against MOHELA). Under the *Kohn* test, moreover, the focus is not on whether the state might elect to pay a specific judgment, but on the state's overall financial responsibility with respect to the entity.

In *Kohn*, the court explored whether, under the third factor, California was the real, substantial party in interest in the event the State Bar was unable to pay a money judgment. 87 F.4th at 1037. The court reasoned that given the State Bar's "vital government function" of regulating lawyers, such a scenario might compel the state to step in and ensure the State Bar could continue to fulfill this role. *Id.* Yet, the court concluded that "in the absence of a showing that money used to pay a judgment will necessarily be replaced with state funds . . . the fact the state may ultimately *volunteer* to pay the judgment . . . is immaterial.'" *Id.* Therefore, despite the State Bar's vital governmental function, the *Kohn* court found that the attenuated nature of any prospective state liability meant the treasury factor did not weigh in the State Bar's favor. *Id.* The same is true here.

Missouri law clearly states that "[n]o assets of the authority shall be considered to be part of the revenue of the state . . . and no asset of the authority shall be required to be deposited into the state treasury, and no asset of the authority shall be subject to appropriation by the general assembly, except for those amounts distributed by the authority to the Lewis and Clark discovery fund." Mo. Rev. Stat. § 173.425. Furthermore, "[t]he assets of the authority shall remain under the exclusive control and management of the authority" to be used to further MOHELA's statutory purposes. *Id.* While MOHELA may contribute to the Lewis and Clark discovery fund,

1  Mo. Rev. Stat. § 173.385.2, there is no evidence that MOHELA is currently required to make

2  such contributions and, in any event, such funds are only a fraction of MOHELA's assets.

3  MOHELA's assets are otherwise categorically excluded from the state's treasury, and Missouri is

4  not financially responsible for MOHELA or its debts and obligations.  Further, given the statutory

5  similarities between MOHELA and MOHEFA, the Missouri Supreme Court would also likely

6  find based on the *Menorah Med. Ctr.* decision that MOHELA is not part of the state for these

7  purposes.  *See Menorah Med. Ctr.*, 584 S.W. 2d at 78–79.

8      The court cannot conclude that MOHELA is "so structured that, as a practical matter, if

9  the agency is to survive, a judgment *must* expend itself against state treasuries."  *Hess*, 513 U.S.

10  at 50 (emphasis added); *see also U.S. ex rel. Oberg v. Penn. Higher Educ. Assistance Agency*, 804

11  F.3d 646, 658–668 (4th Cir. 2015) (similar state instrumentality's financial control over its

12  substantial, independently-generated wealth was persuasive evidence that state not functionally

13  liable for judgment against entity).  Given MOHELA's financial independence from the State

14  under Missouri law and the lack of any obligation for Missouri to pay MOHELA's debts, this

15  factor weighs against finding MOHELA to be an arm of the state.

16      As two of the three factors weigh against MOHELA, the court concludes that MOHELA

17  has not shown that it is an arm of the state entitled to Eleventh Amendment immunity.

18  MOHELA's motion for summary judgment based on Eleventh Amendment immunity is denied.[7]

19      **B.  Walker's motion for partial summary adjudication**

20      Walker seeks partial summary adjudication regarding specific elements of her FCRA and

21  CCRAA claims.

22  _____

23  [7]  Walker filed a notice of supplemental authority citing to *Department of Agriculture Rural

24  Development Rural Housing Service v. Kirtz*, 601 U.S. 42 (2024).  In *Kirtz*, the Supreme Court found that Congress waived sovereign immunity as to federal agencies subject to the FCRA.  *Id.*

25  at 50.  Walker asserts that Congress also waived state sovereign immunity in the FCRA, which defines a "person" subject to the FCRA to include "any . . . government or governmental

26  subdivision or agency."  15 U.S.C. § 1681a.  The issue of state sovereign immunity was not before the Court in *Kirtz*. *Kirtz*, 601 U.S. at 52 n.2.  As MOHELA is not entitled to sovereign

27  immunity, whether the FCRA waives such immunity need not be addressed in this case.  *See Kohn*, 87 F.4th at 1031 ("Waiver and abrogation are second-stage inquiries as to whether, *if* an

28  entity is immune, that immunity may be overcome.").

