No. 22-3286

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

_____

JEFFREY GOOD,

Plaintiff-Appellant,

v.

UNITED STATES DEPARTMENT OF EDUCATION, *et al.*,

Defendants-Appellees.

_____

On Appeal from the United States District Court
for the District of Kansas
No. 2:21-cv-2539-JAR-ADM
Hon. Julie A. Robinson

_____

**REPLY BRIEF FOR PLAINTIFF-APPELLANT JEFFREY GOOD**

_____

Mark D. Molner
Evans & Mullinix, P.A.
7225 Renner Road, Suite 200,
Shawnee, KS 66217
(913) 962-8700
mmolner@emlawkc.com

Nandan M. Joshi
Allison M. Zieve
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
njoshi@citizen.org

*Attorneys for Plaintiff-Appellant*

May 11, 2023

# TABLE OF CONTENTS

Table of Authorities ......................................................................ii

Glossary ....................................................................................viii

Introduction ................................................................................1

Argument ...................................................................................2

I.    MOHELA has not shown that it is an arm of Missouri. ...................2

    A.    MOHELA has not proven that it is an arm of Missouri
        under the *Steadfast* factors. ......................................................2

        1.    Character under state law ...............................................3

        2.    Autonomy under state law ...............................................9

        3.    MOHELA's finances .....................................................14

        4.    MOHELA's geographic reach ..........................................17

    B.    The second step of the analysis confirms that MOHELA
        is not an arm of Missouri. ......................................................18

II.    FCRA waives federal sovereign immunity. ...............................20

Conclusion ................................................................................33

Certificate of Compliance ............................................................34

Certificate of Service ..................................................................35

# TABLE OF AUTHORITIES

**Cases**                                                              **Page(s)**

*In re Ayers*,
   123 U.S. 443 (1887) ...................................................................... 18

*Barnes v. Wagoner County Rural Water District No. 4*,
   No. 15-cv-479, 2016 WL 1627622
   (E.D. Okla. Apr. 22, 2016) ...................................................... 8

*Burgess v. United States*,
   553 U.S. 124 (2008) ..............................................................21, 22

*Burrus v. State Lottery Commission of Indiana*,
   546 F.3d 417 (7th Cir. 2008) .................................................. 15

*City of Newport v. Fact Concerts, Inc.*,
   453 U.S. 247 (1981) ............................................................... 30

*Cochise Consultancy, Inc. v. United States ex rel. Hunt*,
   139 S. Ct. 1507 (2019) ............................................................ 9

*Connecticut National Bank v. Germain*,
   503 U.S. 249 (1992) ............................................................... 32

*Daniel v. National Park Service*,
   891 F.3d 762 (9th Cir. 2018) .................................................. 23

*Dellmuth v. Muth*,
   491 U.S. 223 (1989) ............................................................... 25

*Department of Transportation v. Association of
   American Railroads*,
   575 U.S. 43 (2015) ................................................................. 19

*Digital Realty Trust, Inc. v. Somers*,
   138 S. Ct. 767 (2018) ............................................................21, 22

*Duncan v. Walker*,
  533 U.S. 167 (2001) ...................................................................5

*Dykes v. Missouri Higher Education Loan Authority*,
  No. 4:21-cv-83, 2021 WL 3206691 (E.D. Mo. July 29, 2021) ...............18

*Employees of the Department of Public Health & Welfare*
  *v. Department of Public Health & Welfare*,
  411 U.S. 279 (1973) .........................................................24, 25, 26, 27

*FAA v. Cooper*,
  566 U.S. 284 (2012) ..................................................................24

*Financial Oversight & Management Board for Puerto Rico*
  *v. Centro de Periodismo Investigativo, Inc.*,
  No. 22-96, 2023 WL 3356529 (U.S. May 11, 2023) .............................21

*Fresenius Medical Care Cardiovascular Resources, Inc. v.*
  *Puerto Rico & Caribbean Cardiovascular Center Corp.*,
  322 F.3d 56 (1st Cir. 2003) ...........................................................20

*Hennessey v. University of Kansas Hospital Authority*,
  53 F.4th 516 (10th Cir. 2022) .............2, 9, 10, 11, 13, 14, 15, 16, 18, 20

*Henson v. Santander Consumer USA Inc.*,
  582 U.S. 79 (2017) ..................................................................31

*J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred International, Inc.*,
  534 U.S. 124 (2001) ..................................................................32

*Kirtz v. Trans Union LLC*,
  46 F.4th 159 (3d Cir. 2022)..............21, 23, 24, 25, 27, 28, 29, 30, 31, 32

*Lebron v. National Railroad Passenger Corp.*,
  513 U.S. 374 (1995) ..................................................................19

*Library of Congress v. Shaw,*
478 U.S. 310 (1986) ...............................................................25

*Markham v. Cabell,*
326 U.S. 404 (1945) ...............................................................24

*Menorah Medical Center v. Health & Educational*
*Facilities Authority,*
584 S.W.2d 73 (Mo. 1979) ...............................................3, 6, 7

*Middleton v. Missouri Department of Corrections,*
278 S.W.3d 193 (Mo. 2009) ......................................................4

*Mowrer v. U.S. Department of Transportation,*
14 F.4th 723 (D.C. Cir. 2021) ...................................23, 28, 31

*Patterson v. Rural Water District 2,*
438 F. Supp. 3d 1258 (W.D. Okla. 2020).................................8

*Public School Retirement System of Missouri v. State Street Bank &*
*Trust Co.,*
640 F.3d 821 (8th Cir. 2011).................................................14

*Puerto Rico Aqueduct & Sewer Authority v. Metcalf & Eddy, Inc.,*
506 U.S. 139 (1993) ...............................................................18

*Regents of the University of California v. Doe,*
519 U.S. 425 (1997) .................................................................4

*Return Mail, Inc. v. U.S. Postal Service,*
139 S. Ct. 1853 (2019) ...........................................................21

*Richlin Security Service Co. v. Chertoff,*
553 U.S. 571 (2008) ...............................................................28

*Seminole Tribe of Florida v. Florida,*
517 U.S. 44 (1996) .................................................................30

*Sharp v. United States,*
  580 F.3d 1234 (Fed. Cir. 2009) ............................................................27