15

### 1. FCRA

"Recognizing the importance of accuracy in credit reporting, Congress adopted the FCRA in 1970.  In its present form, the Act allows consumers to sue private lenders who willfully or negligently supply false information about them to agencies that generate credit reports." *Dep't of Agric. Rural Dev. Housing Serv. v. Kirtz*, 601 U.S. 42, 45 (2024).  When originally enacted, the FCRA focused on two groups: credit reporting agencies and "persons" who request information from them.  *Id.* at 46; *see, e.g.*, 15 U.S.C. §§ 1681b, 1681i, 1681d(a).  In 1996, Congress broadened its reach to include those who furnish information to a credit reporting agency ("CRA") and instructed that, if a consumer disputes to a CRA the completeness or accuracy of his credit information, the "person" who furnished it must investigate the matter and take steps to correct any mistake.  *See* 15 U.S.C. § 1681s-2(b).

The FCRA permits a private right of action against a furnisher of credit information for negligent or willful noncompliance with § 1681s-2(b).  *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1154 (9th Cir. 2009).  That provision of the FCRA requires that, after receiving notice from a CRA of a consumer's dispute regarding credit information, the furnisher shall "conduct an investigation with respect to the disputed information," "review all relevant information provided by the CRA," and report the results to the CRA.  *Id.*; 15 U.S.C. § 1681s-2(b)(1)(A)–(C).  "[I]f the investigation finds that the information is incomplete or inaccurate," the furnisher must "report those results to all other [CRAs] to which [it] furnished the information."  15 U.S.C. § 1681s-2(b)(1)(D); *see also Gorman*, 584 F.3d at 1154.  The furnisher must also modify, delete, or block reporting of information that is inaccurate, incomplete, or cannot be verified after investigation.  15 U.S.C. § 1681s-2(b)(1)(E); *Gorman*, 584 F.3d at 1154.  The central inquiry when assessing a consumer's claim under § 1681s-2(b) is "whether the furnisher's procedures were reasonable in light of what it learned about the nature of the dispute from the description in the CRA's notice of dispute."  *Gorman,* 584 F.3d at 1157.

Among other responsibilities, the furnisher is obligated to investigate the dispute and to correct or delete inaccurate information.  *Gross v. CitiMortgage, Inc.*, 33 F.4th 1246 (9th Cir. 2022).  The investigation must be at least "reasonable" and "noncursory."  *Id.* at 1251.  "In this

respect, a furnisher's duties resemble those of a credit reporting agency, which can also be liable for failing to 'follow reasonable procedures to assure maximum possible accuracy' of information on a credit report." *Id.* (quoting 15 U.S.C. § 1681e(b)). "Just as in a lawsuit against a credit reporting agency, to prevail on a FCRA claim against a furnisher, a consumer must make a prima facie showing that the furnisher's report was inaccurate." *Id.* "If there is no inaccuracy, then the reasonableness of the investigation is not in play. On the flip side, if there is an inaccuracy, to succeed, the plaintiff must establish that the investigation was unreasonable." *Id.*; *see also Felts v. Wells Fargo Bank, N.A.*, 893 F.3d 1305, 1313 (11th Cir. 2018) (a FCRA plaintiff must "demonstrat[e] that *had* the furnisher conducted a reasonable investigation, . . . the furnisher would have discovered that the information it reported was inaccurate or incomplete, triggering the furnisher's obligation to correct the information."); *Chiang v. Verizon New Eng. Inc.*, 595 F.3d 26, 37 (1st Cir. 2010) (holding that a lawsuit against a furnisher or agency requires showing a causal relationship between the inaccuracy and allegedly unreasonable investigation).

Walker contends that MOHELA violated § 1681s-2b by failing to conduct a reasonable investigation after the CRAs notified it of Walker's credit disputes, failing to review all relevant information provided by the CRAs, and failing to correct its inaccurate reporting as to Walker. To establish a violation of § 1681s-2(b), Walker must prove: (1) MOHELA is a furnisher, (2) Walker notified the CRA that she disputed MOHELA's reporting as inaccurate; (3) the CRA notified MOHELA of the dispute; (4) MOHELA's reporting was inaccurate; and (5) MOHELA failed to conduct a reasonable investigation as required by § 1681s-2(b)(1). *Henry v. Freedom Mortg. Co.*, No. CV-19-01121-PHX-SRB, 2020 WL 8921079, at *3 (D. Ariz. April 27, 2020); *Robbins v. CitiMortgage, Inc.*, No. 16-CV-0472-LHK, 2017 WL 6513662, at *5 (N.D. Cal. Dec. 20, 2017). Walker seeks summary adjudication as to certain of these elements.