*Sinor's Long Bay Marina, LLC v.*
  *Wagoner County Rural Water District No. 2,*
  335 P.3d 262 (Okla. 2014) .......................................................................8

*Steadfast Insurance Co. v. Agricultural Insurance Co.,*
  507 F.3d 1250 (10th Cir. 2007) ..........2, 3, 6, 9, 10, 13, 14, 15, 16, 17, 18

*Turkiye Halk Bankasi A.S. v. United States,*
  143 S. Ct. 940 (2023) ...............................................................................29

*United States ex rel. Oberg v. Pennsylvania Higher Education*
  *Assistance Agency,*
  804 F.3d 646 (4th Cir. 2015) .............................................................11, 12

*United States ex rel. Sikkenga*
  *v. Regence BlueCross BlueShield of Utah,*
  472 F.3d 702 (10th Cir. 2006) .............................................................9, 17

*United States v. Chemical Foundation,*
  272 U.S. 1 (1926) .....................................................................................25

*United States v. Idaho ex rel. Director, Idaho Department of*
  *Water Resources,*
  508 U.S. 1 (1993) .....................................................................................25

*United States v. Smith,*
  756 F.3d 1179 (10th Cir. 2014) ...............................................................4

*University of Texas Southwestern Medical Center v. Nassar,*
  570 U.S. 338 (2013) .................................................................................24

*Vermont Agency of Natural Resources*
  *v. United States ex rel. Stevens,*
  529 U.S. 765 (2000) .................................................................................30

## Federal Statutes

5 U.S.C. § 552a(b)(12) ................................................................ 32

15 U.S.C. § 1681(a)(1) ............................................................... 27

15 U.S.C. § 1681a(a) .................................................................. 22

15 U.S.C. § 1681a(b) .............................................................. 1, 21

15 U.S.C. § 1681n ........................................... 21, 22, 28, 29, 30, 31, 32

15 U.S.C. § 1681o........................................... 21, 22, 28, 29, 30, 31, 32

15 U.S.C. § 1681p ...................................................................... 30

15 U.S.C. § 1681q ...................................................................... 28

15 U.S.C. §§ 1681s(a), (c) ........................................................... 29

15 U.S.C. § 1681u(j) ................................................................... 31

Fair Credit Reporting Act, Pub. L. No. 91-508, tit. VI, §§ 616–617,
    84 Stat. 1127 (1970) .......................................................... 22, 23

Consumer Credit Reporting Reform Act of 1996,
    Pub. L. No. 104-208, div. A, tit. II, subtit. D, ch. 1, § 2412,
    110 Stat. 3009-426, 3009-446 .................................................. 23

## State Statutes

Mo. Rev. Stat. § 1.020(12) ............................................................ 3

Mo. Rev. Stat. § 173.110.1........................................................... 12

Mo. Rev. Stat. § 173.360............................................................ 3, 6, 10

Mo. Rev. Stat. § 173.385.1(8) ................................................................... 12

Mo. Rev. Stat. § 173.385.1(13) ................................................................. 11

Mo. Rev. Stat. § 173.390 ............................................................................. 7

Mo. Rev. Stat. § 173.415 ..................................................................... 3, 5, 6

Mo. Rev. Stat. § 173.420 ........................................................................... 12

Mo. Rev. Stat. § 173.425 ........................................................................... 12

Mo. Rev. Stat. § 173.445 ............................................................................. 7

Mo. Rev. Stat. § 360.020 ............................................................................. 6

Mo. Rev. Stat. § 360.060 ............................................................................. 7

Mo. Rev. Stat. § 360.085 ............................................................................. 5

Mo. Rev. Stat. § 360.140 ............................................................................. 7

Mo. Rev. Stat. § 537.600 ........................................................................... 18

Okla. Stat. Ann. tit. 82, § 1324.6 ............................................................... 8

## State Regulations

Mo. Code Regs. Ann. tit. 6, § 10-2.030 .................................................... 12

## Other Authorities

S. Rep. No. 103-209 (1993) ................................................................. 26, 27

Merriam-Webster Dictionary,
  https://www.merriam-webster.com/dictionary/ ....................................... 4

# GLOSSARY

| | |
|---|---|
| FCRA | Fair Credit Reporting Act |
| MOHEFA | Health and Educational Facilities Authority of the State of Missouri |
| MOHELA | Higher Education Loan Authority of the State of Missouri |
| USDOE | United States Department of Education |

## INTRODUCTION

The Fair Credit Reporting Act (FCRA) imposes civil liability on "persons" that negligently or willfully fail to comply with their FCRA responsibilities. Defendant-appellee Higher Education Loan Authority of the State of Missouri (MOHELA) does not dispute that it is a "person" under FCRA. Nonetheless, it seeks to avoid liability by invoking Missouri's sovereign immunity. State sovereign immunity, however, is reserved for states and their arms, and MOHELA has failed to prove that it is an arm of Missouri. MOHELA's structural, operational, and financial independence from state government, along with the absence of any risk of direct legal liability to Missouri, confirm that MOHELA is not part of the state and, therefore, not entitled to immunity.

Defendant-appellee United States Department of Education (USDOE) does dispute that it is a "person" subject to FCRA's civil-liability provisions. That argument fails because FCRA defines "person" to include "any … governmental … agency," 15 U.S.C. § 1681a(b), and that definition unambiguously includes USDOE. USDOE seeks to prevent application of that definition to FCRA's civil-liability provisions, but its arguments fly in the face of unambiguous statutory text and

1

traditional canons of statutory interpretation. USDOE, accordingly, may be held civilly liable for its failure to comply with FCRA.

## ARGUMENT

### I.    MOHELA has not shown that it is an arm of Missouri.

Plaintiff-appellant Jeffrey Good and MOHELA agree on several points. Both agree that the two-step inquiry set forth in *Hennessey v. University of Kansas Hospital Authority*, 53 F.4th 516 (10th Cir. 2022), provides the proper framework for determining whether MOHELA is an arm of Missouri entitled to sovereign immunity. *See* Good Br. 21–22; MOHELA Br. 16. Both agree that this Court's review of that question is *de novo*. *See* Good Br. 19; MOHELA Br. 13. Finally, both agree that MOHELA bears the burden of proving that it is an arm of the state. *See* Good Br. 23; MOHELA Br. 15. MOHELA has failed to meet its burden.