### i.   MOHELA as furnisher under the FCRA

As to the first element, Walker seeks summary adjudication as to whether MOHELA was a furnisher of information for purposes of 15 U.S.C. § 1681s-2(b). It is undisputed that MOHELA reported information regarding the student loans to CRAs through May 2019, including that Walker was in default on the loans. Doc. 106-1 at 9. It is also undisputed that,

1     after Equifax and TransUnion notified MOHELA in early June 2020 of Walker's dispute

2     regarding identity theft, MOHELA re-verified its prior reporting to the CRAs.  MOHELA argues

3     that under the FCRA a furnisher only "actually reports" a consumer's information to credit

4     reporting agencies if it is servicing the loan at issue, and that MOHELA's reverification does not

5     constitute a report of credit information for purposes of the statute.  Doc. 106 at 14–15.  But the

6     FCRA does not limit a furnisher's duty to investigate to debts that the furnisher is actively

7     servicing.  Upon notice of a dispute by a credit reporting agency, a furnisher must correct any past

8     misreporting and avoid future misreporting.  § 1681s-2(b)(1)(D), (E); *see Drew v. Equifax Info.*

9     *Servs., LLC*, 690 F.3d 1100, 1108 (9th Cir. 2012).

10          There is no genuine issue of material fact as to MOHELA's prior furnishing of the credit

11    information through May 2019 or as to MOHELA's reverification of the credit information in

12    June 2020.  MOHELA was therefore a furnisher of information under § 1681s-2(b) when the

13    CRAs notified MOHELA in June 2020 of Walker's dispute.

14                              **ii.    Walker's communication of dispute to CRAs**

15          As to the second element, a furnisher's duty to investigate is triggered once a consumer

16    raises a dispute with a credit reporting agency regarding information on their credit report.

17    § 1681s-2(b)(1).  There is also no genuine issue of material fact as to this issue.  It is undisputed

18    that, no later than in May 2020, Walker submitted the IDTN notifying TransUnion and Equifax of

19    her identity theft dispute regarding the student loans.

20                              **iii.    Accuracy of Walker's credit information**

21          As to the fourth element, to prevail on her § 1681s-2(b) claims, Walker must prove that

22    MOHELA's reported information was inaccurate.  *See Carvalho v. Equifax Info. Servs., LLC*, 629

23    F.3d 876, 890 (9th Cir. 2010).  An item on a credit report can be inaccurate "because it is patently

24    incorrect, or because it is misleading in such a way and to such an extent that it can be expected to

25    adversely affect credit decisions." *Id.* at 890 (citation omitted).  "It is the failure to report a bona

26    fide dispute, a dispute that could materially alter how the reported debt is understood, that gives

27    rise to a furnisher's liability under § 1681s-2(b)." *Gorman*, 584 F.3d at 1163.  The consumer

28    must convince the trier of fact that the omission of the dispute was "misleading in such a way and

18

1    to such an extent that [it] can be expected to have an adverse effect." *Id.* (citation omitted).  On

2    the other hand, a furnisher's investigation "is not necessarily unreasonable because it results in a

3    . . . conclusion [that] turns out to be inaccurate." *Drew*, 690 F.3d at 1110 (citation omitted).

4         MOHELA argues that its prior reporting and its reverifications after June 2020 were

5    accurate because the Department of Education had not yet deemed the loans to be fraudulent in

6    2020.  MOHELA claims it "cannot be held liable for purportedly-inaccurate reporting that was

7    inaccurate based only on future information that MOHELA did not and could not possibly have

8    known."  Doc. 106 at 17.  MOHELA argues that its reporting was not inaccurate because the

9    owner of the loans, the Department of Education, had not confirmed that the loans were

10   fraudulently obtained.  There are genuine issues of material fact as to whether MOHELA's

11   reporting was accurate, precluding summary adjudication on this issue.

12   ### iv.    Reasonable investigation

13        As to the fifth element, once the furnisher's duty is triggered, a furnisher is obligated to

14   conduct a reasonable investigation.  § 1681s-2(b)(1)(A).  "[T]he term 'investigation' on its own

15   force implies a fairly searching inquiry." *Id.*  Since "the purpose of the provision is to 'give

16   consumers a means to dispute—and, ultimately, correct—inaccurate information on their credit

17   reports' . . . a 'superficial, *un*reasonable inquir[y]' would hardly satisfy Congress's objective."

18   *Id.* at 1155 (quoting *Johnson v. MBNA Am. Bank, NA,* 357 F.3d 426, 431 (4th Cir. 2004)).  But

19   "[s]ummary judgment is generally an inappropriate way to decide the question of whether a

20   furnisher's investigation was reasonable because of 'the jury's unique competence in applying the

21   reasonable man standard.'" *Roche v. SLM Corp.*, No. SACV 21-00985-CJC (JDEx), 2022 WL

22   16948823, at *3 (C.D. Cal. Nov. 4, 2022).  "Indeed, the reasonableness of any investigation

23   involving identity theft is likely to be a highly individualized and fact-intensive inquiry." *Romero

24   v. Monterey Fin. Servs.*, LLC, No. 19cv1781 JM, 2021 WL 268635, at *3 (S.D. Cal. Jan. 27,

25   2021); *Gorman*, 584 F.3d at 1160 ("the reasonableness of an investigation depends on the facts of

26   the particular case, most importantly the CRA's description of the dispute in its notice").