#### A.  MOHELA has not proven that it is an arm of Missouri under the *Steadfast* factors.

The first step of the inquiry focuses on the four "primary factors" set forth in *Steadfast Insurance Co. v. Agricultural Insurance Co.*, 507 F.3d 1250, 1253 (10th Cir. 2007). *See Hennessey*, 53 F.4th at 528. Those factors support Mr. Good.

### 1. Character under state law

As the opening brief explained, Good Br. 24–29, MOHELA was formed as a corporate body separate from the state. Under state law, MOHELA is a "body politic and corporate" and a "public instrumentality and body corporate." Mo. Rev. Stat. § 173.360. It is also "a separate public instrumentality of the state." *Id.* § 173.415. State law defines "bodies politic and corporate" to be "person[s]." *Id.* § 1.020(12). And the state supreme court has held that another "body politic and corporate"—the Health and Educational Facilities Authority of the State of Missouri (MOHEFA)—is "an entity apart from the state." *Menorah Med. Ctr. v. Health & Educ. Facilities Auth.*, 584 S.W.2d 73, 78, 82 (Mo. 1979). Thus, the first *Steadfast* factor, MOHELA's character under state law, indicates that MOHELA is not an arm of Missouri.

Although MOHELA argues that its corporate form "alone" does not "compel[] the conclusion" that it is a state arm, MOHELA Br. 21, it does not dispute that an entity's separate corporate existence is a factor that weighs against its status as an arm. *See* Good Br. 24–25. MOHELA responds that it differs from other state-affiliated corporate entities because it is "a separate public instrumentality *of* the state." MOHELA

Br. 20 (cleaned up). According to MOHELA, "of" is the "more important word in the statute," and "of" should not be "replaced with 'from.'" *Id.*

Contrary to MOHELA's suggestion, Mr. Good does not argue that "of" should be replaced with "from." Rather, he argues that, although the term "of the state" denotes an entity as an instrumentality of the state, being "of the state" does not mean that "a state instrumentality may invoke the State's immunity." *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429 (1997), *cited in* Good Br. 25. Such an instrumentality could instead have "the same kind of independent status as a county," which lacks sovereign immunity. *Id.* at 429 n.5. Accordingly, the key term in the statutory phrase is not "of," but "separate"—a word that denotes MOHELA as an entity that is "set or kept apart" and "existing by itself: autonomous." *Separate*, Merriam-Webster Dictionary, https://www. merriam-webster.com/dictionary/. "[E]ach word, clause, sentence, and section of a statute should be given meaning," and "a court should not interpret a statute so as to render some phrases mere surplusage." *Middleton v. Mo. Dep't of Corr.*, 278 S.W.3d 193, 196 (Mo. 2009); *see also United States v. Smith*, 756 F.3d 1179, 1187 (10th Cir. 2014) (stating "'[i]t is our duty to give effect, if possible, to every clause and word of a statute'

and we should be 'reluctant to treat statutory terms as surplusage in any setting,'" quoting *Duncan v. Walker*, 533 U.S. 167, 174 (2001)). MOHELA makes no attempt to explain what "separate" means if it does not mean that MOHELA is an entity that is not the state itself.

MOHELA also attempts to distinguish itself from MOHEFA, even though MOHELA acknowledges that the statutes establishing each entity contain "similar language." MOHELA Br. 22. It argues that there are also "stark" differences in the text that justify disparate treatment. *Id*. at 23. Those differences, however, support the conclusion that MOHELA is *not* an arm of Missouri:

| MOHEFA | MOHELA |
|---|---|
| The authority is hereby declared to be performing a public function <u>in behalf of the state</u> and to be a public instrumentality of the state. | The authority is hereby declared to be performing a public function and to be a <u>separate</u> public instrumentality of the state. |
| Mo. Rev. Stat. § 360.085 (emphasis added). | Mo. Rev. Stat. § 173.415 (emphasis added). |

Although each is a "public instrumentality of the state," section 173.415 goes a step further with respect to MOHELA, specifying that it is a "separate" instrumentality. Accordingly, the Supreme Court of Missouri's holding that MOHEFA is not an arm of the state but "an entity apart

from the state," *Menorah Med. Ctr.*, 584 S.W.2d at 82, requires the same conclusion here.

MOHELA argues that the Missouri Supreme Court's holding that MOHEFA is not an arm of the state was "based in part on" the phrase "in behalf of the state," which appears in MOHEFA's statute but not in section 173.415. MOHELA Br. 23. That phrase appears nowhere in *Menorah Medical Center*, however. Instead, the court explained that MOHEFA "is established as a 'body politic and corporate' which is a 'public instrumentality.' § 360.020. Similar bodies have been adjudged as 'separate entities' from the state." 584 S.W.2d at 78. The statutory language with regard to MOHELA is identical to that quoted by the Missouri Supreme Court. Mo. Rev. Stat. § 173.360 ("[T]here is hereby created a body politic and corporate to be known as [MOHELA]. The authority is hereby constituted a public instrumentality and body corporate.").

MOHELA notes other differences between MOHELA and MOHEFA, *see* MOHELA Br. 23, but none are relevant to the outcome in *Menorah Medical Center* or to the first *Steadfast* factor. MOHELA's obligation to transfer funds to the state does not affect its character as a

6

"body politic and corporate." Although MOHELA argues that "MOHEFA's statutes do not impose limits on bond issuances like those imposed on MOHELA by statute," *id.*, it does not identify any relevant limitation that would alter its character under state law. *Compare* Mo. Rev. Stat. § 173.390 (MOHELA) *with id.* § 360.060 (MOHEFA). Likewise, the presence of two *ex officio* members on MOHELA's board does not give it closer ties to the state than MOHEFA, particularly given that a majority of MOHELA's board represent private or non-state public interests. *See* Good Br. 29; *see also infra* pp. 10–11.