27        MOHELA asserts that it conducted a sufficient investigation by "look[ing] to its internal

28

1 records to confirm the prior reporting." Doc. 106 at 19. But the CRAs' June 2020 notices put

2 MOHELA on notice that Walker disputed the loans at issue on the grounds of identity theft. *See,*

3 *e.g.*, Doc. 98-14, Exhibit L, at 2, 29. After the CRAs notified MOHELA of Walker's dispute,

4 MOHELA had a duty to under § 1681s-2(b) to investigate the dispute and correct its reporting if

5 inaccurate. *See Drew v. Equifax Info. Servs., LLC*, 690 F.3d 1100, 1107 (9th Cir. 2012).

6 MOHELA's argument that it satisfied any additional investigation obligation simply by

7 forwarding Walker's dispute to the Department of Education is inconsistent with its statutory

8 obligations. "[R]equir[ing] only a cursory investigation would not provide . . . protection;

9 instead, it would allow furnishers to escape their obligations by merely rubber stamping their

10 earlier submissions, even where circumstances demanded a more thorough inquiry." *Gorman*,

11 584 F.3d at 1155. "[A]s the statute recognizes, the furnisher of credit information stands in a far

12 better position to make a thorough investigation of a disputed debt than the CRA does on

13 reinvestigation." *Id.* at 1156. Moreover, in June 2020 MOHELA re-verified its prior reporting to

14 the CRAs concerning the student loans, *after* receiving the CRAs' notice of Walker's dispute.

15   As there remain genuine issues of material fact as to whether MOHELA conducted a

16 reasonable investigation in response to the CRAs' notifications, summary adjudication is not

17 appropriate as to this element of the FCRA claims.

18       **v. Reckless and willful conduct**

19   As there remain genuine issues of material fact as to the reasonableness of MOHELA's

20 investigation, summary adjudication is also unwarranted as to whether MOHELA's actions were

21 reckless and willful.

22     **2. CCRAA**

23   The CCRAA was enacted to "insure that consumer credit reporting agencies exercise their

24 grave responsibilities with fairness, impartiality, and a respect for the consumer's right to

25 privacy." Cal. Civ. Code § 1785.1(c). "The [CCRAA]'s purpose is thus 'to require that

26 consumer credit reporting agencies adopt reasonable procedures for meeting the needs of

27 commerce for consumer credit . . . and other information in a manner which is fair and equitable

28

1    to the consumer.'" *Robbins*, 2017 WL 6513662, at *14 (quoting Cal. Civ. Code § 1785.1(d)).

2         Walker seeks summary adjudication with respect to the following elements: (1) that

3    MOHELA is a "person" under the CCRAA, (2) that MOHELA reported information to a CRA;

4    (3) the information reported was inaccurate; (4) Walker was harmed; and (5) MOHELA knew or

5    should have known that the information was inaccurate. *See id.* at 14.

6                        **i.    MOHELA is a "person"**

7         As to the first element, California Civil Code § 1785.3(j) defines a person as "any

8    individual, partnership, corporation, trust, estate, cooperative, association, government or

9    governmental subdivision or agency, or other entity."  MOHELA admits in its Answer to

10   Walker's complaint that it is a "quasi-governmental entity of the State of Missouri."  Doc. 23 at

11   ¶ 30.  Thus, there is no genuine issue of material fact as whether MOHELA is a person for

12   purposes of the CCRAA and Walker's motion for summary adjudication is granted as to this

13   element.

14                   **ii.    MOHELA reports information to a credit reporting agency**

15        As addressed above with respect to the corresponding FCRA claim, prior to June 2019

16   MOHELA reported credit information regarding the student loans in Walker's name, and in June

17   2020 MOHELA reverified to the CRAs its prior reporting.  There is no genuine issue of material

18   fact as to those facts and summary adjudication is granted to that extent.

19                  **iii.    Accuracy of information MOHELA reported and harm to Walker**

20        For the reasons discussed above, genuine issues of material fact preclude summary

21   adjudication as to these elements.