MOHELA gives weight to the fact that it "is assigned to" the department of higher education and workforce development. MOHELA Br. 18 (citing Mo. Rev. Stat. § 173.445); *see also id.* at 4, 26, 28, 41. But MOHEFA is also "assigned" to a state-level agency—formerly, to the department of consumer affairs, regulation and licensing, *see Menorah Med. Ctr.*, 584 S.W.2d at 76, and currently to the office of administration, Mo. Rev. Stat. § 360.140. The state supreme court nonetheless recognized that MOHEFA is not a state agency. The assignment therefore does not help MOHELA here.

7

Finally, MOHELA cites district court decisions holding that Oklahoma's rural water districts are state agencies despite being "bodies politic and corporate." MOHELA Br. 24 (citing *Patterson v. Rural Water Dist. 2*, 438 F. Supp. 3d 1258 (W.D. Okla. 2020), and *Barnes v. Wagoner Cnty. Rural Water Dist. No. 4*, No. 15-cv-479, 2016 WL 1627622 (E.D. Okla. Apr. 22, 2016)). The statutory language and history cut against MOHELA, however. As *Patterson* recognized, rural water districts were "not considered agencies of the state" until Oklahoma law was changed to declare each district "a body politic and corporate *and an agency and legally constituted authority of the State of Oklahoma*." 438 F. Supp. 3d at 1268 n.3 (quoting Okla. Stat. Ann. tit. 82, § 1324.6). And Oklahoma's supreme court has held that rural water districts are state agencies. *See id.* at 1268 (citing *Sinor's Long Bay Marina, LLC v. Wagoner Cnty. Rural Water Dist. No. 2*, 335 P.3d 262, 263 (Okla. 2014)). The absence of similar statutory language and judicial determinations here confirms that MOHELA lacks the character under Missouri law to be considered an arm of the state under the first *Steadfast* factor.

## 2. Autonomy under state law

The second *Steadfast* factor looks to "the degree of control the state exercises over the entity." *Steadfast*, 507 F.3d at 1253. As the opening brief demonstrated, Good Br. 29–36, MOHELA "retains substantial autonomy in its operations, and operates with little, if any[,] guidance or interference" from the state, *United States ex rel. Sikkenga v. Regence BlueCross BlueShield of Utah*, 472 F.3d 702, 720–21 (10th Cir. 2006), *abrogated on other grounds*, *Cochise Consultancy, Inc. v. United States ex rel. Hunt*, 139 S. Ct. 1507 (2019). MOHELA has not met its burden of proving otherwise.

MOHELA highlights its seven-member board, which consists of five members nominated by the governor and confirmed by the state senate and two *ex officio* members who are appointed officials within state government. MOHELA Br. 27. But MOHELA ignores this Court's observation that the appointment power "is not sufficient to establish that the autonomy factor favors an arm-of-the-state finding." *Hennessey*, 53 F.4th at 537; *see* Good Br. 33 (citing cases). Importantly, MOHELA does not suggest that the governor has the "power to block or veto action taken by the board" or to "determine[ ] … who among the board members

leads the board [or] the individual in charge of overseeing the day-to-day operations." *Hennessey*, 53 F.4th at 537–38. And MOHELA acknowledges that the governor can remove a board member only for cause. *See* MOHELA Br. 4. The governor's powers over the board's composition, therefore, are not sufficient to tip the second *Steadfast* factor in favor of immunity.

The state's ability to direct MOHELA's affairs is further diminished because three board members represent private institutions and two represent non-state public interests, which means that five of the seven board members hail from outside of state government. Mo. Rev. Stat. § 173.360; *see also* Good Br. 29. MOHELA's response that the entity still performs a public function, MOHELA Br. 28 (citing Mo. Rev. Stat. § 173.360), misses the point. The second *Steadfast* factor is not concerned with MOHELA's mission, but with the "role the state executive branch, specifically the governor, and the state legislature play in the operations of the entity." *Hennessey*, 53 F.4th at 537. Because a majority of MOHELA's board represent non-state interests, state government does not enjoy the level of control that it might otherwise have if most or all of the board appointees were state officers or individuals otherwise

dedicated to advancing the state's interests. And "[a]n entity's ability to set its own policies, without oversight and control from the state or a state agency, is instrumental in the entity being autonomous from the state." *Id.* at 541.

MOHELA also enjoys autonomy from the state because it owns and controls its property and makes its own business decisions. *See* Good Br. 31, 34, 36. MOHELA cites various statutory provisions that it says restrict its control over its property and its business. MOHELA Br. 30. The existence of some limitations on an entity's autonomy is insufficient to support immunity, however, where the "statutory restrictions operate predominantly at the administrative edges rather than the discretionary heart of [the entity's] authority." *United States ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 804 F.3d 646, 673 (4th Cir. 2015) (*Oberg III*); *see also id.* at 671–73 & n.22.

MOHELA does not explain how any of the statutory provisions it cites, *see* MOHELA Br. 30, meaningfully limit its "power to set policies and control the day-to-day operation." *Hennessey*, 53 F.4th at 541. For instance, although MOHELA is required to invest its unused funds prudentially, Mo. Rev. Stat. § 173.385.1(13), it has discretion to

determine the mix of investments to utilize. And while MOHELA must obtain the prior approval of the department of higher education and workforce development before agreeing to sell student loans that the state has guaranteed, *see id.* §§ 173.385.1(8); 173.110.1; Mo. Code Regs. Ann. tit. 6, § 10-2.030, MOHELA offers no evidence of the volume of state-guaranteed loans in its portfolio or the nature of the department's review process. *See Oberg III*, 804 F.3d at 671 (giving diminished weight to "a checklist-driven, essentially non-substantive review process" in evaluating state control). Likewise, although MOHELA argues that Missouri has "preserved its authority" over MOHELA's assets, MOHELA Br. 30, the provision it cites is merely a rule of construction. *See* Mo. Rev. Stat. § 173.420 ("Nothing in these sections shall be construed to deprive the state and its governmental subdivisions of their respective powers over assets of the authority."). Elsewhere, the Missouri legislature has made clear that "[n]o asset of the authority shall be considered to be part of the revenue of the state" and that "[t]he assets of the authority shall remain under the exclusive control and management of the authority." *Id.* § 173.425. MOHELA ignores that provision.