22                        **iv.    MOHELA's knowledge**

23        Neither party is entitled to judgment as a matter of law as to whether MOHELA knew or

24   should have known it was reporting inaccurate information, because there remain genuine issues

25   of material fact regarding whether MOHELA reasonably investigated Walker's disputes.

26

27

28

                                              21

C. **MOHELA's motion for summary judgment as to the FCRA**
   **and CCRAA claims**

   1. **FCRA and CCRAA claims**

MOHELA argues that Walker cannot establish that it violated the FCRA and CCRAA by failing to conduct a reasonable investigation and by furnishing inaccurate information about Walker's credit.  Doc. 99-1 at 8.  MOHELA also argues that it satisfied any obligation by referring the matter to the Department of Education pursuant to the applicable Code of Federal Regulations.  *Id.* at 10; 34 C.F.R. § 685.215.  MOHELA fails to establish how this Department of Education regulation, which concerns procedures for the government's discharge of student loans in various circumstances, has any bearing on MOHELA's statutory obligation under the FCRA and CCRAA to provide accurate information to credit reporting agencies and to investigate and correct any prior incorrect reports when properly presented with a dispute.  Moreover, as discussed above, genuine issues of material fact remain concerning the reasonableness and accuracy of MOHELA's investigation and reporting.  MOHELA's motion for summary judgment as to these claims is denied.

   2. **Damages**

MOHELA also seeks summary judgment as to Walker's damages.  MOHELA argues that Walker cannot show that she suffered actual damages due to its reporting on her credit reports and that it is entitled to summary judgment as to such damages.  Doc. 99-1 at 25.  Walker asserts that MOHELA's reporting on her credit reports as to the disputed loans negatively impacted her credit score, causing her credit cards to be cancelled and preventing her from qualifying for a home loan.  It is undisputed that Walker's credit report showed four delinquent accounts.  Binder Depo., Doc. 107-2 at 19.  MOHELA's expert acknowledged that two of the account entries were from MOHELA and two were from the Department of Education.  *Id.*  The witness acknowledged that someone looking at the entries would not "realize that they're the same accounts" as they are reported and viewed as separate accounts on a credit report, and that if MOHELA's entries had been the only tradelines listed on Walker's credit report it still "would negatively affect"

1    Walker's credit, though not by as much as the Department of Education's entries.  *Id.*

2            Walker does not need to show that MOHELA's "reporting was the only cause of [her]

3    harm," but merely that its reporting was a "substantial factor in [Walker's] loss of credit rating

4    to create an issue of fact regarding causation."  *Robbins*, 2017 WL 6513662, at * 17 (cleaned up).

5    There are genuine issues of material fact concerning the extent and scope of the adverse impact of

6    MOHELA's credit report entries on Walker's credit rating and the cancellation of her credit

7    cards, precluding summary judgment on that issue.  Walker also contends she suffered emotional

8    distress from the credit reporting and had to pay for postage costs to submit her loan disputes.

9    Doc. 107 at 18.  The parties' briefing does not meaningfully address Walker's claims for

10    emotional distress or postage damages, and summary judgment is not warranted as to these

11    claimed damages.

12            MOHELA is entitled to summary judgment with respect to Walker's claimed damages

13    due to her inability to obtain a home loan.  Walker concedes that she never applied for a home

14    loan.  She claims she did not apply for a loan because her lender advised that she would not

15    qualify for a competitive interest rate.  Doc. 108-1 at 16.  Her asserted damages due to a

16    hypothetical inability to obtain a home loan are speculative.  "It is black-letter law that damages

17    which are speculative, remote, imaginary, contingent or merely possible cannot serve as a legal

18    basis for recovery."  *Navellier v. Sletten*, 262 F.3d 923, 939 (9th Cir. 2001) (citations omitted);

19    *Robbins*, 2017 WL 6513662, at *17.  In *Robbins*, the court similarly granted summary judgment

20    where the plaintiff never applied for a home loan and did not identify a particular property she

21    intended to purchase.  *Robbins*, at *18.  "Lost opportunity damages this speculative fail to survive

22    summary judgment."  *Id.*  MOHELA's motion for summary judgment is granted as to Walker's

23    claim for damages with respect to her claimed inability to obtain a home loan.

24    ///

25    ///

26    ///

27    ///

28    ///

**IV.    CONCLUSION**

For the foregoing reasons, the Court ORDERS:

1.  Walker's Motion for Partial Summary Adjudication (Doc. 98) is GRANTED in part and DENIED in part; and

2.  MOHELA's Motion for Summary Judgment (Doc. 99) is GRANTED in part and DENIED in part.


IT IS SO ORDERED.

Dated:    July 26, 2024

_____
UNITED STATES DISTRICT JUDGE