None of the other ties between MOHELA and Missouri reveals a material limitation on MOHELA's autonomy. MOHELA has not shown how its duty to contribute to the Lewis and Clark Discovery Fund and to follow statutory directives in making and issuing loans and bonds, *see* MOHELA Br. 30, materially affects its "ability to establish policies and govern day-to-day affairs without interference from the state." *Hennessey*, 53 F.4th at 542. MOHELA likewise fails to explain how its establishment by state statute, its assignment to the department of higher education and workforce development, and its duty to comply with the state's open-meeting laws, *see* MOHELA Br. 30, place it under state control. "[A] court must remain cognizant that some ties and oversight will always remain between the state and an entity created by the state." *Hennessey*, 53 F.4th at 536. Accordingly, the cited points about MOHELA's operations cannot satisfy its burden of demonstrating state control.

Other considerations relevant to the second *Steadfast* factor confirm MOHELA's autonomy. As Mr. Good's opening brief demonstrated, MOHELA's employees are classified differently, and compensated separately, from state employees; and MOHELA has the

power to form its own contracts. Good Br. 30–32. MOHELA has no response other than to reiterate that its board is appointed by the governor. MOHELA Br. 29. MOHELA also acknowledges that it may sue or be sued. *Id.* at 32. Although it contends that this consideration is not conclusive, *id.* (citing *Pub. Sch. Ret. Sys. of Mo. v. State St. Bank & Tr. Co.*, 640 F.3d 821, 827–28 (8th Cir. 2011)), it is nonetheless another fact weighing against its argument. *Hennessey* makes clear that "the ability of the entity to sue and be sued" supports "a finding that the entity is autonomous." 53 F.4th at 541.

### 3. MOHELA's finances

The third *Steadfast* factor looks at the entity's finances to determine "the amount of state funding the entity receives" and to "consider whether the entity has the ability to issue bonds or levy taxes on its own behalf." *Steadfast*, 507 F.3d at 1253. Although MOHELA cannot levy taxes, "an entity's inability to levy taxes is emblematic of it being an arm of the state only if the entity also cannot issue bonds without state oversight and cannot generate its own revenue." *Hennessey*, 53 F.4th at 535. The district court correctly concluded that the third

*Steadfast* factor favors a finding that MOHELA is not an arm of Missouri. App. 194 (Dist. Ct. Op. 8); *see also* Good Br. 36–41.

MOHELA contends that the third factor is neutral or favors immunity because it is "subject to limitations" of the type that it previously relied on in addressing the second *Steadfast* factor. *See* MOHELA Br. 34. In *Hennessey*, however, the entity was also subject to financial limitations, yet this Court concluded that the finances factor weighed against immunity because its bonds were "not backed by the State." 53 F.4th at 534. The same is true here. *See* Good Br. 39–40.

MOHELA again invokes its duty to fund state scholarship programs. MOHELA Br. 35. That obligation is not relevant to the third *Steadfast* factor, which focuses on an entity's "financing and revenue streams." *Hennessey*, 53 F.4th at 533. For instance, in *Burrus v. State Lottery Commission of Indiana*, 546 F.3d 417 (7th Cir. 2008), the state lottery commission transferred "a great portion of Lottery revenues … to the Indiana state teachers' retirement fund, the Indiana pension relief fund, and the build Indiana fund." *Id*. at 421. The Seventh Circuit nevertheless held that the commission enjoyed "financial autonomy from

15

the state" because of its "complete lack of fiscal reliance upon the state." *Id.* at 420. The same is true here.

MOHELA also criticizes the district court for considering whether a judgment against MOHELA would be paid out of the state treasury, claiming that this consideration belongs under the second step of the *Hennessey* test rather than the third *Steadfast* factor. *See* MOHELA Br. 36–37. MOHELA errs in suggesting that, absent that consideration, the third *Steadfast* factor would not weigh against immunity. In any event, although MOHELA is correct that *Hennessey* did not examine whether the state would be responsible for paying a judgment in discussing the third *Steadfast* factor, *Hennessey* does not suggest that it would be impermissible to do so. Indeed, *Steadfast* itself considered whether "state funds" would be used to pay "[a]ny judgment entered against the [entity]." 507 F.3d at 1255. Here, MOHELA does not dispute the district court's conclusion that "a judgment against it would not come directly out of the state's treasury." App. 193 (Dist. Ct. Op. 7); *see also* Good Br. 41. Accordingly, the district court correctly concluded that the third *Steadfast* factor weighed against MOHELA's status as an arm of Missouri.

16

### 4. MOHELA's geographic reach

As Mr. Good's opening brief explained, the fourth *Steadfast* factor cuts both ways in the arm analysis. Good Br. 42–43. Although certain aspects of MOHELA's operations are state-focused, other aspects of its business are indisputably national in scope. *Id*. Indeed, this case is before this Court and not the Eighth Circuit because Mr. Good is a resident of Kansas, a state where MOHELA conducts business. App. 10.

MOHELA acknowledges that it "services student loans for borrowers outside Missouri," but argues that its national reach is irrelevant. MOHELA Br. 39. In *Sikkenga*, however, this Court took note of the entity's "nationwide activity" to support the conclusion that it was not an arm of the state. 472 F.3d at 719. MOHELA attempts to distinguish *Sikkenga* because that entity "was not registered as a non-profit, issued stock, was licensed in nine states, and marketed its services to all fifty states." MOHELA Br. 39 n.10. But the 5.2 million student loan accounts that MOHELA services, *see* Good Br. 42 n.3, likely also involve borrowers in all fifty states, and MOHELA's non-profit and non-stock characteristics are not relevant to the geographic reach of its business.

17

Based on the record in this case, the fourth *Steadfast* factor is either neutral, or favors Mr. Good, in the arm-of-the-state analysis.

### B. The second step of the analysis confirms that MOHELA is not an arm of Missouri.

The *Steadfast* factors demonstrate that MOHELA is not an arm of Missouri. The second step of the *Hennessey* analysis confirms it.

A lawsuit against MOHELA does not threaten Missouri's dignitary interests because the state is not being haled into court. *See* Good Br. 44–45. MOHELA largely relies on its *Steadfast* analysis to argue otherwise, MOHELA Br. 41–43, but it cannot deny that Missouri is not subject to the "coercive process of judicial tribunals at the instance of private parties" when MOHELA is sued. *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993) (quoting *In re Ayers*, 123 U.S. 443, 505 (1887)).

MOHELA argues that it enjoys tort immunity as a "public entity" under Missouri law. MOHELA Br. 42; *see* Mo. Rev. Stat. § 537.600. But "[i]mmunity [for public entities under Missouri law] is broader than the immunity provided by the Eleventh Amendment. It extends to municipalities and other public entities that are not protected by the [Eleventh] Amendment." *Dykes v. Mo. Higher Educ. Loan Auth.*, No.

18

4:21-cv-83, 2021 WL 3206691, at *5 (E.D. Mo. July 29, 2021). Missouri's decision to immunize non-sovereign entities from tort claims does not imply that the state's dignitary interests are offended when those entities are named as defendants in a lawsuit.

MOHELA errs in seeking support from *Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374 (1995), and *Department of Transportation v. Association of American Railroads*, 575 U.S. 43 (2015) (*Railroads*). *Lebron* and *Railroads* do not concern state sovereign immunity. Rather, they hold that Amtrak, a congressionally chartered and federally controlled corporation, is a governmental entity bound by the Constitution. *See Lebron*, 513 U.S. at 394; *Railroads*, 575 U.S. at 55. Neither decision suggests that Amtrak, by virtue of being bound by the Constitution, is an arm of the federal government. To the contrary, *Lebron* makes clear that an entity's constitutional status and its entitlement to immunity are distinct legal questions. *See* 513 U.S. at 392 (explaining that Congress may "disavow[]" Amtrak's "agency status" for purposes of sovereign immunity, but not for "determining the constitutional rights of citizens").

Finally, MOHELA does not dispute that Missouri will not be legally responsible for a money judgment against MOHELA. Although MOHELA asserts that a money judgment could threaten Missouri with "financial injury," it "acknowledges this Court's recent statement that '[t]he focus of this judgment liability issue is on direct legal liability and not on any indirect or practical loss of funds to the state.' *Hennessey*, 53 F.4th at 529." MOHELA Br. 44. MOHELA seeks to downplay the importance of the absence of direct legal liability to the state. *See id.* But this Court has explained that "the potential payment from the state treasury is the most critical factor in determining whether an entity is operating as an arm of the state." *Hennessey*, 53 F.4th at 529 (quoting *Fresenius Med. Care Cardiovascular Res., Inc. v. P.R. & Caribbean Cardiovascular Ctr. Corp.*, 322 F.3d 56, 66 (1st Cir. 2003)).

In sum, the second step of the *Hennessey* analysis, like the first, confirms that MOHELA is not an arm of Missouri and, therefore, may not invoke Missouri's sovereign immunity.

## II.    FCRA waives federal sovereign immunity.

FCRA extends civil liability to "[a]ny person" for negligently or willfully failing "to comply with any requirement imposed" by the statute.

20

15 U.S.C. §§ 1681n & 1681o. These provisions, in combination with FCRA's definition of "person," expressly waive the government's immunity from suit. *See Fin. Oversight & Mgmt. Bd. for P.R. v. Centro de Periodismo Investigativo, Inc.*, No. 22-96, 2023 WL 3356529, at *5 (U.S. May 11, 2023) (holding that a statute waives sovereign immunity when it "creates a cause of action and authorizes suit against a government on that claim").

Although the word "person" "is usually presumed to not include the sovereign," this presumption "only applies 'in the absence of an express statutory definition.'" *Kirtz v. Trans Union LLC*, 46 F.4th 159, 164 (3d Cir. 2022) (quoting *Return Mail, Inc. v. U.S. Postal Serv.*, 139 S. Ct. 1853, 1861–62 (2019) (brackets removed)), *petition for cert. filed*, No. 22-846 (Mar. 3, 2023). "When a statute includes an explicit definition, [the courts] must follow that definition." *Digital Realty Tr., Inc. v. Somers*, 138 S. Ct. 767, 776–77 (2018) (quoting *Burgess v. United States*, 553 U.S. 124, 130 (2008)). Here, FCRA defines the term "person" to include "any … government or governmental subdivision or agency," 15 U.S.C. § 1681a(b), a phrase that unambiguously "encompasses the United States and its agencies," *Kirtz*, 46 F.4th at 165. USDOE does not dispute

that it is a "governmental … agency" and, therefore, falls within FCRA's definition of "person."

FCRA's definition of "person" applies to the use of the term "person" in sections 1681n and 1681o because "[s]tatutory definitions control the meaning of statutory words." *Burgess*, 553 U.S. at 129 (internal quotation marks omitted). Confirming that black-letter principle, 15 U.S.C. § 1681a(a) explicitly directs that the "[d]efinitions and rules of construction set forth in [section 1681a] are applicable for the purposes of" the entire "subchapter" in which FCRA's provisions are codified. Section 1681a(a) thus leaves "no doubt as to the definition's reach." *Digital Realty Tr.*, 138 S. Ct. at 777.

USDOE offers several disparate arguments in an attempt to avoid the outcome compelled by the statutory text. Those arguments lack merit.

**A.** USDOE begins with a historical argument. It argues that, because sections 1681n and 1681o originally extended civil liability only to "'consumer reporting agenc[ies]'" and "'user[s] of information,'" rather than "person[s]," the original statute "did not waive the sovereign immunity of the United States." USDOE Br. 16 (quoting Fair Credit

22

Reporting Act, Pub. L. No. 91-508, tit. VI, §§ 616–617, 84 Stat. 1127, 1134 (1970) (1970 Act)). "Against that background," it contends, Congress's decision in 1996 to extend FCRA's civil-liability provisions to "person[s]" "cannot properly be construed to have silently subjected the United States to suits for money damages." *Id.* at 17; *see* Consumer Credit Reporting Reform Act of 1996, Pub. L. No. 104-208, div. A, tit. II, subtit. D, ch. 1, § 2412, 110 Stat. 3009-426, 3009-446 (1996 Amendment).

Other courts of appeals have rejected USDOE's premise that the original FCRA did not waive sovereign immunity. *See Kirtz*, 46 F.4th at 167–68 (positing that the United States may have been liable as a "user" of consumer credit information); *Mowrer v. U.S. Dep't of Transp.*, 14 F.4th 723, 730 n.1 (D.C. Cir. 2021) (same); *but see Daniel v. Nat'l Park Serv.*, 891 F.3d 762, 775 (9th Cir. 2018) (suggesting the opposite conclusion). "In any event, even if the [USDOE] is correct that the 1970 Act did not waive sovereign immunity," the 1996 Amendment did so "in clear and unambiguous terms" when it "authorize[d] suits against all 'persons,' including the United States." *Kirtz*, 46 F.4th at 168. Congress's authorization did not happen "silently," as USDOE contends, Br. 17, but by employing a defined term to amend the text of FCRA's civil-liability

provisions. "Congress' choice of words is presumed to be deliberate," as are "its structural choices." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 353 (2013). And "the normal assumption is that where Congress amends only one section of a law, leaving another untouched, the two were designed to function as parts of an integrated whole." *Markham v. Cabell*, 326 U.S. 404, 411 (1945).

**B.** USDOE argues that the Supreme Court's conclusion in *Employees of the Department of Public Health & Welfare v. Department of Public Health & Welfare*, 411 U.S. 279 (1973) (*Employees*), that the Fair Labor Standards Act (FLSA) did not abrogate state sovereign immunity justifies a similar outcome here. USDOE Br. 19–20. In *Employees*, the Court held that, although states were "covered by" the "literal language" of an FLSA amendment, *id.* at 283, the legislative history of the amendment did not reveal a purpose to abrogate state immunity, *id.* at 285.

As the Third Circuit recognized, the mode of analysis used in the 1973 opinion in *Employees* has been superseded by more recent case law, which "makes clear that [the] analysis must begin and end with the text." *Kirtz*, 46 F.4th at 169 n.11; *see FAA v. Cooper*, 566 U.S. 284, 291 (2012)

("What we thus require is that the scope of Congress' waiver be clearly discernable from the statutory text in light of traditional interpretive tools."). Indeed, the United States itself has recently advised the Supreme Court that "legislative history 'generally will be irrelevant to a judicial inquiry into whether Congress intended to abrogate' … sovereign immunity, especially … where the statutory text is clear in categorically abrogating sovereign immunity." Br. for U.S. as Amicus Curiae Supporting Respondent at 33, *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Coughlin*, No. 22-227 (filed Mar. 31, 2023) (quoting *Dellmuth v. Muth*, 491 U.S. 223, 230 (1989)). Not surprisingly, no other court of appeals to consider the question of sovereign immunity under FCRA has considered *Employees* relevant to the analysis. And no other case cited by USDOE countenances the use of legislative history to override clear statutory text.[1]

---

[1] None of the trio of cases that USDOE claims Mr. Good "ignore[d]" rehabilitates *Employees*. *See* USDOE Br. 20–21 (citing *United States v. Idaho ex rel. Director, Idaho Dep't of Water Res.*, 508 U.S. 1, 7 (1993); *Library of Cong. v. Shaw*, 478 U.S. 310, 323 (1986); *United States v. Chem. Found.*, 272 U.S. 1, 21 (1926)). Those cases have no relevance to this case other than recognizing the existence of the sovereign-immunity canon.

USDOE responds that *Employees* "relied not only on the legislative history but also on the absence of 'clear language' in the statute." USDOE Br. 38 (quoting 411 U.S. at 285). But *Employees*' search for clear language in the statute cannot be divorced from its examination of the legislative history: It was only because the Court "found not a word in the history of the [FLSA] amendments to indicate a purpose of Congress to make it possible for a citizen of that State or another State to sue the State in the federal courts" that it concluded that the statutory language was insufficient to overcome the legislative history's silence. 411 U.S. at 285.

Moreover, to the extent that legislative history is relevant, *see* USDOE Br. 29–31, the history here supports reading FCRA's unambiguous text to waive the government's immunity. As explained in the opening brief, Good Br. 53–55, Congress enacted the 1996 Amendment to strengthen the credit reporting system by requiring furnishers to investigate consumer disputes and make necessary corrections. Congress's expansion of FCRA's civil-liability provisions to "person[s]" was part and parcel of its decision to regulate furnishers. S. Rep. No. 103-209, at 7 (1993). Unlike in *Employees*, where "private enforcement of the [FLSA] was not a paramount objective," 411 U.S. at

286, Congress understood that FCRA "was designed to be largely self-enforcing" and that "the capacity of consumers to bring private actions to enforce their rights under the statute is at least equally important" as federal enforcement. S. Rep. No. 103-209, at 6 (quoting testimony by the Federal Trade Commission's Director of Credit Practices). Because the federal government is the "nation's largest lender and creditor," USDOE Br. 31, it furnishes much of the information that appears on consumers' credit reports. Thus, "authorizing enforcement against the federal government" for violating its furnisher responsibilities advances FCRA's goal of promoting "'fair and accurate credit reporting.'" *Kirtz*, 46 F.4th at 174 (quoting 15 U.S.C. § 1681(a)(1)).[2]

**C.** USDOE argues that the Court should apply the sovereign-immunity canon and interpret "person" in sections 1681n and 1681o to exclude federal agencies because such a reading is plausible. USDOE Br. 21–22. That argument rests on the idea that FCRA's definition of

---

[2] USDOE's reliance on Congressional Budget Office estimates is misplaced. *See* USDOE Br. 30–31. "[T]he 'CBO is not Congress,' … and its expertise is calculating costs, not statutory interpretation." *Kirtz*, 46 F.4th at 169 n.10 (quoting *Sharp v. United States*, 580 F.3d 1234, 1239 (Fed. Cir. 2009)).

"person" applies to the statute's substantive provisions, but not to its remedial provisions, including the civil-liability provisions. *Id*. That reading is not plausible, however, because it requires disregarding the statutory text and applicable canons of statutory construction.

Any "distinction" between FCRA's substantive and remedial provisions is "wholly artificial" because "FCRA could not be clearer that its definitions apply to the entire" statute, "and there is nothing in the text of the FCRA's civil liability provisions nor its other enforcement provisions to the contrary." *Kirtz*, 46 F.4th at 166; *see also Mowrer*, 14 F.4th at 730 (stating that "there is no arguable basis for limiting FCRA's definition of 'person' to substantive but not enforcement provisions"). "There is no need … to resort to the sovereign immunity canon" if "there is no ambiguity … to construe." *Richlin Sec. Serv. Co. v. Chertoff*, 553 U.S. 571, 590 (2008).

**D.** USDOE tries to create ambiguity in sections 1681n and 1681o by arguing that applying the statutory definition of "person" to a different section would create absurd results. USDOE Br. 22. Specifically, it focuses on 15 U.S.C. § 1681q, which makes it unlawful for a "person" to use false pretenses to obtain consumer information. *See* USDOE Br. 17,

22, 35. But regardless of whether applying the definition of "person" to the criminal provision would be absurd, USDOE has never suggested that applying the express statutory definition to sections 1681n and 1681o would be absurd.[3] *See* Good Br. 58.

The other FCRA provisions on which USDOE relies also do not create any ambiguity. Sections 1681s(a) and (c) authorize the Federal Trade Commission to enforce FCRA against "person[s]," and create a cause of action under which states may sue "person[s]" that violate the statute. 15 U.S.C. §§ 1681s(a), (c). These outcomes are not absurd, and USDOE acknowledges that Congress may authorize such actions by making its intent "clear." USDOE Br. 22–23.

Similarly, in authorizing punitive damages for willful FCRA violations, section 1681n overrides the "'presumption against the imposition of punitive damages on governmental entities,'" which

---

[3] The Supreme Court's recent decision in *Turkiye Halk Bankasi A.S. v. United States*, 143 S. Ct. 940 (2023), suggests that holding a government entity accountable under criminal law is not absurd. There, the Court held that federal criminal law may be applied to "foreign states or their instrumentalities," subject to the potential existence of common-law immunity. *Id*. at 945–46, 951. The Court noted the "history" of attempts by "the Executive Branch … to subject foreign-government-owned entities to federal criminal investigation." *Id*. at 948.

Congress may do through a "clear expression" of its intent. *Kirtz*, 46 F.4th at 173 (quoting *Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 785 (2000), and citing *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 263–64 (1981)). *See* USDOE Br. 24.

USDOE further argues that interpreting sections 1681n and 1681o to authorize private suits against states would be unconstitutional under *Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996). *See* USDOE Br. 26. That argument "conflate[s] Congress's intent with its power." *Kirtz*, 46 F.4th at 172. Under *Seminole Tribe*, Congress lacks the power under the Commerce Clause to abrogate state sovereign immunity. *See* 517 U.S. at 72–73. But by authorizing states as potential defendants in FCRA actions, Congress expressed its intent that states that violate FCRA may be held liable by courts with jurisdiction over them, including state courts, which have concurrent jurisdiction over FCRA claims, *see* 15 U.S.C. § 1681p, and federal courts if a state has waived its Eleventh Amendment immunity against suit in federal court. USDOE cites no authority suggesting that it is unconstitutional for Congress to take such action.

USDOE also defends the district court's attempt to draw a negative inference from the waiver of sovereign immunity in 15 U.S.C. § 1681u(j), which creates a cause of action against "[a]ny agency or department of the United States" for obtaining or disclosing consumer reports in violation of section 1681u. *See* USDOE Br. 27–28. But USDOE does not engage with the history of FCRA or the differences between section 1681u and sections 1681n and 1681o. *See* Good Br. 60–61. Instead, USDOE argues that "'differences in language' in the same statute generally 'convey differences in meaning.'" USDOE Br. 27 (quoting *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 86 (2017)). The difference in meaning is apparent, however, and does not support USDOE: Whereas section 1681u(j) addresses actions against the federal government for a discrete breach of duties specific to it and inapplicable to other persons (and provides for a different statutory damages amount than sections 1681n and 1681o), sections 1681n and 1681o create a cause of action against all persons—including governmental agencies—who violate duties under FCRA. *See Kirtz*, 46 F.4th at 170; *Mowrer*, 14 F.4th at 729.

**E.** Finally, USDOE invokes the Privacy Act, which touches on conduct subject to FCRA because it authorizes federal agencies to report

31

information to consumer reporting agencies when the government has a claim against an individual. *See* 5 U.S.C. § 552a(b)(12). USDOE argues that Congress would not have made "the United States liable for money damages under FCRA" where the same conduct would not trigger money damages under the Privacy Act. USDOE Br. 34. Yet USDOE does not deny that it is subject to the *substantive* obligations of both statutes and does not suggest any inconsistency between the Privacy Act and FCRA. Courts typically "give effect to two statutes that overlap, so long as each reaches some distinct cases." *J.E.M. Ag Supply, Inc. v. Pioneer Hi-Bred Int'l, Inc.*, 534 U.S. 124, 144 (2001); *see also Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253 (1992) ("Redundancies across statutes are not unusual events in drafting, and so long as there is no 'positive repugnancy' between two laws, a court must give effect to both." (citation omitted)). And it "would have been quite reasonable for Congress, in enacting the 1996 FCRA amendments, to find that the Privacy Act's remedial scheme, with its strict limit on money damages, was insufficient to ensure the accuracy of consumer credit information." *Kirtz*, 46 F.4th at 176. Accordingly, the Privacy Act offers "no reason to set aside [FCRA's] clear statutory text." *Id*.

## CONCLUSION

This Court should reverse the judgment of the district court and remand the case to the district court for further proceedings.

May 11, 2023

Mark D. Molner
Evans & Mullinix, P.A.
7225 Renner Road, Suite 200,
Shawnee, KS 66217
(913) 962-8700
mmolner@emlawkc.com

Respectfully submitted,

/s/ Nandan M. Joshi
Nandan M. Joshi
Allison M. Zieve
Public Citizen Litigation Group
1600 20th Street NW
Washington, DC 20009
(202) 588-1000
njoshi@citizen.org

*Attorneys for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B). The brief is composed in a 14-point proportional typeface, Century Schoolbook. As calculated by my word processing software (Microsoft Word 365), the brief (excluding those parts permitted to be excluded under the Federal Rules of Appellate Procedure and this Court's rules) contains 6490 words.

<u>/s/ Nandan M. Joshi</u>
Nandan M. Joshi

## CERTIFICATE OF SERVICE

I hereby certify that, on May 11, 2023, the foregoing document was served through the Court's ECF system on counsel for all parties.

<u>/s/ Nandan M. Joshi</u>
Nandan M. Joshi